KEKER & VAN NEST, LLP
JOHN W. KEKER - #49092
DARALYN J. DURIE - #169825
MICHAEL S. KWUN - #198945
CHRISTINE P. SUN - #218701
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188

Attorneys for Defendant and Counterclaimant
GOOGLE TECHNOLOGY INC., sued under its former name
GOOGLE INC.

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

#### SAN FRANCISCO DIVISION

| | |
|---|---|
| OVERTURE SERVICES, INC., a Delaware corporation, | Case No. C 02-01991 JSW (EDL) |
| Plaintiff and Counterdefendant, | **GOOGLE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF (REDACTED VERSION)** |
| v. | Tutorial: October 15, 2003, 2:00 p.m. |
| GOOGLE INC., a California corporation, | Hearing: October 22, 2003, 2:00 p.m. |
| Defendant and Counterclaimant. | Courtroom: 2, 17th Floor |
| | Judge: Hon. Jeffrey S. White |

<u>**PUBLIC VERSION**</u>

**REDACTED**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................1

II.  BACKGROUND ..................................................................................2

   A.   Overview of the '361 Patent ......................................................2

      1.   Search engines "prioritize results in accordance with consumers' preferences" ...................................................2

      2.   The problems the '361 inventors set out to solve: bad search results, and ineffective advertisements ...........................2

      3.   The basics of the "pay for performance" model described in the '361 specification: you get for what you pay for..............3

   B.   Overview of Google AdWords Select ........................................4

III. LEGAL STANDARD ...........................................................................5

   A.   Claim Interpretation Begins With a Review of the Intrinsic Evidence: The Language of the Claims, the Patent Specification, and the File History...................................................5

   B.   Dictionary Definitions, Although Often Useful, Are Never Alone Determinative......................................................6

   C.   The Specification Is Crucial to Defining the Meaning of a Disputed Term...........................................................8

IV.  ARGUMENT ......................................................................................11

   A.   "search listing" and "search result list" .................................11

      1.   The parties' proposed constructions ............................11

         a.   "search listing".................................................11

         b.   "search result list" ...........................................11

      2.   Summary of dispute .....................................................11

      3.   A "search listing" is an entry in (or intended to be in) a search result list...........................................................12

         a.   The definition of "search listing" should not include the phrase "search term"....................................12

         b.   Google's construction is consistent with the ordinary meaning of the claim language, read in light of the specification ...................................................13

i

## TABLE OF CONTENTS
(cont'd)

**Page**

4.    Google's construction of "search result list" is consistent with the ordinary meaning of the claim terms, as used in the specification .................................................................................................13

    a.    A "list" is a series of entries, arranged one after the other ......................................................................................13

    b.    A "search result" is something obtained in response to a search submitted by a consumer using an Internet search engine.........................................................................14

        (i)    Overture's definition does not provide a meaningful definition of "result," and does not provide any definition of "search"......................................14

        (ii)    Google's definition is consistent with the intrinsic evidence ......................................................15

        (iii)    The extrinsic evidence confirms that a search result is different from prior art Internet advertisements that appeared alongside or above search results...................................................17

5.    Google does not contend that a search result list must be displayed .................................................................................18

B.    "[modifiable] bid amount".................................................................18

    1.    The parties' proposed constructions .........................................18

    2.    Summary of dispute ................................................................18

    3.    Googles agrees that the triggering event required by the '361 patent is a click-through.................................................19

    4.    A bid amount is the amount a successful bidder will pay........................20

        a.    The ordinary meaning of "bid amount," read in light of the specification, is the amount the advertiser *will* pay ...............20

        b.    The prosecution history confirms the meaning of "bid amount".................................................................22

        c.    In a patent application it has described as "related" to the '361 patent application, Overture has confirmed that "bid amount" refers to the actual price that will be paid .............23

        d.    The extrinsic evidence supports Google's construction ...............24

# TABLE OF CONTENTS
## (cont'd)

**Page**

(i)    Google's definition is supported by extrinsic evidence concerning Overture's "pay for performance" system .................................................24

(ii)    Google's definition is consistent with eBay's description of an analogous system ....................25

5.    "Modifiable" means the bid amount can be changed by the web site promoter ..............................................................26

C.    "a modifiable bid amount that is *independent of* other components of the search listing"...............................................................27

    1.    The parties' proposed constructions .........................................27

    2.    Summary of dispute ................................................................27

    3.    The ordinary meaning of "independent of" is "unconstrained by"........................................................................................27

    4.    The specification supports Google's interpretation .....................28

D.    The Ordering Limitations ...................................................................30

    1.    The parties' proposed constructions .........................................30

        a.    "ordering . . . *in accordance with* the values of the respective bid amounts"................................................30

        b.    "arranged in an order *determined using* the bid amounts" .............................................................................30

        c.    "arranged in an order *corresponding to* the bid amounts" .............................................................................30

    2.    Summary of dispute ................................................................30

    3.    The dictionary definitions fail to resolve all ambiguities about the definitions of the ordering terms ...........................................30

    4.    Overture has misstated Google's position ..................................32

    5.    The specification supports Google's constructions ....................32

    6.    Google's construction is not in conflict with the principle of claim differentiation..............................................................34

    7.    Overture's definitions would render the claims invalid...........................35

        a.    Overure's definitions are indefinite .............................................35

iii

1
2

# TABLE OF CONTENTS
## (cont'd)

Page

3      (i)      "corresponding to" ............................................................ 36

4      (ii)     "determined using" ........................................................... 37

5      (iii)    "in accordance with" ......................................................... 37

6      b.      If construed as Overture proposes, the claims would be
               invalid for lack of a supporting written description ...................... 37

7

8      E.     "in response to" ................................................................................. 39

       1.      The parties' proposed constructions .............................................. 39
9
       2.      Summary of dispute .................................................................... 40
10
11     3.      The ordinary meaning of "in response to," read in the context
               of the specification, is "in fulfillment of" ...................................... 40

12     F.     "database" ......................................................................................... 41

13     1.      The parties' proposed constructions .............................................. 41

14     2.      Summary of dispute .................................................................... 41

15     3.      The ordinary meaning of "database," read in the context of the
               specification, is broad ................................................................ 42
16
17     G.     "deducted from an account" ................................................................ 43

18     1.      The parties' proposed constructions .............................................. 43

       2.      Summary of dispute .................................................................... 43
19
20     3.      The ordinary meaning of "deduct" is to "subtract" from a total;
               read in view of the specification, this requires a prepaid
               account ..................................................................................... 43
21
22     H.     "account record" ............................................................................... 44

23     I.     "from a/the searcher" ........................................................................ 45

       V.     CONCLUSION ................................................................................... 46
24

25
26
27
28

317500.01

1
# TABLE OF AUTHORITIES

2
**Page(s)**

3
**Cases**

4
*All Dental Prodx, LLC v. Advantage Dental Prods., Inc.,*
5
    309 F.3d 774 (Fed. Cir. 2002) ................................................................... 36

*Allen Eng'g Corp. v. Bartell Indus.,*
6
    299 F.3d 1336 (Fed. Cir. 2002) ................................................................... 6

7
*Amgen Inc. v. Hoechst Marion Roussel,*
    314 F.3d 1313 (Fed. Cir. 2003) ................................................................. 38
8

*Amgen, Inc. v. Chugai Pharm. Co.,*
9
    927 F.2d 1200 (Fed. Cir. 1991) ................................................................. 36

10
*Apple Computer, Inc. v. Articulate Sys., Inc.,*
    234 F.3d 14 (Fed. Cir. 2000) .............................................................. 9, 46
11

*Athletic Alternatives, Inc v. Prince Mfg., Inc.,*
12
    73 F.3d 1573 (Fed. Cir. 1998) ..................................................................... 1

13
*Augustine Med., Inc. v. Gaymar Indus., Inc.,*
    181 F.3d 1291 (Fed. Cir. 1999) ................................................................... 4
14

*Bell Atlantic Network Servs., Inc. v. Covad Comms. Group, Inc.,*
15
    262 F.3d 1258 (Fed. Cir. 2001) ................................................................... 9

16
*Biogen, Inc. v. Berlex Labs., Inc.,*
    318 F.3d 1132 (Fed. Cir. 2003) ............................................................ 8, 23
17

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.,*
18
    246 F.3d 1368 (Fed. Cir. 2001) ................................................................. 34

19
*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,*
    334 F.3d 1294 (Fed. Cir. 2003) ............................................................ 7, 31
20

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.,*
21
    246 F.3d 1336 (Fed. Cir. 2001) ................................................................. 10

22
*Cultor Corp. v. A.E. Staley Mfg. Co.,*
    224 F.3d 1328 (Fed. Cir. 2000) ................................................................... 9
23

*CVI/Beta Ventures v. Tura LP,*
24
    112 F.3d 1146 (Fed. Cir. 1997) ................................................................. 10

25
*Cybor Corp. v. FAS Techs. Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998) (en banc) .................................................. 5
26

*Digital Biometrics, Inc. v. Indentix, Inc.,*
27
    149 F.3d 1335 (Fed. Cir. 1998) ................................................................. 36

28

1

## TABLE OF AUTHORITIES
### (cont'd)

2

**Page(s)**

3

*Elkay Mfg. Co. v. Ebco Mfg. Co.,*
192 F.3d 973 (Fed. Cir. 1999) ......................................................................... 23

4

*Enzo Biochem, Inc. v. Gen-Probe Inc.,*
296 F.3d 1316 (Fed. Cir. 2002) ....................................................................... 38

5

6

*Guttman, Inc. v. Kopykake Enters., Inc.,*
302 F.3d 1352 (Fed. Cir. 2002) ................................................................. 6, 44

7

*Hill-Rom Co. v. Kinetic Concepts, Inc.,*
209 F.3d 1337 (Fed. Cir. 2000) ......................................................................... 8

8

9

*Hormone Res. Found., Inc. v. Genentech, Inc.,*
904 F.2d 1558 (Fed. Cir. 1990) ....................................................................... 35

10

*In re Wilder,*
736 F.2d 1516 (Fed. Cir. 1984) ....................................................................... 38

11

12

*Innovad, Inc. v. Microsoft Corp.,*
260 F.3d 1326 (Fed. Cir. 2001) ....................................................................... 10

13

*Interactive Gift Express, Inc. v. Compuserve Inc.,*
256 F.3d 1323 (Fed. Cir. 2001) ......................................................................... 8

14

15

*Kemode Mfg. Co. v. United States,*
347 F.2d 315 (Ct. Cl. 1965) ............................................................................. 36

16

*Kraft Foods, Inc. v. International Trading Co.,*
203 F.3d 1362 (Fed. Cir. 2000) ................................................................. 6, 35

17

18

*Liebscher v. Boothroyd,*
258 F.2d 948 (C.C.P.A. 1958) ........................................................................... 7

19

*Lockwood v. American Airlines,*
107 F.3d 1565 (Fed. Cir. 1989) ....................................................................... 39

20

21

*Markman v. Westview Instrs., Inc.,*
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996) ............... 6

22

23

*Martin v. Mayer,*
823 F.2d 500 (Fed. Cir. 1987) ......................................................................... 38

24

*Modine Mfg. Co. v. United States Int'l Trade Comm'n,*
75 F.3d 1545 (Fed. Cir. 1996) ........................................................................... 9

25

26

*Morton Int'l v. Cardinal Chem. Co.,*
5 F.3d 1464 (Fed. Cir. 1993) ........................................................................... 36

27

*Multiform Desiccants, Inc. v. Medzam Ltd.,*
133 F.3d 1473 (Fed. Cir. 1998) ................................................................. 7, 35

28

317500.01

1

**TABLE OF AUTHORITIES**
(cont'd)

2

Page(s)

3

*North Am. Vaccine, Inc. v. American Cyanamid Co.,*
7 F.3d 1571 (Fed. Cir. 1994) ............................................................................ 34

4

*O.I. Corp. v. Tekmar Co.,*
115 F.3d 1576 (Fed. Cir. 1997) ........................................................................... 9

5

6

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.,*
320 F.3d 1354 (Fed. Cir. 2003) ........................................................................... 8

7

*Personalized Media Comms., L.L.C. v. International Trade Comm'n,*
161 F.3d 696 (1998) .......................................................................................... 36

8

9

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
182 F.3d 1298 (Fed. Cir. 1999) ..................................................................... 7, 42

10

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,*
237 F.3d 1359 (Fed. Cir. 2001) ................................................................... 10, 38

11

12

*Regents of the Univ. of Cal. v. Eli Lilly & Co.,*
119 F.3d 1559 (Fed. Cir. 1997) ......................................................................... 38

13

14

*Renishaw PLC v. Marposs SpA,*
158 F.3d 1243 (Fed. Cir. 1998) ......................................................... 7, 8, 10, 31

15

*SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.,*
242 F.3d 1337 (Fed. Cir. 2001) ................................................................ 8, 9, 33

16

17

*Seattle Box Co. v. Industrial Crating & Packing, Inc.,*
731 F.2d 818 (Fed. Cir. 1984) ........................................................................... 36

18

*Standard Oil Co. v. American Cyanamid Co.,*
774 F.2d 448 (Fed. Cir. 1985) ........................................................................... 36

19

20

*Storage Tech. Corp. v. Cisco Sys., Inc.,*
329 F.3d 823 (Fed. Cir. 2002) ....................................................................... 6, 17

21

*Tandon Corp. v. United States Int'l Trade Comm'n,*
831 F.2d 1017 (Fed. Cir. 1987) ......................................................................... 35

22

23

*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.* 279
F.3d 1357 (Fed. Cir. 2002) ..................................................................... 4, 35, 39

24

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
299 F.3d 1313 (Fed. Cir. 2002) ........................................................................... 6

25

26

*Telemac Cellular Corp. v. Topp Telecom, Inc.,*
247 F.3d 1316 (Fed. Cir. 2001) ......................................................................... 12

27

*Texas Digital Sys., Inc. v. Telegenix, Inc.,*
308 F.3d 1193 (Fed. Cir. 2002) .............................................................. 1, 5, 6, 7

28

vii

317500.01

**TABLE OF AUTHORITIES**
(cont'd)

**Page(s)**

*Toro Co. v. White Consolidated Indus., Inc.,* 199 F.3d 1295 (Fed. Cir.
     1999) ............................................................................................................... 9

*Tronzo v. Biomet,*
     156 F.3d 1154 (Fed. Cir. 1998) ............................................................... 38, 39

*Unique Concepts, Inc. v. Brown,*
     939 F.2d 1558 (Fed. Cir. 1991) ...................................................................... 12

*United States Surgical Corp. v. Ethicon, Inc.,*
     103 F.3d 1554 (Fed. Cir. 1997) ........................................................................ 4

*Vas-Cath v. Mahurkar,*
     935 F.2d 1555 (Fed. Cir. 1991) ...................................................................... 38

*Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.,*
     200 F.3d 795 (Fed. Cir. 1999) .......................................................................... 4

*Wang Labs., Inc. v. America Online, Inc.,*
     197 F.3d 1377 (Fed. Cir. 1999) ........................................................... 9, 35, 39

*Watts v. XL Sys., Inc.,*
     232 F.3d 877 (Fed. Cir. 2000) ...................................................................... 8, 9

**Statutes**

35 U.S.C. § 112 ............................................................................................ 35, 37, 38

**Regulations**

37 C.F.R. § 1.104 ..................................................................................................... 23

37 C.F.R. § 1.72 ......................................................................................................... 8

65 F.R. 54604 (Sept. 8, 2000) ................................................................................. 23

GOOGLE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. C 02-01991 JSW (EDL)

317500.01

# I.    INTRODUCTION[1]

Overture's Opening Brief demonstrates a slavish devotion to selected dictionary definitions, while ignoring the fact that such definitions are only one part of the claim construction inquiry.  Overture overlooks the fact that well-established precedent – including *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193 (Fed. Cir. 2002), the case it cites repeatedly – also requires that claims be construed in view of the patent specification and file history.

Overture's failure to address the patent specification and file history leads to two fundamental problems.  ***First***, Overture frequently proposes that the Court simply replace each of the disputed words with synonyms found in dictionaries.  These purported definitions may be accurate as far as they go, but they fail to shed any light on the crucial interpretive disputes that must be resolved in order for the court (or a jury) to address the ultimate issues of invalidity and non-infringement.

***Second***, by ignoring its own description of the purported invention, Overture seeks to enlarge the scope of some of the patent's claim terms in ways that are fundamentally inconsistent with the stated purpose of the invention.  At the same time, Overture recognizes that the meaning of *other* claim terms is constrained by the invention that is described in the specification.  Overture has thus failed to follow the "predictable claim construction analysis [that] is essential to the patent system."  *Athletic Alternatives, Inc v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1998).

For the reasons expressed below, Google submits that principles of claim construction –

---

[1] We recognize that brevity is the soul of wit.  This brief may not be witty, but we believe that it is as brief as it reasonably can be.  Google notes that the Honorable Jeffrey S. White's Standing Order provides that briefs "in support of, or opposition to, any motion, with the exception of summary judgment motions, may not exceed fifteen pages."  Standing Order ¶ 7.  It is Google's understanding that claim construction proceedings, which are mandated by the Patent Local Rules and which are not based on the filing of any notice of motion or motion pursuant to the Federal Rules of Civil Procedure or Civil Local Rule 7-2, are not "motions," and that the Court's page limits therefore do not apply.  If the Court concludes that this brief is subject to a page limit, then Google respectfully requests leave to file this brief as an oversized brief.  Google will, of course, file a shorter brief should the Court so direct, but respectfully submits that good cause exists for the filing of this brief in its present form.

1

317500.01

construing the claim language in light of the ordinary meaning of the terms, read in light of the specification – support its constructions, and yield interpretations that are faithful to the purpose of the invention, as explained by the inventors themselves.

## II.    BACKGROUND

### A.    Overview of the '361 Patent[2]

#### 1.    Search engines "prioritize results in accordance with consumers' preferences"

The '361 patent claims a purportedly novel method of doing what search engines are supposed to do – "prioritize results in accordance with consumers' preferences." Patent at 2:65-67.[3] The results delivered by search engines are based on queries entered by searchers. *Id.* at 2:42-46. "[S]earch services . . . enable consumers to search the Internet for a listing of web sites based on a specific topic, product, or service of interest." *Id.* at 2:32-35. The *raison d'être* of a search engine is to "deliver relevant information . . . to interested parties." *Id.* at 3:43-44.

#### 2.    The problems the '361 inventors set out to solve:  bad search results, and ineffective advertisements

According to the '361 inventors, pre-existing search engines were ill-equipped to achieve their goals for two reasons.  First, these prior art search engines, which "rel[ied] in large part on complex, mathematics-based database search algorithms that select and rank web pages based on multiple criteria such as keyword density and keyword location," *id.* at 2:48-53, sometimes returned "random and even irrelevant" search results, *id.* at 2:55, and failed properly to prioritize

---

[2] Patent claims are written for the hypothetical person skilled in the relevant art.  *See, e.g., Generation II Orthotics Inc. v. Medical Tech. Inc.,* 263 F.3d 1356, 1366-67 (Fed. Cir. 2001) ("the viewing glass through which the claims are construed is that of a person skilled in the art").  Based on the '361 specification's description of the claimed invention, a person skilled in the art is knowledgeable about Internet search services and Internet advertising.

Because Overture's Opening Brief fails to propose a definition of a person skilled in the art, Google's definition is uncontested.

**REDACTED**

[3] Citations herein to the "Patent" are citations to the '361 patent, a copy of which appears as Overture *Markman* Exh. 1.  Citations to specific columns and lines in a patent are in the form ___:___, where the number before a colon indicates the column number, and the number or numbers after a colon indicate the line number or numbers.

GOOGLE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. C 02-01991 JSW (EDL)

317500.01

1  search results according to the searcher's preferences, *id.* at 2:65-67.

2       Second, traditional Internet advertising methods, such as "banner" advertisements, often

3  generated little consumer interest.  *Id.* at 3:16-33.  Even banner advertisements that were targeted

4  to search terms, *id.* at 3:28-30, often failed to deliver a good return on investment.  Interest in

5  such traditional advertisements was low, because "visitors to a web site seek specific information

6  and may not be interested in the information announced in the banner."  *Id.* at 3:36-38.

7       In their patent, the '361 inventors propose a single solution to both these problems:

8  "[W]eb site promoters should be able to control their placement in search result listings so that

9  their listings are prominent in searches that are relevant to the content of their web site."  *Id.* at

10  3:51-54.  According to the inventors, this would make search results more relevant, because

11  advertisers would "have an incentive to select and bid on those search keyword that are most

12  relevant to their web site offerings."  *Id.* at 4:1-2.  Moreover, by allowing advertisers to place

13  their advertisements in the search results themselves, advertisers would be provided with a "cost-

14  effective way to target consumers."  *Id.* at 3:58.

15       **3.    The basics of the "pay for performance" model described in the '361**
          **specification:  you get for what you pay for**

16

17       The '361 abstract succinctly describes the inventors' claimed invention.  Advertisers

18  submit "search listings" having a description, at least one search term, and a bid amount.  *See id.*,

19  Abstract.  Advertisers bid on search terms "through a continuous online competitive bidding

    process."  *Id.*  The inventors later describe this process as a "pay-for-performance" process that
20

21  "applies market principles to advertising on the Internet."  *Id.* at 5:1-5.  "A higher bid . . . will

22  result in a higher rank value and a more advantageous placement."  *Id.*  The described invention

23  thus embodies an old adage:  you get what you pay for.

24       Overture's inventors do not claim to have invented any of the elements that make up their

25  purported invention.  The idea of keyword-triggered advertisements was well-known, and the

26  inventors concede that others had done it before.  *Id.* at 3:28-30.  Selling placement in search

27  engine results had also been tried before, by a company called Open Text.  Declaration of

28

3

GOOGLE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. C 02-01991 JSW (EDL)

1  Michael S. Kwun ("Kwun Decl."), Exh. 1 at OVG 1371 (of record)[4] (1996 article noting that

2  "Open Text Index search engine recently began selling Web site 'preferred' status in its index").

3  The pricing model chosen by the inventors – cost-per-click rather than per-impression pricing,

4  *see, e.g.,* Patent at 5:22-27 – was also someone else's idea; Proctor & Gamble had bargained for

5  cost-per-click advertisements on Yahoo! as early as 1996.  *See* Kwun Decl., Exh. 2 at OVG 1216

6  (of record).  Finally, the notion of selling advertisement placements through an auction had also

7  been tried by others.  *See* Kwun Decl., Exh. 3 at OVG 1124 (of record) (citing articles from 1997

8  that described advertising auctions).  At best, the '361 patent represents a narrow improvement in

9  a crowded field.  *See Augustine Med., Inc. v. Gaymar Indus., Inc.,* 181 F.3d 1291, 1301 (Fed.

10  Cir. 1999) ("non-pioneers . . . must craft narrow claims to evade the strictures of a crowded art

11  field").

12  **B.      Overview of Google AdWords Select**

13  Claims should be construed objectively; the meaning of a claim term does not depend on

14  the method or device accused of infringement.  *See Vivid Techs., Inc. v. American Sci. & Eng'g,*

15  *Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999).  However, because claim construction is for "resolution

16  of disputed meanings," *see id.* (quoting *United States Surgical Corp. v. Ethicon, Inc.,* 103 F.3d

17  1554, 1568 (Fed. Cir. 1997)), some familiarity with the defendant's method or device may be

18  useful in order to allow the court better to understand the areas of dispute.  *Id.*

19  Google has long offered a "traditional" search engine that ranks search results on the

20  basis of their relevance using a complex "PageRank" algorithm.[5]  In February 2002, Google

21  introduced a new service, AdWords Select ("AWS"), *see* <http://www.searchenginewatch.com/

22  searchday/article.php/2159301>,[6] which Overture accuses of infringing the '361 patent.

23

---

24  [4] Articles cited during the prosecution of a patent application are intrinsic evidence.  *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.,* 279 F.3d 1357, 1372 n.4 (Fed. Cir. 2002).

25  In this brief, Google will include "of record" parenthetical references when citing articles that were cited during prosecution. The first four pages of the '361 patent list articles and patents that

26  were cited during prosecution.

[5] *See* <http://www.google.com/technology/index.html> (describing PageRank).

27  [6] SearchEngineWatch.com is a site that is well known as a source of independent analysis in the Internet search industry.

28

317500.01

1    "AdWords advertisements appear on search result pages when a query matches the keywords

2    purchased by advertisers. The advertisements appear to the right of search results, in small

3    boxes labeled 'sponsored links.'" *Id.*

4          AWS advertisements are priced using a cost-per-click model. *Id.* "However, unlike

5    other programs where the highest bidder takes the top placement, Google measures clickthrough

6    rates, or popularity, to help determine the position of an ad." *Id.* "In essence, this means that if

7    one ad is twice as effective as another ad, Google will rank the first ad as if its maximum cost-

8    per-click were double what the advertiser actually set . . . ." *Id.*

9          AWS also incorporates a feature called the "AdWords Discounter." *Id.* The AdWords

10    Discounter "monitors all bids placed for keywords, constantly on the lookout for changes. If a

11    competitor's bid drops on a keyword, the discounter automatically lowers your bid . . . ." *Id.*

### III.    LEGAL STANDARD

**A.    Claim Interpretation Begins With a Review of the Intrinsic Evidence: The Language of the Claims, the Patent Specification, and the File History**

15          The interpretation of patent claims is a question of law to be decided by the Court. *Cybor*

16    *Corp. v. FAS Techs. Inc.,* 138 F.3d 1448, 1454-56 (Fed. Cir. 1998) (en banc). Overture

17    repeatedly cites *Texas Digital* in support of its assertion that claim terms ought to be construed

18    based on their dictionary definitions. But *Texas Digital* cautions that one must consult the

19    intrinsic evidence:

> By examining relevant dictionaries, encyclopedias, and treatises to ascertain
> possible meanings that would have been attributed to the words of the claims by
> those skilled in the art, *and by further utilizing the intrinsic record to select from*
> *those possible meanings the one or ones most consistent with the use of the words*
> *by the inventor,* the full breadth of the limitations intended by the inventor will be
> more accurately determined and the improper importation of unintended
> limitations from the written description into the claims will be more easily
> avoided.

24    *Id.* at 1205 (emphasis added). Thus *Texas Digital* makes clear that dictionary definitions of

25    claim terms, alone, are insufficient. The *Texas Digital* approach is consistent with numerous

26    decisions of the Federal Circuit, both before and after *Texas Digital,* that make clear that the

27    process of interpreting claims is more sophisticated than Overture suggests.

28          In construing the claims of a patent, courts first consider three sources: the language of

5

1   the claims, the patent specification and the prosecution history.  *Markman v. Westview Instrs.,*

2   *Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996).  Collectively, the

3   claims, specification, and prosecution history, which are the intrinsic evidence, are "the most

4   significant source of the legally operative meaning of disputed claim language."  *Teleflex, Inc. v.*

5   *Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed. Cir. 2002) (quotation marks and citation

6   omitted).

7        "We begin our claim construction analysis, as always, with the words of the claim."  *Id.*

8   at 1324.  Words in the claim are given their ordinary meaning unless the patentee gives special

9   meaning to them in the specification or prosecution history.  *Kraft Foods, Inc. v. International*

10  *Trading Co.,* 203 F.3d 1362, 1366 (Fed. Cir. 2000).  Dictionaries and treatises are often helpful

11  sources in determining the ordinary meaning of claim language.  *Texas Digital,* 308 F.3d at

12  1203.  "The specification acts as a dictionary when it expressly defines terms used in the claims

13  or when it defines terms by implication."  *Guttman, Inc. v. Kopykake Enters., Inc.,* 302 F.3d

14  1352, 1360 (Fed. Cir. 2002) (quotation marks and citation omitted).  In addition, the prosecution

15  history "is often of critical significance in determining the meaning of the claims."  *Allen Eng'g*

16  *Corp. v. Bartell Indus.,* 299 F.3d 1336, 1345 (Fed. Cir. 2002) (quotation marks and citation

17  omitted).

18       If the intrinsic evidence fails to resolve all ambiguities about the meaning of the claim

19  language, the Court may rely upon extrinsic evidence.  *Storage Tech. Corp. v. Cisco Sys., Inc.,*

20  329 F.3d 823, 832 (Fed. Cir. 2002).  Extrinsic evidence may be used to educate the Court about

21  the technology or to provide definitions of terms of art, but may not be used to contradict the

22  terms of the claims.  *Markman,* 52 F.3d at 980.

23  **B.    Dictionary Definitions, Although Often Useful, Are Never Alone Determinative**

24       Dictionaries and treatises "are always available to the court to aid in the task of

25  determining meanings that would have been attributed by those of skill in the relevant art to any

26  disputed terms used by the inventor in the claims."  *Texas Digital,* 308 F.3d at 1208.  Consulting

27  dictionaries and treatises is particularly helpful "to ensure that [the Court's] understanding of the

28  *technical* aspects of the patent is not entirely at variance with the understanding of one skilled in

1   the art." *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1309 (Fed. Cir. 1999)

2   (emphasis added).

3        However, as the Federal Circuit cautioned as recently as June of this year, "precedent

4   referencing the use of dictionaries should not be read to suggest that abstract dictionary

5   definitions are alone determinative." *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,* 334 F.3d

6   1294, 1300 (Fed. Cir. 2003). To the contrary, "a common meaning, such as one expressed in a

7   relevant dictionary, that flies in the face of the patent disclosure is undeserving of fealty."

8   *Renishaw PLC v. Marposs SpA,* 158 F.3d 1243, 1250 (Fed. Cir. 1998). "While dictionaries and

9   treatises are useful resources in determining the ordinary and customary meaning or meanings of

10  disputed claim terms, the correct meaning of a word or phrase is informed only by considering

11  the surrounding text." *Brookhill Wilk 1,* 334 F.3d at 1300.

12       Dictionary definitions must be applied with care. "Courts must exercise caution lest

13  dictionary definitions . . . be converted into technical terms of art having legal, not linguistic,

14  significance." *Multiform Desiccants, Inc. v. Medzam Ltd.,* 133 F.3d 1473, 1478 (Fed. Cir. 1998);

15  *see also Renishaw,* 158 F.3d at 1250 ("Indiscriminate reliance on definitions found in

16  dictionaries can often produce absurd results.") (quoting *Liebscher v. Boothroyd,* 258 F.2d 948,

17  951 (C.C.P.A. 1958)). The Court should reject dictionary definitions that "hav[e] no relation to

18  the claimed invention." *Texas Digital,* 308 F.3d at 1203. Instead, the Court should look for the

19  definition that is "is most consistent with the use of the words by the inventor." *Id.* Only if there

20  are multiple definitions that are "most consistent" with the usage in the specification should the

21  claims be construed to encompass all of those meanings. *See id.; see also id.* at 1205 (claim

22  construction requires selecting from among the ordinary meanings for the claim terms "the one

23  or ones *most* consistent with the use of the words by the inventor" (emphasis added)).

24       Regardless of the dictionary definitions proffered by the parties, "if the inventor has

25  disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion

26  or restriction," the inventor's description of his invention will control. *Id.* Even where there is

27  no expression of "manifest" exclusion, if the specification "uses the words in a manner clearly

28  inconsistent with . . . a dictionary definition," that definition should be rejected. *Id.* Thus, "the

7

1   construction that stays true to the claim language and most naturally aligns with the patent's

2   description of the invention will be, in the end, the correct construction." *Renishaw,* 158 F.3d at

3   1250.

4   **C.    The Specification Is Crucial to Defining the Meaning of a Disputed Term**

5        "Claims must be read in view of the specification, of which they are a part." *Markman,*

6   52 F.3d at 979.  The specification "is the single best guide to the meaning of a disputed term."

7   *Guttman,* 302 F.3d at 1360 (quotation marks and citation omitted).  The Court must "look to the

8   specification to ascertain the meaning of the claim term as it is used by the inventor in the

9   context of the entirety of his invention."  *Interactive Gift Express, Inc. v. Compuserve Inc.,* 256

10  F.3d 1323, 1332 (Fed. Cir. 2001) (internal quotation marks and citation omitted).  An inventor's

11  description of his or her invention in the patent's abstract is particularly relevant to determine the

12  invention's scope.  *See Pandrol USA, LP v. Airboss Ry. Prods., Inc.,* 320 F.3d 1354, 1363 (Fed.

13  Cir. 2003) (relying on "[b]oth the abstract and the preferred embodiment" to construe claim

14  language).  The Federal Circuit has "frequently looked to the abstract to determine the scope of

15  the invention."  *Hill-Rom Co. v. Kinetic Concepts, Inc.,* 209 F.3d 1337, 1341 n.* (Fed. Cir.

16  2000); *see also Biogen, Inc. v. Berlex Labs., Inc.,* 318 F.3d 1132, 1136 (Fed. Cir. 2003)

17  (interpreting claims in light of the abstract).[7]

18       The Court should examine the specification "to determine if the patentee has limited the

19  scope of the claims."  *Watts v. XL Sys., Inc.,* 232 F.3d 877, 882 (Fed. Cir. 2000).  For example,

20  where the specification describes a feature as being part of the "present invention," that is

21  "strong evidence" that the scope does not extend to features contrary to the one described.

22  *SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1343 (Fed. Cir. 2001).

23  As the Federal Circuit has explained:

24       Where the specification makes clear that the invention does not include a
         particular feature, that feature is deemed to be outside the reach of the claims of
25       the patent, even though the language of the claims, read without reference to the
         specification, might be considered broad enough to encompass the feature in
26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [7] Patent Examiners are not allowed to use the abstract to interpret claims, 37 C.F.R. § 1.72(b),
    but that is "a rule of the Patent and Trademark Office that governs the conduct of patent
28  examiners in examining patent applications; it does not address the process by which courts
    construe claims in infringement actions."  *Hill-Rom,* 209 F.3d at 1341 n.*.

8

317500.01

1    question.

2    *Id.* at 1341.

3        In *Watts,* the court interpreted the term "sealingly connected" to mean sealingly

4    connecting *using a varying taper angle,* based on the specification's description of the invention

5    as using that feature.  232 F.3d at 883.  Similarly, although the parties in *Wang Labs., Inc. v.*

6    *America Online, Inc.,* 197 F.3d 1377 (Fed. Cir. 1999), agreed that the claim term "frame" could,

7    considered in isolation, apply both to bit-mapped and character-based display systems, because

8    only the latter type of system was both described and enabled by the specification, the court

9    concluded that bit-mapped systems were outside the scope of the patent.  *Id.* at 1164.  And in

10   *SciMed,* the court construed claim language requiring an "inflation lumen" separate from a

11   "guide wire lumen" to mean coaxial lumens (one in which the inflation lumen surrounds the

12   guide wire lumen) and not to mean side-by-side lumens, because the repeated descriptions in the

13   specification of coaxial lumens "[r]ead together . . . lead to the inescapable conclusion" that the

14   claim language, though otherwise subject to a broader reading, had to be construed narrowly.

15   242 F.3d at 1342.[8]

16       Claims "must be interpreted in light of the teachings of the written description and

17   purpose of the invention described therein."  *Apple Computer, Inc. v. Articulate Sys., Inc.,* 234

18   F.3d 14, 25 (Fed. Cir. 2000) (relying on description "in great detail" in the specification in

19   construing the claim term "help access window").  Courts also may properly reject proposed

20   constructions that encompass subject matter outside the stated purpose of the invention.

21

22   [8] *See also Cultor Corp. v. A.E. Staley Mfg. Co.,* 224 F.3d 1328, 1331 (Fed. Cir. 2000) (explicit
     description in the specification requiring the use of a citric acid catalyst was a disclaimer of
23   methods using other acid catalysts); *O.I. Corp. v. Tekmar Co.,* 115 F.3d 1576, 1581 (Fed. Cir.
     1997) (district court properly construed claim term "passage" to mean the specific type of
24   passage disclosed in a preferred embodiment); *Toro Co. v. White Consolidated Indus., Inc.,*
     199 F.3d 1295, 1302 (Fed. Cir. 1999) (limitation of "including" a restriction ring mean
25   permanent attachment of a restriction ring, where the specification described a unitary structure
     as being important to the invention); *Bell Atlantic Network Servs., Inc. v. Covad Comms. Group,*
26   *Inc.,* 262 F.3d 1258, 1271-73 (Fed. Cir. 2001) (construing "mode" narrowly, where the
     specification consistently implied a narrow meaning for that term).  Describing an embodiment
27   as a "preferred" embodiment does not necessarily change this principle.  Where an embodiment
     is described as the invention itself, the scope of the claims should be construed with reference to
28   that description.  *Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1551
     (Fed. Cir. 1996).

9

317500.01

*Innovad, Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1332 (Fed. Cir. 2001) (excluding feature from scope of claim that contradicted stated purpose of invention); *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.,* 246 F.3d 1336, 1349 (Fed. Cir. 2001) (rejecting construction that "would contradict the clear purpose of the invention"); *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,* 237 F.3d 1359, 1364 (Fed. Cir. 2001) (district court properly relied on the "fundamental purpose and significance" of the invention in construing claims); *CVI/Beta Ventures v. Tura LP,* 112 F.3d 1146, 1159 (Fed. Cir. 1997) (adopting construction that "is consistent with and furthers the purpose of the invention").

Reliance on the specification to clarify claim terms should not be confused with the prohibited practice of simply reading limitations from the specification into a claim. *See Renishaw,* 158 F.3d at 1248. The claim construction inquiry is limited to defining words that actually appear in the claims; statements in the specification that do not relate to words that actually appear in a claim cannot be used to the limit the claim. *See id.* ("a party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements"). However, where the specification clarifies the meaning of a claim term, for example by providing a "patent disclosure of singular purpose," courts are entitled to rely upon the context provided by the specification to define the scope of the claims. *Id.* at 1251-53 (construing "when" narrowly in light of the specification).

**REDACTED**

10

# IV.    ARGUMENT

## A.    "search listing" and "search result list"

### 1.    The parties' proposed constructions

#### a.    "search listing"

| Google's Proposed Construction | Overture's Proposed Construction |
|---|---|
| an entry in (or intended to be in) a search result list | a collection of information that includes at least one search term and that can be included in a search result list |

#### b.    "search result list"

| Google's Proposed Construction | Overture's Proposed Construction |
|---|---|
| the series of entries, selected from the database being searched by a searcher, arranged one after the other, containing the information responsive to the searcher's search | a set of search listings that is obtained by calculation |

### 2.    Summary of dispute

Google has defined a search listing as an entry that is or is intended to be in a search result list, and a "search result list" as a series of such entries arranged one after the other (i.e. a "list"). Overture's definitions are both artificially narrower (requiring that search listings include at least one search term), and potentially broader than the scope of the invention disclosed (search listings in a search result list merely must be a "set" of search listings that is "obtained by calculation").

The parties also dispute whether the search result list must be responsive to the searcher's inquiry. Google contends that the search result list must be in fulfillment of the consumer's request for information, whereas Overture's proposed construction includes no analogous limitation. This dispute is relevant to infringement because Google contends that the list generated by AWS is not in response to the search request. Instead, a searcher using Google's site requests and receives a list generated by a Google "web search" server – that is, search listings from Google's neutral and unpaid database of web sites, ordered using Google's PageRank algorithm. The searcher also receives a list of advertisements displayed next to the

PageRank results, which is *not* the information that the searcher has requested.  Thus, if the Court adopts Google's construction, the list generated by AWS will not be a "search result list" as claimed by the '361 patent.[9]

### 3.    A "search listing" is an entry in (or intended to be in) a search result list

#### a.    The definition of "search listing" should not include the phrase "search term"

In their brief summary of their purported invention, the inventors describe three distinct aspects of the invention, which "enable a web site promoter to [1] define a search listing for a search result list, [2] select a search term relevant to the promoter's web site, and [3] influence a search result position for the search listing on an Internet search engine."  Patent at 4:55-60.  Those three aspects correspond to (1) the search listing; (2) the search term; and (3) the bid amount.  Overture's proposed definition for "search listing," however, *already includes a search term.*  If Overture's definition were correct, the act of defining a search listing would necessarily include choosing a search term, and thus there would be no need further to state that the web site promoter "select[s] a search term."  *Id.* at 4:58.

If every "search listing" by definition includes at least one search term, then there would be no need expressly to require that the search listings recited in the claims must be associated with at least one search term, *see, e.g., id.* at 22:64-67 (claim 1), because that requirement would already be implicit in the requirement of a search listing.  *See Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1325 (Fed. Cir. 2001) (rejecting claim construction that would render other express claim language mere surplusage); *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1562 (Fed. Cir. 1991) (claims should generally be interpreted to render all the limitations in the claim meaningful).

---

[9] Overture's Opening Brief emphasizes another point:  the fact that search listings exist independent of whether they are included in a search result list.  *See, e.g.,* Opening Brf. at 8:9-11 (arguing that a search listing "exists on its own, regardless of whether it has been aggregated with other listings").  This, however, is not disputed.  Indeed, during the meet-and-confer process that led to the filing of the joint claim construction statement, and after reading Overture's preliminary construction, Google amended its construction to include the parenthetical phrase "or intended to be in" in recognition of the fact that a search listing is a listing even before it is included in a search result – and, indeed, even if it is never included in a search result list.

1    Overture's approach also suffers from a lack of internal consistency.  Every claim also

2    requires that each search listing be associated with, include, or have a bid amount.  Overture's

3    definition arbitrarily incorporates some extraneous claim language (search term) but not other

4    such language (bid amount).  Overture offers no reason to incorporate one limitation, but not the

5    other, into its definition of a search listing.

6    Finally, Overture's approach is inconsistent with the specification, which describes prior

7    art search systems in which the listings were not necessarily tied to search terms.  *See* Patent at

8    2:42-67.  In these prior art systems, "search algorithms select and rank web pages based on

9    multiple criteria such as keyword density and keyword location." *Id.* at 2:48-53.  In fact, the

10   specification makes clear that unpaid listings, which will not include bid amount-search term

11   pairings, can be included in a search result list. *Id.* at 10:27-35.

### b.    Google's construction is consistent with the ordinary meaning of the claim language, read in light of the specification

12

13   Google simply defines a "search listing" as an entry in a search result list (or, because

14   listings exist prior to actually being in search results, an entry that is intended to be in a search

15   result list).  Coupled with Google's definition of "search result list," discussed below, this

16   definition is consistent with both the ordinary meaning of the claim language and the

17   specification.

### 4.    Google's construction of "search result list" is consistent with the ordinary meaning of the claim terms, as used in the specification

18

19

20   The Court should begin by considering the ordinary meaning of the claim terms, read in

21   light of the specification.  Because a "search result list" is a *list* of *search results,* Google will

22   begin by addressing the word "list."

### a.    A "list" is a series of entries, arranged one after the other

23

24   A "list" is, as Google proposes, an ordered series of entries, and not merely a "collection

25   of information" or a "set" of search listings.  Google's definition is consistent with the ordinary

26   meaning of the word "list."  American Heritage defines a "list" as "a series of names, words, or

27   other items written, printed, or imagined one after the other[.]"  Kwun Decl., Exh. 4 at 1021.

28   The New Oxford Dictionary of English similarly defines a list as "a number of connected items

1   or names written or printed consecutively, typically one below the other[.]"  Kwun Decl., Exh. 5

2   at 1076.  The word "set" does not imply any sort of order, while "list" does.

3           Google's definition is also consistent with the language of the claims, each of which

4   indicates that a "list" is what one gets after placing search listings *in an order*.  Patent at 23:11-

5   12 (claim 1, "ordering the identified search listings into a search result list"); *id.* at 24:1 (claim

6   11, same); *id.* at 24:27-28 (claim 13, same); *id.* at 25:33-35 (claim 14, "the search result list

7   arranged in an order determined using the bid amounts"); *id.* at 27:2-3 (claim 30, "the search

8   result list arranged in an order corresponding to the bid amounts"); *id.* at 28:50-51 (claim 52,

9   same).

10          The context supplied by the patent specification also supports Google's definition.  The

11  specification consistently uses the term "search result list" to refer to an *ordered* set of search

12  listings.  The first mention of a "search result list" appears in the '361 abstract, which states that

13  the invention relates to a system and method allowing one to "influence a position for a search

14  listing within search result list."  Patent, Abstract.  The abstract goes on to explain that position is

15  determined by "rank," which is in turn determined by the "bid amounts" of the search listings.

16  *Id.*  In the background section, the inventors note that "[t]he higher an advertiser's position on a

17  search result list, the higher likelihood of a 'referral'.  *Id.* at 4:3-4.  Simply put, the disclosed

18  purpose of the invention – allowing advertisers "to pinpoint the placement of their web site

19  description within the search results," *id.* at 5:11-12 – cannot be achieved unless a "search result

20  list" is an *ordered* series of entries.  If a list is merely a "set," none of this makes sense.

21          **b.    A "search result" is something obtained in response to a search
                    submitted by a consumer using an Internet search engine**

22

23          **(i)    Overture's definition does not provide a meaningful definition
                     of "result," and does not provide any definition of "search"**

24          Overture's definition of "search result" – "search listings . . . obtained by calculation" – is

25  simply unhelpful.  Overture asserts that "[t]he parties generally agree that a search result list

26  includes a collection of information that is obtained or selected as the result of some type of

27  action, *such as* a search and/or *a calculation*."  Opening Brf. at 9:21-22 (emphases added).

28  Google agrees that a "search result" should be the result of a search, but Overture's attempt to

---

14

1    equate "search" with "calculation" is inapposite.  Indeed, Overture's inclusion of the phrase

2    "obtained by calculation" derives from a dictionary definition for the word "result."  *See*

3    Overture *Markman* Exh. 6 (Merriam Webster Collegiate Dictionary (Tenth ed. 1995); Merriam-

4    Webster Unabridged (Online ed. 2003)).  Replacing "search" with "calculation"  is tantamount to

5    defining "search result" as the "result of a result," which is circular.  Coupled with Overture's

6    failure to explain what it means by "calculation," this renders Overture's definition

7    unsatisfactory.

8          Moreover, even Overture's reference to "search listing" fails to give meaning to the word

9    "search," because, as noted above, Overture's attempt to include "search term" in its definition

10   of "search listing" is improper.  And without "search term," Overture's definitions for both

11   "search listing" and "search result" lack any reference to the concept of  "search."  Given that the

12   '361 patent claims a system and method that relates to *search* result lists generated by *search*

13   engines, *see, e.g.,* Patent, Title, any proper definition of these claim terms must be firmly rooted

14   in the notion of a "search."

15         Overture's attempts to dodge this central concept are unexplained in its Opening Brief,

16   but it may be that Overture is hoping to argue that Google's PageRank search results – the main

17   attraction at Google's web site – are not "search results" or "search listings" at all.  In proving

18   infringement, Overture would then focus exclusively on AWS's advertisements at the side of the

19   page – thus avoiding thorny questions regarding which list in the Google system is the list of

20   "search results."  Because most jurors will instantly associate the word "search" with Google's

21   PageRank search listings, rather than with AWS advertisements, Overture wants to downplay the

22   significance of the term "search."  The specification, however, describes an invention that is

23   emphatically concerned with searches, and any definition of claim terms that include the word

24   "search" should reflect that reality.

25              **(ii)    Google's definition is consistent with the intrinsic evidence**

26         The term "search result" is best understood as a term of art.  The title of the patent refers

27   to a "search result list" generated by a "search engine."  *See* Patent, Title.  Internet search

28   engines address a problem that, although not entirely unique, is particularly prevalent on the

15

317500.01

1    World Wide Web, which "is composed of a seemingly limitless number of web pages dispersed

2    across millions of different computer systems all over the world in no discernable organization."

3    *Id.* at 2:26-29.  Internet search engines represent one solution – well-known at the time the '361

4    patent application was filed – allowing Internet users to find information they are looking for.

5    *Id.* at 2:29-32.  At the time the '361 patent application was filed, search services were already

6    second only to electronic mail among Internet tools.  *Id.* at 2:36-41.  When a person skilled in the

7    art reads the '361 patent application, he or she will understand "search" to refer to Internet search

8    services.

9         A "search result," then, is the result of an Internet search – which is designed, as best as

10   possible, to "prioritize results in accordance with consumers' preferences."  *Id.* at 2:65-67.

11   When using the described invention, a searcher is supposed to receive "quick, easy and relevant

12   search results," *id.* at 3:56-58, thus allowing him or her to "find companies or businesses that

13   offer the products, services, or information that the consumer is seeking."  *Id.* at 3:58-62.  The

14   searchers are "seeking specific information on the web," *id.* at 10:8, and the search engine

15   described in the patent is trying to provide them with search results in response.  While the

16   phrase "obtained by calculation" aptly describes the "results" one obtains when completing a

17   mathematics assignment, the context supplied by the '361 specification points to a more useful

18   and precise definition for the word "result":  search listings, selected from the search engine

19   database being searched by a searcher, containing the information responsive to the searcher's

20   search.

21        Moreover, a "search result," properly construed, should *not* include "banner" or "tile"

22   advertisements.  Nothing in Overture's definition of "search result list" precludes a banner

23   advertisement from being included in a search result list.  The specification, however,

24   specifically excludes "banners" from the scope of the term "search result."  The inventors

25   distinguished their purported invention from "current paradigms for generating web site traffic,

26   such as banner advertising."  *Id.* at 3:16-17.  The advertising system championed by the

27   inventors instead focuses on placing advertisements *in search results.  Id.* at 3:51-54 ("Ideally,

28   web site promoters should be able to control their placement *in* search result listings . . . .");  *id.* at

16

1    5:54-56 (search listings are placed "*within* a search result list") (emphasis added).  In contrast,

2    pre-existing "paradigms for generating web site traffic, such as banner advertising, follow

3    traditional advertising paradigms and fail to utilize the unique attributes of the Internet."  *Id.* at

4    3:16-19.  The inventors note that banner advertisements can be linked to search terms on search

5    engines, *id.* at 3:38-30, but nonetheless may not reach interested parties, because "most visitors

6    to a web site seek specific information and may not be interested in the information announced in

7    the banner."  *See id.* at 3:38-41.  Thus, while banners and tiles may be *triggered* by a user's

8    search, they are not *responsive* to the searcher's search, because they are not the thing for which

9    the searcher is searching.  Google's proposed construction, which requires that a search result be

10   responsive to a searcher's search, captures this distinction, while Overture's does not.

11           **(iii)    The extrinsic evidence confirms that a search result is different
                        from prior art Internet advertisements that appeared
12                      alongside or above search results**

13           To the extent that the Court concludes that any ambiguity remains after considering the

14   intrinsic evidence, it should look to extrinsic evidence.  *Storage Tech.,* 329 F.3d at 832.  And the

15   extrinsic evidence confirms the distinction between search results (or search listings) and other

16   informational displays (such as banner advertisements and advertising "tiles").

17

18

19

20

21

22           **REDACTED**

23

24

25

26

27

28

**REDACTED**

Google's AWS takes a different approach. Instead of including advertisers' listings *in* search results, AWS places advertisements *next to* search results. "The main difference between the two programs is the way in which their ads are listed – Google's are highlighted alongside the regular Google search results, and Overture's appear AS regular search results." Kwun Decl., Exh. 6 at GOG 32243 (capitalized emphasis in the original). Industry usage, and Overture's own usage, confirms that "search results" do *not* include banner and tile advertisements.

### 5. Google does not contend that a search result list must be displayed

Overture devotes considerable space disputing a point that Google has not made. Overture contends that Google is taking the position that a search result list *must* be displayed. Google's definition, however, does not anywhere use the word "display." This is a non-issue.

## B. "[modifiable] bid amount"

### 1. The parties' proposed constructions

| Google's Proposed Construction | Overture's Proposed Construction |
| --- | --- |
| the price the website promoter will pay upon occurrence of a triggering event [changes to which can be controlled by the website promoter] | a quantity of money [which can be changed] that a customer or client is willing to pay per click |

### 2. Summary of dispute

This claim term is central to the parties' dispute. Every claim requires that paid listings have modifiable bid amounts. There are two important differences between the parties' proposed constructions.

18

1    First, Google contends that a "bid amount" is the amount the advertiser *will* pay.

2  Overture argues that a "bid amount" is the amount an advertiser *is willing* to pay.  The real

3  dispute between the parties is whether "bid amount" means an amount that an advertiser will

4  actually pay (Google's position) or whether it also encompasses the maximum amount the

5  advertiser is willing to pay (Overture's position).  This is significant because AWS advertisers

6  set a *maximum* bid, but the actual bid amount they are charged depends on a variety of other

7  factors.  In other words, the maximum bid is a *ceiling* on the bid amount rather than the bid

8  amount itself.  If the Court adopts Overture's definition, the "bid amount" could be a maximum

9  bid, even though the advertiser typically will *not* pay that amount for a click-through.

10    Second, the parties disagree about the meaning of "modifiable."  Google contends this

11  refers to the *advertiser's* control over its bid amount.  Overture argues that it merely means that

12  the bid amount can be changed – by anyone.

13    **3.    Googles agrees that the triggering event required by the '361 patent is a click-through**

14

15    Google's construction of "bid amount" is stated in terms of a "triggering event," while

    Overture's is stated in terms of a "click."  Google agrees that the '361 patent requires that the bid

16  amount be a price per click.  Notably, this conclusion finds no support in the language of the

17  claims, considered in isolation.  Nor is it derived from dictionary definitions.  Instead, the *only*

18  way one knows that a bid amount is measured on a cost-per-click basis is the specification's

19  repeated and consistent explanation that the invention is based on a cost-per-click pricing model.

20

21    Here, where it apparently suits its purposes, Overture readily proposes a construction that

    can only be supported by reading the claims in light of the specification, with an eye toward

22  ascertaining the purpose of the invention.[10]  Elsewhere, however, Overture refuses to apply this

23  claim construction principle consistently, and instead steadfastly ignores the teachings of the

24  specification while relying almost exclusively on dictionary definitions.  Based on the disclosure

25  in the specification, Google agrees that the Court can construe "bid amounts" to be limited to

26

27  ───────────────
    [10] Overture presumably intends to argue that prior art systems which did not charge on a cost-

28  per-click basis cannot anticipate the claims of the '361 patent.

317500.01

1   cost-per-click bids.  But doing so requires Overture (and the Court) to adopt a consistent

2   methodology in construing the other disputed terms and phrases.

3           4.      **A bid amount is the amount a successful bidder will pay**

4           The Court should adopt Google's definition of "bid amount" for several reasons.  Most

5   important, both the ordinary meaning of the term as well as explicit statements in the

6   specification make very clear that bid amount means the amount one will actually pay upon the

7   occurrence of some event.  The Examiner's expressly stated reasons for allowance make clear

8   that bid amount means the amount one will actually pay.  Overture's own party admissions made

9   in describing a "pay for performance" advertising system in another patent application make

10  clear that bid amount means the amount one will actually pay.  Even extrinsic evidence makes

11  clear that bid amount means the amount one will actually pay.

12          a.      **The ordinary meaning of "bid amount," read in light of the
                    specification, is the amount the advertiser *will* pay**[11]

13

14          The dictionary definitions cited by the parties overwhelmingly favor Google.  Random

15  House defines bid, in its verb form, to mean "to offer (a certain sum) as the price one will pay or

16
    _____

    [11] Prior to evaluating the evidence and deciding which party's construction is more persuasive,
17  the Court must first determine what the parties' respective positions are.  Unfortunately,
    Overture's definition is, on its face, ambiguous, and its Opening Brief does little to dispel this
18  ambiguity.

19          Overture may be arguing that the "bid amount" is *any* amount that the advertiser is
    willing to pay.  For example, if an advertiser is willing to pay up to $1 per click-through for the
20  search term "San Francisco," but that advertiser knows that none of its competitors are willing to
    pay more than 25 cents for that search term, presumably the advertiser will choose to list its
21  search listing at 26 cents – just high enough to ensure top billing.  But if "bid amount" simply
    means any amount the advertiser is willing to pay, then *every price between 0 and 100 cents*
22  would *simultaneously* be the advertiser's bid amount, because every amount in that range is an
    amount the advertiser is "willing" to pay.  Indeed, even if the advertiser changes the listed cost
23  per click to 50 cents, its bid amount would still be every price between 0 and 100 cents.  This
    definition, under which there is never a single bid amount for a search listing, should be rejected
24  (assuming Overture is even advancing it) because it defies common sense.

25          Alternatively, Overture may mean that the "bid amount" is the most the advertiser is
    willing to pay.  That is problematic, because it would seem to mean a subjective value that may
26  not be known by the search system at all.  In the foregoing example, the advertiser is *willing*
    to pay a maximum of $1 per click-through, but *never enters that figure into the system*.  In order to
27  modify the advertiser's "bid amount," one would need actually to change the advertiser's mind.

28          Finally, it could be that Overture intends "bid amount" to mean the maximum amount
    that an advertiser has told the search system it is willing to pay.  This third possibility will be the
    focus of our discussion.

1    charge:  *They bid $25,000 and got the contract.*"  Kwun Decl., Exh. 7 at 204 (Random House's

2    italics).  Webster's similarly defines bid (again in the verb form) to mean "to offer (a certain

3    sum) as the price or fee that one will pay or accept."  Kwun Decl., Exh. 8 at 136.  Merriam-

4    Webster's definition is also in accord.  Kwun Decl., Exh. 9 at 111 ("a statement of what one will

5    give or take for something").  The New Oxford Dictionary also defines "bid" in terms of a price

6    one will actually pay, rather than a price one would be willing to pay.  Kwun Decl., Exh. 10 at

7    170 ("an offer of a price").  For example, if a collector sends an buyer to a Sotheby's auction

8    with instructions to bid no more than $10 million for a Picasso, and the buyer submits a winning

9    bid of $5 million, no one would argue that the collector's "bid amount" was $10 million rather

10   than $5 million.[12]

11        The inventors unequivocally state that the cost of a search listing is the bid amount

12   multiplied by the number of click-throughs, which necessarily means that the bid amount is the

13   actual cost per click (i.e. the amount the advertiser *will* pay for each click through):

14        The system calculates the projections based on a cost projection algorithm . . .
          using [any of] a number of different algorithms known in the art.  However, *since*
15        *the cost of a search listing is calculated by multiplying the bid amount by the total*
          *number of clicks received by the search listing at that bid amount during a*
16        *specified time period,* every cost projection algorithm must generally determine
          an estimated number of clicks per month (or other specified time period) for a
17        search listing.

18   Patent at 21:4-13 (emphasis added).  If the bid amount were anything other than the actual cost

19   per click, the cost of a search listing would *not* be the bid amount multiplied by the number of

20   clicks.  In short, the italicized assertion is *only* true if Google's proposed construction is correct.

21        The '361 specification consistently uses "bid amount" to mean the amount the advertiser

22   actually *will* pay, rather than an amount it is *willing* to pay.  *Id.* at 5:22-26 (summary of

23   invention) (advertiser's bid is "a money amount the advertiser *will* pay . . . each time a searcher

24   clicks on the advertiser's hyperlinked listing" (emphasis added)); *id.* at 9:46-49 (detailed

25   

26   [12] Overture argues that Google's definition is contrary to the ordinary meaning of "bid," in which
     only the winning bidder pays the amount bid.  Opening Brf. at 14:5-11.  Google, however, has
27   defined "bid amount" to mean the amount the advertiser will pay *upon a triggering event.*  If that
     triggering event (a click-through) occurs, the advertiser necessarily has "won," and thus "will"
28   pay the bid amount.

317500.01

1  description) (bid amount is "a money amount that *is* deducted from the account of the advertiser

2  for each time the advertiser's web site is accessed via a hyperlink on the search result list page"

3  (emphasis added)); *id.* at 13:3-8 (detailed description) (bid amount is the money amount that "*is*

4  deducted from the advertiser's prepaid account or is recorded for advertiser accounts that are

5  invoiced for each time . . . the search result list hyperlink is used to refer the searcher to the

6  advertiser's web site" (emphasis added)).

7        The specification also repeatedly equates the "cost to advertiser" with the "bid amount."

8  *Id.* at 4:6-9 ("The openness of this advertising marketplace is further facilitated by publicly

9  displaying, to consumers and other advertisers, the price bid by an advertiser on a particular

10  search result listing."); *id.* at 5:42-43 ("Most preferably, the bid amount is included on the

11  identification [of the listing as a paid listing]."); *id.* at fig. 7 (displaying the "Cost to advertiser"

12  for each search listing); *id.* at 18:19-23 (explaining that the listings in figure 7 "display the

13  advertiser's bid amount").

14        Finally, the microfiche appendix to the patent application, *see* Patent at 1:6-13, includes a

15  file called "rates.html" that is in a "mediakit" subdirectory. *See* Kwun Decl., Exh. 11. This file

16  defines "bids" as "the price you agree to pay per click-through for each search term." *See id.* at

17  2;                          **REDACTED**                           .[13]

18        **b.    The prosecution history confirms the meaning of "bid amount"**

19        At the conclusion of the prosecution of the '361 patent application, the Examiner filed a

20  statement of reasons for allowance as part of the Notice of Allowability. Kwun Decl., Exh. 12.

21  In support of his conclusion that *all* of the pending claims were allowable, the Examiner stated

22  that "the bid amount correspond[s] to a money amount that is deducted from an account . . . upon

23  receipt of a retrieval request for the network location." *Id.* at 3. Overture did not file a response

24  _____

25  [13] Overture's citation to a different statement in the microfiche appendix is not to the contrary.
*See* Overture *Markman* Exh. 9 ("the bid price is the amount you're willing to pay"). In

26  Overture's original system, the amount an advertiser was charged per click was always the same
as the amount that the advertiser told the system it would be "willing" to pay. However, as the

27  rest of the evidence makes clear, although the bid amount in the original Overture system
happened to be the same as the amount the advertiser indicated it was willing to pay, the thing

28  that made that amount the "bid amount" was the fact that the advertiser *was in fact* charged that
amount per click.

1  to the Examiner's statement.  *See* 37 C.F.R. § 1.104(e) (when an Examiner files a statement of

2  reasons for allowance, the applicant or patent owner "may file a statement on the reasons for

3  allowance within such time as may be specified by the examiner").

4      Overture's failure to respond to the Examiner's statement of reasons for allowance gives

5  rise to an inference that Overture agreed with the Examiner's explanation.  *See Elkay Mfg. Co. v.*

6  *Ebco Mfg. Co.,* 192 F.3d 973, 979 (Fed. Cir. 1999) (construing patent claim narrowly, relying, in

7  part, on the applicant's failure to respond to the examiner's statement of reasons for allowance);

8  *Biogen, Inc. v. Berlex Labs, Inc.,* 318 F.3d 1132, 1138-40 (Fed. Cir. 2003) (construing claim

9  narrowly in part because the examiner construed it narrowly, as evidenced by, among other

10  things, a statement of reasons for allowance).[14]  In the face of evidence that the Examiner

11  understood "bid amount" to mean the amount that an advertiser actually will pay for a click-

12  through, the public is entitled to assume that bid amount does, in fact, mean the amount an

13  advertiser *will* pay for a click-through.  By failing to respond to the Examiner's statement of

14  reasons for allowance, Overture acquiesced in the Examiner's understanding.

15          c.      **In a patent application it has described as "related" to the '361 patent**
                    **application, Overture has confirmed that "bid amount" refers to the**
16                  **actual price that will be paid**

17      In a patent application that is "related" to the '361 patent application, Overture was faced

18  with the need separately to describe the minimum, maximum, and actual cost per click, and

19  chose to call the *actual cost per click* the "bid amount."  Kwun Decl., Exh. 13 ¶¶ 1, 35-40

20  (hereinafter, "Cheung et al.").  Darren J. Davis, the first-named inventor on the '361 patent, is

21  listed as a co-inventor on Cheung et al., and this application is being prosecuted by attorneys at

22

---

23  [14]  The regulation allowing the filing of a response to a statement of reasons for allowance

24  *previously* provided, "Failure to file such a statement shall not give rise to any implication that
    the applicant or patent owner agrees with or acquiesces in the reasoning of the examiner."  37
    C.F.R. § 1.109 (former version, now recodified and amended as section 1.104(e)).  However, this

25  sentence was deleted, effective November 1, 2000 (the Examiner's reason for allowance is dated
    March 23, 2001), because "[t]his statement of the rule is inconsistent with recent decisions by the

26  United States Supreme Court (Supreme Court) and the United States Court of Appeals for the
    Federal Circuit (Federal Circuit), which highlight the crucial role a prosecution history plays in

27  determining the validity and scope of a patent."  65 F.R. 54604, 54633 (Sept. 8, 2000) (citations
    omitted).  Thus, the failure to file a response to a statement of reasons for allowance *is* relevant

28  in construing the claims.

GOOGLE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. C 02-01991 JSW (EDL)

317500.01

1    Brinks Hofer, the same firm that prosecuted the '361 patent application. *Id.* (face page).

2    Cheung et al. describes an embodiment in which the minimum, maximum, and actual

3    cost per click are all distinct parameters. *Id.* ¶¶ 35-40. The advertiser chooses a "bid cap,"

4    which is "the maximum dollar amount at which a bid may be set by the system." *Id.* ¶ 40. The

5    system then sets "[b]id amounts" that are "less than or equal to the bid cap." *Id.* The bid,

6    however, will "never be lower than the minimum bid of $0.05." *Id.* In Cheung et al., Overture

7    described the advertiser's *actual cost* as the "bid amount," and the *cap* on the advertiser's cost

8    the "bid cap." In short, until it decided to sue Google, Overture understood "bid amount" to

9    mean the *actual* cost per click. Overture should not be allowed to switch course now to satisfy

10   the exigencies of the current litigation.

11          **d.    The extrinsic evidence supports Google's construction**

12          To the extent that the Court concludes that ambiguities remain after consideration of all

13   of the intrinsic evidence, the extrinsic evidence offers still further support for Google's definition

14   of "bid amount."

15                  **(i)    Google's definition is supported by extrinsic evidence
                    concerning Overture's "pay for performance" system**

16

17          When Overture introduced a Google-style bidding mechanism (in which advertisers can

18   set a ceiling on a cost per click rather than directly setting the actual cost per click), it *named* and

19   *described* that new system in a manner that implicitly adopted Google's proposed definition of

20   "bid amount." Google introduced AWS in February 2002. *See* Kwun Decl., Exh. 14 at GOG

21   32256. That summer, Overture added a new feature to its system, called "Auto Bidding," that

22   borrowed heavily from the AWS bidding system. *See id.* In the Google bidding system, the

23   advertiser sets a maximum cost per click, and the system automatically discounts the actual cost

24   (i.e. the amount the advertiser will pay) as much as possible without sacrificing positional

25   ranking – or, to borrow the explanation offered by one industry report, AWS includes "an

26   automatic discounter, which lowers your bid amount every time there's a gap." Kwun Decl.,

27   Exh. 15 at GOG 32255; *see also* Kwun Decl., Exh. 6 at GOG 32244 (AWS "automatically keeps

28   your bid one penny ahead of the competition, up to your stated maximum amount").

1    Overture's Auto Bidding feature, when introduced in the summer of 2002, was

2  recognized as being similar to AWS.  "Overture has taken the hint and has implemented a similar

3  tool, referred to as its 'Auto Bidding' tool."  *Id.* at GOG 32245.  Another industry report

4  described Overture's Auto Bidding system like this:

5        Under the old system, you simply put what you would pay for a paid link and
       your result was ranked accordingly.  Under the new system, you put in the very
6      most you're willing to pay, and the actual price you are charged raises and lowers
       depending on what the competition is.

7
       This new system is similar to the way bidding works on eBay.  When you bid on
8      eBay . . . you put in the most you're willing to pay.  *The actual bid is the most
       necessary to be the leader in the auction.*  If someone bids higher than your
9      revealed bid, *your bid is adjusted* to maintain your winning position.  Ebay will
       continue doing that until someone bids higher than the highest bid you've put in.
10     (Ebay calls this proxy bidding.)

11  Kwun Decl., Exh. 14 at GOG 32256 (emphases added).  This explanation equates the "actual

12  bid" with the amount one *will* pay, distinct from the "maximum bid."  *See also* Kwun Decl., Exh.

13  17 at GOG 32231 (when using Auto Bidding, "[t]he max bid is not always the actual bid price").

14

15                              **REDACTED**

16

17                    Instead, Overture does the bidding for you – hence the

18  name of the new feature, Auto Bidding.  *See* Kwun Decl., Exh. 16 at GOG 32231 (explanation,

19  by a third party, that "Auto Bidding will change your bid price for you automatically up to a Max

20  Bid amount you have selected").

21

22                              **REDACTED**

23

24        **(ii)    Google's definition is consistent with eBay's description of an
                  analogous system**

25    Google's definition is also supported by industry custom and usage, as evidenced by

26  eBay's description of its own Internet bidding system.  The eBay online auction system – which

27  was already quite popular at the time the '361 patent application was filed – is one of the best

28

GOOGLE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. C 02-01991 JSW (EDL)

317500.01

1   known examples of an Internet system in which the maximum cost (i.e. the cost one is *willing* to

2   bear) and the actual cost (i.e. the cost one *will* bear) are distinct.  And, consistent with Google's

3   proposed construction, eBay calls a buyer's maximum cost the "maximum bid," and the buyer's

4   actual cost (assuming the buyer wins the auction) the "bid" or the "current bid."  *See* Kwun

5   Decl., Exh. 17 at GOG 32225.

**5.    "Modifiable" means the bid amount can be changed by the web site promoter**

6       Overture again exhorts the Court to construe "modifiable" in isolation, without reference

7   to the contextual cues that make clear that it is the *advertiser* who must be in control of changes

8   made to the bid amount.  The parties agree that "modifiable," considered in isolation, means

9   "changeable."  That is not in dispute.  The context provided by the specification, however, makes

10  it clear that the claims are referring to changes *under the control of the advertiser*.

11      First, Overture's definitions are internally inconsistent.  According to Overture, a "bid

12  amount" is the amount an advertiser is *willing* to pay, while "modifiable" means that the bid

13  amount is changeable *by anyone.*  That makes no sense.  The amount an advertiser is *willing* to

14  pay cannot be changed *by someone other than the advertiser.*

15      Moreover, the context supplied by the specification demonstrates that the *purpose* of the

16  claimed invention is to allow advertisers precisely to control placement of their advertisements,

17  which can be achieved only if changes to bid amounts are controlled by the advertisers.  In

18  describing the impetus for the patent, the inventors explain, "Ideally, web site promoters should

19  be able to control their placement . . . ."  Patent at 3:51-52.  The method of achieving this control

20  is to provide an "on-line marketplace[ in which] companies selling products, services, or

21  information bid in an open auction environment for positions on a search result list . . . ."  *Id.* at

22  3:62-64.  In summarizing their invention, the inventors further explain, "The bidding process

23  occurs when an advertiser enters a new bid . . . .  Preferably the promotor's bid is processed in

24  real time."  *Id.* at 5:62-65.  The inventors' failure to describe the act of the *advertiser* entering a

25  new bid as merely preferable – in contrast with real-time processing, which is expressly

26  identified as preferable – is illuminating.  Toward the end of their summary of their invention,

27

28

1  the inventors again highlight that it is the advertiser who controls changes to its bid amount,

2  noting that "the promotor may . . . modify . . . the bid amount of a search listing . . . ." *Id.* at

3  6:28-31.

4        Placing control over changes in the bid amount with the advertiser is crucial to achieving

5  the objective of the invention, which is to allow advertisers "to pinpoint the placement of their

6  web site description within the search results . . . ." *Id.* at 5:11-12.  Here, the inventors'

7  consistent explanation of their invention as one in which the *advertiser* controls the bid amount,

8  coupled with the importance of this feature in achieving the stated goal of allowing "pinpoint"

9  placement of search listings, is dispositive.

10 **C.    "a modifiable bid amount that is *independent of* other components of the search listing"**

11

12       **1.    The parties' proposed constructions**

13

| Google's Proposed Construction | Overture's Proposed Construction |
|---|---|
| a modifiable bid amount that is **unconstrained by** other components of the search listing | a modifiable bid amount that is **not dependent or contingent upon** other components of the search listing |

14

15

16       **2.    Summary of dispute**

17       The parties' dispute over the term "independent of" concerns the degree to which other

18 components of the search listing affect the bid amount.  Google's definition clarifies that other

19 components of the search listing have *no* effect on the bid amount.  Overture's proposed

20 construction is a non-definition; it provides no more clarity on this issue than does the phrase to

21 be construed.

22       The Court's construction is relevant to infringement.  For example, in AWS, the actual

23 cost per click (which Google contends is the "bid amount") for a given listing is a function of the

24 maximum cost per click for that listing, the expected click-through rate for that listing, and the

25 maximum cost per click for other listings that are associated with the same search term.  It is thus

26 based on several other components of the search listing, and is not independent of them.

27       **3.    The ordinary meaning of "independent of" is "unconstrained by"**

28       Overture's proposed construction well illustrates the problem with excessive reliance on

27

317500.01

1   dictionary definitions. It is hard to argue that independent does not mean "not dependent." But

2   this definition is unhelpful. If a jury cannot understand what it means to be "independent," it

3   will not help to be told that it means to be "not dependent." The meaning of the other half of

4   Overture's definition – "not contingent" – is obscured by its pairing with the circular definition

5   "not dependent."

6        In the context of the '361 patent, Google believes that "unconstrained by" concisely

7   conveys the meaning of "independent of." This definition is consistent with the ordinary

8   meaning of the word "independent." One of the definitions for "independent" offered by

9   Random House equates "independent" with "unconstrained." Kwun Decl., Exh. 18 at 970.

10  Other Random House definitions include "not influenced or controlled by others," and "not

11  influenced by the thought or action of others." *Id.* Webster's New World Collegiate Dictionary

12  similarly focuses on freedom from influence or control by others. Kwun Decl., Exh. 19 at 686.

13  Overture has advanced no reason why this definition is incorrect, nor suggested that it differs in

14  any way from the second part of its definition, "not contingent."

15       **4.    The specification supports Google's interpretation**

16       Google's definition best captures the invention described by the inventors. The

17  specification criticizes the results generated by prior art systems, which relied on multiple criteria

18  to order results, and explains the benefits of the method and system claimed by the inventors, in

19  which bid amount determines placement. Google's definition correctly highlights that the bid

20  amount must be freely determinable by the advertiser – unconstrained by other factors, such as

21  keyword density, or algorithmic determinations of the relevance of a web site to a search term.

22  Were this not the case, the "free market" bidding system advocated by the inventors would, in

23  fact, be saddled with the same problems for which they criticize prior art search systems.

24       According to the inventors, one problem with prior search systems was that their ranking

25  of search listings was based on "multiple criteria such as keyword density and keyword

26  location," which could yield "random and even irrelevant" results. Patent at 2:52-55. The

27  specification establishes that the disclosed invention represents a clean break from the prior art,

28  which relied on multiple criteria derived from the websites themselves, in favor of a market-

28

1   based approach that looks to the amount each advertiser will pay for a click-through. As

2   explained in the '361 abstract, "A higher bid by a network information provider *will* result in . . .

3   more advantageous placement." *Id.,* Abstract (emphasis added). This point is confirmed in the

4   summary of the invention. *Id.* at 5:35-37 ("The higher the bid, the more advantageous the

5   placement"). Although the inventors often preface statements with the word "preferably," which

6   appears in the specification no less than forty-nine times, the foregoing statement is offered

7   without reservation.

8       Articles about Overture's system, submitted during prosecution of the '361 patent

9   application, confirm that the "bid amount" must be free from constraint by other aspects of the

10  search listing. In an article published more than fifteen months before the patent application was

11  filed, an industry reporter explained that the new Overture search engine would be different,

12  because "it ranks Web sites based on how much the sites are willing to pay . . . rather than based

13  on keyword density or some other mathematical formula." Kwun Decl., Exh. 20 at OVG 1222

14  (of record). The bid amount would be determined by "[s]upply and demand." Kwun Decl., Exh.

15  21 at OVG 1226 (of record). Instead of relying on an algorithm or editorial constraints,

16  Overture's bids are based on "the free market." Kwun Decl., Exh. 22 at OVG 1232 (of record).

17  "Those willing to pay more can appear higher in the search results." Kwun Decl., Exh. 23 at

18  OVG 1366 (of record).

19      Unless the "bid amount" is unaffected by other components of the search listing, these

20  repeated statements, all of which are intrinsic evidence, fail properly to describe the claimed

21  invention. If one's bid amount is constrained or affected by the popularity of one's search

22  listing, that is not the "open auction" the specification speaks of. Patent at 3:63-64. If an

23  advertiser's ability to choose a bid amount is constrained by other aspects of its listing, it cannot

24  "pinpoint" its placement. *Id.* at 5:11. If the bid amount is itself a function, even in part, of

25  factors such as keyword density, then the inventors' criticisms of the prior art also apply to the

26  system itself. The intrinsic evidence therefore compels the conclusion that the bid amount, in

27  order to be "independent of" other components of a search listing, must be unconstrained by

28  those other components.

29

317500.01

**D.    The Ordering Limitations**

    **1.    The parties' proposed constructions**

        **a.    "ordering . . . *in accordance with* the values of the respective bid amounts"**

| Google's Proposed Construction | Overture's Proposed Construction |
| --- | --- |
| ordering . . . **in conformance with** the values of the respective bid amounts | ordering **in agreement with** the values of the respective bid amounts |

        **b.    "arranged in an order *determined using* the bid amounts"**

| Google's Proposed Construction | Overture's Proposed Construction |
| --- | --- |
| arranged in an order **established by** the bid amounts | arranged in an order **ascertained by an analysis that utilizes** the bid amounts |

        **c.    "arranged in an order *corresponding to* the bid amounts"**

| Google's Proposed Construction | Overture's Proposed Construction |
| --- | --- |
| arranged in an order **conforming to** the bid amounts | arranged in an order **similar to** the order of the bid amounts |

    **2.    Summary of dispute**

For each of the three ordering limitations, the parties' central dispute is the same:  Does a search listing order that does not match the bid amount order fall within the scope of the claims? This issue is potentially dispositive, because in the accused system and method, search listings are ordered by Google's expected revenue.  Google's expected revenue for each search listing depends not only on the bid amount for the listing, but also on the likelihood of a searcher clicking on that listing (i.e. the estimated click-through rate), which itself depends on many factors.  This means that a popular advertisement (i.e. one that searchers are likely to click on) may be displayed above an unpopular advertisement, even if the bid amount for the latter advertisement is higher than the bid amount for the former advertisement.

    **3.    The dictionary definitions fail to resolve all ambiguities about the definitions of the ordering terms**

As is true for most of its claim construction arguments, Overture's support for its constructions of the ordering limitations comes primarily from a rote stringing together of

317500.01

1   dictionary definitions of single words considered in isolation.  The problem with this approach is

2   that the key words at issue – "accordance," "determined," and "corresponding" – are susceptible

3   to widely varying meanings.  One cannot breathe life into them without examining the context in

4   which they appear.

5          The dictionaries cited by the parties each offer similar, terse definitions for "accordance."

6   The definitions variously use the words "agreement," "conformity," or "harmony" to define this

7   word.  Google has selected "conformance" as the word best suited to define "accordance," in the

8   context of the '361 patent, while Overture points to "agreement."  The key issue, from Google's

9   perspective, is that an order is not in "accordance" with the bid amounts unless it is *in the same*

10  *order* as the bid amounts.  For "determined," the parties again look to different parts of the cited

11  dictionary definitions.  Google borrows from definitions that use the word "establish," while

12  Overture looks to the word "ascertain."[15]  Finally, for "corresponding," Google relies on

13  dictionary definitions that require conformity, while Overture asserts that mere similarity

14  suffices.

15         Google believes that the ordinary meaning of the words "accordance" and

16  "corresponding," even considered in isolation, strongly favors Google's position.  Google also

17  recognizes that the phrase "determined using," again considered in isolation, is susceptible to the

18  broader meaning suggested by Overture.  Dictionaries, however, do not define claims, and "a

19  common meaning, such as one expressed in a relevant dictionary, that flies in the face of the

20  patent disclosure is undeserving of fealty."  *Renishaw,* 158 F.3d at 1250.  Although dictionaries

21  can easily serve as an interpretive crutch, "the correct meaning of a word or phrase is informed

22  only by considering the surrounding text."  *Brookhill Wilk 1,* 334 F.3d at 1300.

23         As explained below, the intrinsic evidence demonstrates that this is not a situation in

24

25  [15] Overture argues that Google's definition improperly replaces "using" with "by."  The
    requirement of strict ordering, however, derives from the word "determined" itself, which
26  Google defines as "established."  When an appellate court instructs that an issue be "determined
    using" a three-part test, surely it does not contemplate that the trial court might consider the three
27  prongs of that test, but then conclude that some fourth factor (never mentioned by the appellate
    court) outweighs the result compelled by the first three.  There may be other possible definitions
28  for "determined using," when it is considered in isolation, but Google's definition is the one that
    "is most consistent with the use of the words by the inventor."  *Texas Digital,* 308 F.3d at 1203.

31

317500.01

1  which merely "utilizing" a bid amount could be enough.  Mere "similarity" will not suffice.  The

2  intrinsic evidence establishes that an order that fails to match the order of the bid amounts does

3  not fall within the scope of the claims.

4  **4.      Overture has misstated Google's position**

5  Overture repeatedly suggests that, under Google's proposed constructions, embodiments

6  of the '361 patent cannot rely on any factor other than bid amount when ordering search listings.

7  This is incorrect.  For example, one could order search listings by relying on bid amounts, the

8  size of the advertisement, and the time at which the advertisement was placed, and this would

9  fall within the scope of the patent, *so long as the ordering algorithm never resulted in an order*

10  *that was contrary to the order of the bid amounts.*  An algorithm that used the following rules,

11  for example, would fall within the scope of the ordering limitations:

12          (1)      Arrange the search listings in order of their bid amounts;

13          (2)      If two search listings have identical bid amounts, position the
          smaller advertisement first; and

14

15          (3)      If two search listings have identical bid amounts and are the same
          size, position the earlier advertisement first.

16  Examples of multi-factor ordering schemes of this sort – in which the resulting orders are always

17  consistent with the order demanded by one primary factor – are commonplace[16] and are

18  described in the specification.  *See, e.g.,* Patent at 18:23-26 (describing a preferred embodiment

19  where, in the event of a bidding tie, the search listing for which the bid was first received is

20  placed first); *see also id.* at 26:8-18 (claim 19) (claims with the same bid amount are ordered by

21  creation time).

22  **5.      The specification supports Google's constructions**

23  The *only* passage from the specification that Overture relies upon states, "When an

24  Internet user enters the search terms in a search engine query, the search engine will generate a

25  search result list with the web site promoter's position influenced by ***one or more parameters***

26  defined by the promoter."  *Id.* at 4:60-64 (Overture's emphasis).  However, as explained above,

27

28  [16] For example, alphabetical ordering is one such scheme.  An alphabetically ordered list orders
primarily by the first letter, secondarily by the second letter, and so on.

GOOGLE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. C 02-01991 JSW (EDL)

1  nothing in Google's definition precludes reliance on multiple factors, so long as the resulting

2  order conforms with the order of the bid amounts.

3      The only way to achieve the stated purpose of the invention is to arrange the order of the

4  search listings in the same order as their bid amounts. This is the only way to ensure that the

5  advertiser can "control" (*id.* at 3:51), "easily predict" (*id.* at 5:7), and "pinpoint" (*id.* at 5:11) the

6  placement of its search listing. An ordering scheme in which a higher bid amount merely means

7  that an advertiser's search listing *might* be placed higher is inconsistent with the '361 abstract's

8  bold assertion that "[a] higher bid by a network information provider *will result* in a higher rank

9  value and a more advantageous placement." *Id.*, Abstract (emphasis added). The abstract does

10  not purport to explain only an *embodiment* of the invention, but rather describes the "present

11  invention" itself. *Id.; SciMed,* 242 F.3d at 1343 (specification's description of the "present

12  invention" is "strong evidence" for purposes of claim construction).

13      Again and again, the specification explains that the order of the search listings *must*

14  conform to the order of the bid amounts. The inventors' summary of their invention could not be

15  more clear:

16      *The higher the bid, the more advantageous the placement* in the search result list
        that is generated when the bidded search term is entered by a searcher using the
17      search engine. *The search result list is arranged in order of decreasing bid
        amount,* with the search listing corresponding to the highest bids displayed first to
18      the searcher.

19  *Id.* at 5:35-40 (emphasis added). Indeed, while the very next sentence after the above quote

20  notes that "[p]referably" the search listings should be identified to the searcher as paid listings,

21  no such fudge word is inserted when describing the ordering requirement. *Compare id.* at 5:40-

22  42 *with id.* at 5:35-40. A similarly definitive statement appears in the detailed description, which

23  states that "higher bids receive more advantageous placement." *Id.* at 9:42-45. Again, the

24  *following* sentence is described as applying to a "preferred embodiment," but the explanation of

25  the method of ordering is not so limited. *Id.* at 9:45-49.[17]

26

27  ───────────────
   [17] The Federal Circuit requires district courts to walk a fine line in construing claims, reading the
   specification to understand and breathe life into claim terms but not importing new limitations
28  from the specification into the claims. Overture would have the Court avoid reading the
   specification at all to avoid improper importation of limitations. This is error. Similarly, it

                                              33

1

2

**6.     Google's construction is not in conflict with the principle of claim differentiation**

Contrary to Overture's arguments, claims 52, 63 and 64 all vary in scope under Google's constructions, as do claims 30, 46 and 47.  Every claim, including claims 30 and 52, requires that the search listings be positioned in the same order as their respective bid amounts.  Claims 46 and 63, as Overture notes, require that the claims be ordered *from highest to lowest* bid amounts. Arranging listings from *lowest to highest* bid amounts therefore falls within the scope of the ordering limitations in claims 30 and 52, but not claims 46 and 63.  This reverse ordering scheme is not inconsistent with the specification's repeated admonition that higher bid amounts will result in more advantageous placement, because in some (admittedly rare) situations the most "advantageous" position may be the last position.[18]

Claims 47 and 64 require that each search listing be assigned a "rank value," and that the rank value order correspond to the bid amount order.  Thus, if the search listing with the *highest* bid amount is assigned the *lowest* rank value, and so on, that is outside the scope of claims 47 and 64, while it may be within the scope of claims 30, 46, 52 and 63.

In short, Google's constructions are fully consonant with the principle of claim differentiation.  In any event, claim differentiation is an interpretative guideline, not a rigid rule. *See, e.g., Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.,* 246 F.3d 1368, 1376 (Fed. Cir. 2001).  "[T]he dependent claim tail cannot wag the independent claim dog."  *North Am. Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1577 (Fed. Cir. 1994).  Although there is a

would be error to read every nuance of the specification into the claims.  Google's claim interpretation properly takes a middle ground between these two extremes.  Google looks to the specification to see how the inventors contemplated using bid amounts to determine the ordering of search results.  The answer is given in the language of the specification:  "The higher the bid, the more advantageous the placement."  Patent at 5:35-40.  By contrast, Google's approach avoids reading in limitations not necessary to understand how the inventors used the bid amounts to determine ordering.  For example, while the specification states that "the search result list is arranged in order of decreasing bid amount, with the search listing corresponding to the highest bids displayed first to the searcher," *id.,* Google does not argue that "determined using" should be construed to require that the order be increasing or decreasing.  Whether the order is increasing or decreasing is not an issue addressed in the language of the claims, and it would be error to read such a limitation into the ordering claim terms.

[18] For example, a search result list might be presented as a "top ten" list, with the tenth "best" search listing presented first, followed by the ninth, and so on, with the "best" search listing presented last.

317500.01

presumption that different claims should have different scope, that presumption may be rebutted by a showing that the specification indicates otherwise. *Kraft Foods,* 203 F.3d at 1368; *see also Hormone Res. Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1567 n.15 (Fed. Cir. 1990) (the presumption of claim differentiation "cannot overshadow the express and contrary intentions of the patent draftsman"); *Tandon Corp. v. United States Int'l Trade Comm'n,* 831 F.2d 1017, 1023-24 (Fed. Cir. 1987) ("Whether or not claims differ from each other, one can not interpret a claim to be broader than what is contained in the specification and claims as filed."). As the Federal Circuit has explained,

> That the patentee chose several words in drafting a particular limitation of one claim, but fewer (though similar) words in drafting the corresponding limitation in another, does not mandate different interpretations of the two limitations, since defining a state of affairs with multiple terms should help, rather than hinder, understanding.

*Kraft Foods,* 203 F.3d 1362, 1368 (Fed. Cir. 2000).[19] Here, the specification demonstrates that the only ordering method the inventors intended to claim was one in which the order of the search listings conforms to the order of the bid amounts.

### 7.    Overture's definitions would render the claims invalid

"[C]laim language should generally be construed to preserve validity, if possible." *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.,* 279 F.3d 1357, 1367 (Fed. Cir. 2002); *see also Wang Labs.,* 197 F.3d at 1383 ("claims are not properly construed to have a meaning or scope that would lead to their invalidity for failure to satisfy the requirement of patentability"). If Overture's definitions are adopted, the claims fail to satisfy at least two requirements of the Patent Act. The Court should therefore reject Overture's proposed constructions.

### a.    Overure's definitions are indefinite

Overture's definitions are indefinite. 35 U.S.C. § 112, ¶ 2 (claims must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention"). Indefiniteness is "a legal conclusion that is drawn from the court's performance of

---

[19] *See also Multiform Desiccants,* 133 F.3d at 1480 ("claims that are written in different words may ultimately cover substantially the same subject matter."); *Tandon Corp,* 831 F.2d at 1023 ("two claims which read differently can cover the same subject matter").

317500.01

1  its duty as the construer of patent claims." *Personalized Media Comms., L.L.C. v. International*

2  *Trade Comm'n,* 161 F.3d 696, 705 (1998). "The primary purpose of the definiteness

3  requirement is to ensure that the claims are written in such a way that they give notice to the

4  public of the extent of the legal protection afforded by the patent, so that interested members of

5  the public . . . can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage*

6  *Dental Prods., Inc.,* 309 F.3d 774, 779 (Fed. Cir. 2002).

7      "[A]t some point a lack of clarity may result in a conclusion that the claim is too

8  indefinite to be valid." *Digital Biometrics, Inc. v. Indentix, Inc.,* 149 F.3d 1335, 1344 n.4 (Fed.

9  Cir. 1998); *see also Morton Int'l v. Cardinal Chem. Co.,* 5 F.3d 1464, 1470 (Fed. Cir. 1993)

10  (claims indefinite, because they "are not sufficiently precise to permit a potential competitor to

11  determine whether or not he is infringing"); *Standard Oil Co. v. American Cyanamid Co.,* 774

12  F.2d 448, 453 (Fed. Cir. 1985) ("partially soluble" indefinite). Claims are indefinite if they are

13  not stated with "sufficient clarity that the metes and bounds thereof can be determined." *Kemode*

14  *Mfg. Co. v. United States,* 347 F.2d 315, 319 (Ct. Cl. 1965).

15      Although limitations may sometimes be defined using words of degree (such as "about"

16  or "substantially") that do not convey numerical specificity, "[d]efiniteness problems often arise

17  when words of degree are used in a claim." *Seattle Box Co. v. Industrial Crating & Packing,*

18  *Inc.,* 731 F.2d 818, 826 (Fed. Cir. 1984). In that event, the Court must "determine whether the

19  patent's specification provides some standard for measuring that degree." *Id.* For example, in

20  *Amgen, Inc. v. Chugai Pharm. Co.,* 927 F.2d 1200 (Fed. Cir. 1991), the court concluded that

21  claims using the phrase "at least about" were indefinite, because "nothing in the specification,

22  prosecution history, or prior art provides any indication as to what range of specific activity is

23  covered by the term 'about.'" *Id.* at 1218.

24          **(i)    "corresponding to"**

25      Overture's definition of "corresponding to" flunks the test for definiteness. According to

26  Overture, the order of the search listings must be "similar" to that of the bid amounts. How

27  similar? The specification is silent, as is Overture's Opening Brief, except to note that it must be

28  more similar than would be mandated by "determined using," but it need not be as similar as "in

36

accordance with" requires.  The threshold clarity required by paragraph 2 of section 112 cannot have been met if Overture's standardless definition is adopted, because Overture has provided *no* guideposts that would explain what Overture might mean by "similar."

### (ii)    "determined using"

Overture's definition of "determined using" is also indefinite.  How much "utilization" is enough?  Is it enough to order search listings by keyword density, using the bid amount to break ties?  Can a prior art relevance algorithm contributes 99% of a listing's ranking score, with the bid amount contributing the remaining 1%?  Neither of these ordering schemes functions in a manner remotely similar to the invention described in the '361 specification, and thus neither can fall within the scope of the "determined using" limitation.  Neither of these systems offers advertisers the ability to "pinpoint" the placement of their search listings, Patent at 5:11, while also ensuring that "[a] higher bid . . . will result in a higher rank value and a more advantageous placement," *id.,* Abstract.

But *why* is it that those examples would not fall within the scope of the limitation, as defined by Overture?  What is the test?  How is the public to know whether a given ordering scheme infringes?  If Overture's definition is adopted, neither the claims nor the specification identifies the metes and bounds of the claims.

### (iii)    "in accordance with"

It appears that Overture is conceding that "in accordance with" means that the search listings must be in the same order as the bid amounts.  If so, the parties are in substantive agreement, though they disagree over the language that best expresses this meaning.  However, if Overture is advocating some broader meaning for "in accordance with," then the indefiniteness arguments stated above apply with equal force to its definition for "in accordance with."

### b.    If construed as Overture proposes, the claims would be invalid for lack of a supporting written description

Paragraph 1 of section 112 requires that the specification "contain a written description of the invention . . . ."  35 U.S.C. § 112, ¶ 1.  The written description must convey that the inventors were in actual possession of the invention at the time the application was filed.  *See Tronzo v.*

1  *Biomet,* 156 F.3d 1154, 1158 (Fed. Cir. 1998).  While the exact language of the claims need not

2  be found in the specification, "one skilled in the art, reading the original disclosure, must

3  immediately discern the limitation at issue in the claims." *Purdue Pharma,* 230 F.3d at 1323

4  (internal quotation marks and citation omitted); *see also Regents of the Univ. of Cal. v. Eli Lilly*

5  *& Co.,* 119 F.3d 1559, 1566-67 (Fed. Cir. 1997).

6          The written description requirement is distinct from the requirement that the specification

7  enable one skilled in the art to make use of the invention.  *Vas-Cath v. Mahurkar,* 935 F.2d 1555,

8  1563-64 (Fed. Cir. 1991) (citing *In re Wilder,* 736 F.2d 1516, 1520 (Fed. Cir. 1984) ("The

9  description requirement is found in 35 U.S.C. § 112 and is separate from the enablement

10  requirement of that provision.")).  It is not enough that the claimed invention is obvious in light

11  of the invention described in the specification; "the disclosure must describe the claimed

12  invention with all its limitations."  *See Tronzo,* 156 F.3d at 1158.[20]

13          A claim that is generic as to a given limitation (a "genus" claim) will not always be

14  supported by a written description that is limited to a single species of the claimed genus.  *See*

15  *Wilder,* 736 F.2d at 1520 (rejecting claims that were generic as to the method of indicating

16  location on a recording tape where the specification described only the species of indicating

17  location using synchronous scanning).  The question is whether the "specification adequately

18  describe[s] the full breadth of the claims."  *Amgen Inc. v. Hoechst Marion Roussel,* 314 F.3d

19  1313, 1330 (Fed. Cir. 2003); *see also Enzo Biochem, Inc. v. Gen-Probe Inc.,* 296 F.3d 1316,

20  1327 (Fed. Cir. 2002) (considering whether the disclosure's description was "representative of

21  the scope of the genus claims").

22          For example, in *Tronzo,* the patent-in-suit related to artificial hip sockets with cup

23  implants.  156 F.3d at 1156.  The patentee sought to enforce a claim that was generic as to the

24  type of cup used.  *Id.* at 1158.  The written description upon which the patentee relied described

25

26  _____

[20] *See also Lockwood v. American Airlines,* 107 F.3d 1565, 1572 (Fed. Cir. 1989) ("The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification."); *Martin v. Mayer,* 823 F.2d 500, 504 (Fed. Cir. 1987) (it is "not a question of whether one skilled in the art might be able to construct the patentee's device from the teachings of the disclosure . . . . Rather, it is a question whether the application necessarily discloses that particular device.") (internal quotation marks and citations omitted).

27

28

38

1    only a conical cup.  *Id.*  The defendant's device did not use a conical cup, but incorporated a

2    hemispherical cup.  *Id.*  Not only did the specification fail expressly to disclose a hemispherical

3    cup, it also specifically touted the advantages of using a cup that had a conical form.  *Id.* at 1159.

4    The specification therefore failed to provide a written description adequate to support claims that

5    were generic as to the cup limitation.  *Id.* at 1160.

6           If the Court adopts constructions broader than those proposed by Google, the same

7    reasoning would invalidate the claims for lack of a supporting written description.  As in *Tronzo,*

8    the '361 specification actually describes only *one* method of ordering – ordering the search

9    listings in the same order as the bid amounts.  As in *Tronzo,* the specification actively promotes

10   the advantages of the disclosed ordering method, harping on the benefits of allowing advertisers

11   not only to "control" (Patent at 3:51) and "easily predict" (*id.* at 5:7) the placement of their

12   search listings, but indeed to "pinpoint" (*id.* at 5:11) the placement of their search listings.

13          By describing a single species of ordering in the '361 specification – a species the

14   inventors argued was superior to prior methods that depended on "multiple criteria such as

15   keyword density and keyword location," *id.* at 2:48-53 – the inventors did not thereby

16   demonstrate a right to claim a broader genus of ordering methods, in which the order of the

17   search listings is merely "similar" to the order of the bid amounts, or perhaps merely bears some

18   distant relation to the bid amounts.  Simply put, if the claims extend to ordering methods other

19   than strict ordering by bid amount, the '361 specification fails to allow a person skilled in the art

20   to "clearly conclude that the inventor invented the claimed invention."  *Lockwood v. American*

21   *Airlines,* 107 F.3d 1565, 1572 (Fed. Cir. 1989).  Thus, because the Court should, if possible,

22   avoid claim constructions that would invalidate the claims, the Court should reject Overture's

23   constructions.  *Wang Labs.,* 197 F.3d at 1383; *Tate Access Floors,* 279 F.3d at 1367.

24   **E.**    **"in response to"**

25          **1.**    **The parties' proposed constructions**

| Google's Proposed Construction | Overture's Proposed Construction |
|---|---|
| in fulfillment of | in reaction to |

39

317500.01

**2.      Summary of dispute**

As described in the '361 specification, individual consumers use search engines because they are looking for specific and relevant information on the Internet. Accordingly, Google has proposed a definition that makes clear that the search result list generated by the bidding system claimed in the patent is intended to fulfill a searcher's request for specific information. Overture's proposed definition again ignores the crucial context supplied by the specification, which repeatedly and consistently describes the invention as an Internet search application – i.e. a method and system that "prioritize[s] results in accordance with consumers' preferences." Patent at 2:65-67. Under Overture's construction, anything that is generated "in reaction to" a request – even if it is, to use a legal term of art, entirely non-responsive – is a "response" to that request.

The Court's determination on this issue will answer the question of whether advertisements delivered by AWS – which appear alongside Google's PageRank search results – are "in response to" a searcher's search. When a searcher uses Google's search engine, he or she is seeking Google's PageRank search results. AWS delivers advertisements that Google hopes the searcher will be interested in – but those advertisements are decidedly *not* what the searcher asked for. Thus, should the Court adopt Google's definition, the results generated by AWS would not be "in response" to the searcher's inquiry.

**3.      The ordinary meaning of "in response to," read in the context of the specification, is "in fulfillment of"**

Google assumes the Court is familiar with the ordinary meaning of the word "response." The key question is whether a response is designed to include the search results the searcher is looking for. The answer to that question, upon consideration of the context supplied by the specification, is "yes." The claims require that a search result list be generated "in response to" a searcher's search. *See, e.g.,* Patent at 22:60-62 (claim 1). As the specification explains, that means the search engine should "prioritize results in accordance with *consumers' preferences*." *Id.* at 2:65-67 (emphasis added). The result? The searcher "find[s] companies or businesses that offer the products, services, or information *that the consumer is seeking.*" *Id.* at 3:58-62

1    (emphasis added).

2          Overture's definition fails to acknowledge the context of the claimed invention.

3    According to Overture, *anything* delivered in reaction to a searcher's search request is "in

4    response to" that request. For example, if the search engine crashes, presumably the standard

5    "This page cannot be found" error message[21] would fall within the scope of Overture's definition

6    of a "response to" a searcher's request. Overture's definition is inconsistent with the description

7    of the invention in the specification.

8    **F.**    **"database"**

9        **1.**    **The parties' proposed constructions[22]**

| Google's Proposed Construction | Overture's Proposed Construction |
| --- | --- |
| a computer based system for recording and maintaining information | a collection of related data, organized in such a way that its contents can be accessed, managed and updated by a computer |

    **2.**    **Summary of dispute**

      Overture's definition, with its reference to "related data," and its requirement that data be

"organized in such a way that its contents can be accessed, managed and updated by a

computer," is too narrow. Google's first concern is that Overture may be attempting to limit the

term "database" to certain specific, high-end databases called "relational databases." In a

relational database, data concerning the same subject matter may be stored in two or more

different "tables," and queries that depend on the "relations" between the data in the tables can

be made using an appropriate query language (such as, commonly, "structured query language,"

or "SQL").[23] If, in fact, this is what Overture is advocating, it presumably is taking this position

---

[21] *See* <http://www.cand.uscourts.gov/foo.html> (the web page this link points to does not exist, and thus will lead to a "not found" error message).

[22] Overture proposes a longer definition for the term "account database." Neither party identified "account database" as a disputed term; Overture added its definition of "account database" during the meet-and-confer process that led to the filing of the Joint Claim Construction Statement. Google does not believe that a special definition for "account database" is necessary. An account database is a database of accounts.

[23] *See generally* <http://hotwired.lycos.com/webmonkey/99/13/index1a_page2.html?tw=backend> (tutorial on relational databases).

317500.01

1  in an effort to distinguish the invention claimed by the '361 patent from prior art bid-for-

2  placement systems, including Overture's own pre-critical date system, which may have used

3  non-relational databases as a means for recording and maintaining account information.

4      Second, Overture may be arguing that advertisers must be able to access, manage, and

5  update their information in an "account database" by computer.  If so, Overture's position is

6  inconsistent with the ordinary meaning of the word "database," and unsupported by the

7  specification.

8      **3.  The ordinary meaning of "database," read in the context of the specification,
          is broad**

9

10     The term "database" is a technical term, and thus Federal Circuit cases encourage the

     Court to refer to treatises or textbooks to better understand its ordinary meaning.  *Pitney Bowes*,

11   182 F.3d at 1309.  The third edition of the classic database textbook by C.J. Date explains that a

12   "database system" is "nothing more than a computer-based recordkeeping system."  Kwun Decl.,

13   Exh. 24 at 3.  The Chamber Science and Technology Dictionary defines a database as a

14   "[c]ollection of structured data independent of any particular application."  Kwun Decl., Exh. 25

15   at 228.  Even the Elmasri and Navathe textbook cited by Overture explains that a database can

16   take many forms:

17
         You may have recorded this data in an indexed address book, or you may have
18       stored it on a diskette using a personal computer and software such as DBASE III
         or Lotus 1-2-3.  This is a collection of related data with an implicit meaning and
19       hence is a database.

20   Kwun Decl., Exh. 26 at 3.  At root, "a database has some source from which data are derived,

21   some degree of interaction with events in the real world, and an audience that is actively

22   interested in the contents of the database."  *Id.* at 4.  None of these definitions limits "database"

23   to any particular class of databases, such as relational databases.

24     The specification confirms that the inventors intended a broad meaning for the term

25   "database."  The inventors describe the World Wide Web as "a unique distributed database

26   designed to give wide access to a large universe of documents."  Patent at 1:44-45.  As the

27   inventors note, documents on the web are "dispersed across countless individual computer

28   systems" and the database that is the web "has no recognizable organization or morphology."  *Id.*

42

1    at 1:48-51.  More often than not, web pages are *not* stored in relational databases.[24]

2    Moreover, Overture's definition inappropriately defines a database using language that

3    describes a *database management system.  See* Kwun Decl., Exh. 26 at 4 ("[a] **database**

4    **management system (DBMS)** is a collection of programs that enables users to create and

5    maintain a database").  A "database" need not be designed to be manageable or updateable –

6    indeed, one database described in the specification, the World Wide Web, has "no recognizable

7    organization or morphology," and thus cannot readily be "managed."

8    In sum, the ordinary meaning of the term "database," as informed by the '361

9    specification, is simply "a computer based system for recording and maintaining information."

10   **G.    "deducted from an account"**

11   **1.    The parties' proposed constructions**

12   

| **Google's Proposed Construction** | **Overture's Proposed Construction** |
|---|---|
| subtracted from a prepaid account | taken away from a record of financial transactions |

15   **2.    Summary of dispute**

16   The Court's construction of this term is relevant to the infringement analysis because

17   Google does not require that AWS advertisers use prepaid accounts.  Instead, AWS generally

18   keeps track of click-throughs, and generally charges advertisers when they have exceeded their

19   credit limit.

20   **3.    The ordinary meaning of "deduct" is to "subtract" from a total; read in view**
     **of the specification, this requires a prepaid account**

21   

22   The New Oxford Dictionary of English defines "deduct" to mean to "subtract or take

23   away (an amount or part) from a total: *tax has been deducted from the payments.*"  Kwun Decl.,

     Exh. 27 at 480 (italics in original).  Webster's New World Collegiate Dictionary offers a similar

24   definition.  Kwun Decl., Exh. 28 at 360 ("to take away or subtract (a quantity)").  Merriam-

25   Webster's Unabridged Dictionary focuses on the same two points as the New Oxford definition –

26   

27   ────────────────────
     [24] *See* <http://ourworld.compuserve.com/homepages/ken_north/dsud_ddw.htm> (describing a
28   relational database that can be used to store web pages, in contrast to the "traditional method of
     organizing Web pages" in "individual files managed by the operating system").

43

317500.01

1  *subtracting* from a *total*.  Kwun Decl, Exh. 29.

2          Read in isolation, these definitions fail to clarify whether the "total" from which one

3  subtracts must be positive – i.e. whether one can "deduct" an amount from a credit-based

4  account.  The inventors, however, use "deduct" specifically to refer to prepaid accounts:

5          The bid amount **358** preferably is a money amount bid by an advertiser for a
        listing.  This money amount is *deducted from the advertiser's prepaid account* **or**
6        *is recorded for advertiser accounts that are invoiced* for each time a search is
        executed by a user on the corresponding search term and the search result list
7        hyperlink is used to refer the searcher to the advertiser's web site.

8  Patent at 13:4-9 (emphases added).  Thus, while bid amounts are "deducted" from prepaid

9  accounts," they are "recorded" for credit-based accounts.[25]

10         Extrinsic evidence, such as dictionary definitions, cannot be used "to vary claim terms

11  from how they are defined, even implicitly, in the specification."  *Guttman,* 302 F.3d at 1360.

12  The specification's careful distinction between prepaid accounts and invoiced accounts therefore

13  controls.  The word "deduct," as used in the claims of the '361 patent, requires use of a prepaid

14  account.

15  **H.      "account record"**

16

| Google's Proposed Construction | Overture's Proposed Construction |
|---|---|
| a record of information pertaining to an account | a collection of data that is part of a database, where the data relates to a customer or client |

19         Google believes that the terms "account" and "record," as used in the '361 patent, have

20  no special meaning beyond their ordinary meanings.  Nothing in the specification suggests

21  otherwise, and indeed Overture's Opening Brief fails to cite anything from the specification.

22         Google's main concern with Overture's definition was whether Overture was perhaps

23  attempting implicitly to alter the meaning of the claim term, thereby artificially narrowing the

24  term.  Having reviewed Overture's Opening Brief, Google now believes that the parties' dispute

25  _____

26  [25] Overture argues that this portion of the specification supports its construction, because
   Google's construction fails to include the disclosed idea of invoiced, non-prepaid accounts.
   However, many of the claims do not include the "deduct" limitation.  *See, e.g.,* Patent at 28:10-
27  52 (claim 52).  Thus, the fact that, according to Google, claims that *do* include the "deduct"
   limitation exclude the possibility of invoiced accounts does not counsel against Google's
28  construction.

317500.01

1    over the term "account record" amounts to no more than a difference of opinion concerning the

2    best words to express a simple idea.

3         Google believes that its proposed construction better captures the meaning of the term

4    "account record," but does not specifically take issue with Overture's construction.  Overture

5    appears likewise merely to prefer its own choice of words.  Google respectfully suggests that the

6    proper course of action for the Court may simply be to declare that no construction is necessary

7    for this term.

8    **I.    "from a/the searcher"**

| Google's Proposed Construction | Overture's Proposed Construction |
| --- | --- |
| input by the individual using the search engine to perform a search | originated by the user who is seeking information |

12         Overture correctly frames the dispute:  When a "searcher" submits a query, does that

13    imply that the searcher is using a search engine?  Overture is also correct when it notes that none

14    of the dictionaries refer to search engines.  But, as Google has noted many times, claim language

15    must be read in light of the specification.  And, as explained above while discussing the claim

16    term "search result list," the purported invention of the '361 patent relates to *searches* conducted

17    with a *search engine.  See supra,* Part IV.A.4.b(ii).  The '361 patent is concerned with and

18    describes only one type of search – a search using a search engine.  In this context, a "searcher"

19    is one who uses a search engine.

20         The patent consistently describes a "searcher" as one who uses a search engine.  Patent at

21    5:25-27 ("each time search clicks on the . . . listing in the search result list generated by the

22    search engine"); *id.* at 5:37 ("searcher using the search engine"); *id.* at 6:4-5 ("when the search

23    term is entered into the query box on the search engine by the searcher"); *id.* at 10:9-10 ("The

24    searchers may access, through their browsers **16**, a search engine web page **36** residing on web

25    server **24**."); *id.* at 10:13-14 ("the searcher may query the search engine web server"); *id.* at

26    10:17-18 ("searcher may transmit the query to the search engine web server"); *id.* at 17:19-20 ("a

27    remote searcher accesses the search query page on the search engine web server").

28         Overture's only argument to the contrary is that the dictionary definitions do not refer to

1    search engines.  However, claims "must be interpreted in light of the teachings of the written

2    description and purpose of the invention described therein." *Apple Computer,* 234 F.3d at 25.  In

3    light of the repeated, clear, and consistent usage in the specification, one skilled in the art would

4    understand that a "searcher" is one who is using a search engine, and thus that "from a/the

5    searcher" means "input by the individual using the search engine to perform a search."

6                                        **V.      CONCLUSION**

7              For the foregoing reasons, Google respectfully requests that the Court adopt Google's

8    proposed constructions of the disputed claim terms, and that it reject Overture's proposed

9    constructions.

10

11   Dated:  August 22, 2003                          KEKER & VAN NEST, LLP

12

13

                                                      By:    ___/s/ Daralyn J. Durie_____
14                                                          DARALYN J. DURIE
15                                                          Attorneys for Defendant and
                                                           Counterclaimant GOOGLE
16                                                          TECHNOLOGY INC., sued under its
                                                           former name GOOGLE INC.

17

18

19

20

21

22

23

24

25

26

27

28

317500.01