1  KEKER & VAN NEST, LLP
   JOHN W. KEKER - #49092
2  DARALYN J. DURIE - #169825
   CHRISTINE P. SUN - #218701
3  RAVIND S. GREWAL - #220543
   710 Sansome Street
4  San Francisco, CA 94111-1704
   Telephone: (415) 391-5400
5  Facsimile: (415) 397-7188

6  Attorneys for Defendant and Counterclaimant
   GOOGLE INC.

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11

12 | OVERTURE SERVICES, INC.,                  | Case No. C 02-01991 JSW (EDL)

13 |         Plaintiff and Counterdefendant,   | **GOOGLE'S RESPONSIVE CLAIM
                                                 CONSTRUCTION BRIEF
14 |    v.                                       (REDACTED VERSION)**

15 | GOOGLE INC.,                                Tutorial:    March 10, 2004, 2:00 p.m.
                                                 Hearing:     March 24, 2004, 2:00 p.m.
16 |         Defendant and Counterclaimant.     Courtroom:   2, 17th Floor
                                                 Judge:       Hon. Jeffrey S. White

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

I.   INTRODUCTION ...................................................................................................1

II.  BACKGROUND .....................................................................................................1

    A.   Overview of the '361 Patent ........................................................................1

    B.   Overview of Google AdWords Select .........................................................3

III. LEGAL STANDARD..............................................................................................4

    A.   Claim Interpretation Requires a Review of the Intrinsic Evidence ..................................4

    B.   Dictionary Definitions, Although Often Useful, Are Never Alone
        Determinative..............................................................................................5

IV.  ARGUMENT...........................................................................................................6

    A.   "search listing" and "search result list"........................................................6

        1.   A "search listing" is an entry in (or intended to be in) a search result
            list........................................................................................................7

        2.   Google's construction of "search result list" is consistent with the
            ordinary meaning of the claim terms, as used in the specification ..........................8

            a.   A "search result" is something obtained in response to a search
                submitted by a consumer using an Internet search engine..............................8

            b.   A "list" is a series of entries, arranged one after the other..........................10

    B.   "[modifiable] bid amount" ...........................................................................11

        1.   A bid amount is the amount a successful bidder will pay......................................11

            a.   Both the ordinary meaning and the specification confirm that "bid
                amount" is the amount the advertiser *will* pay..............................................11

            b.   The prosecution history confirms the meaning of "bid amount"....................12

            c.   Overture has confirmed that "bid amount" refers to the actual
                price that will be paid.......................................................................................13

            d.   The extrinsic evidence supports Google's construction ..............................14

        2.   "Modifiable" means the bid amount can be changed by the web site
            promoter...............................................................................................15

    C.   "a modifiable bid amount that is *independent of* other components of the
        search listing"...............................................................................................16

i

## TABLE OF CONTENTS
### (continued)

                                                            **Page**

D.    The Ordering Limitations ........................................................................17

    1.    The dictionary definitions fail to resolve all ambiguities about the definitions of the ordering terms ...........................................................17

    2.    Overture's definitions would render the claims invalid as being indefinite to the extent they seek to broaden the scope of these terms beyond strict ordering ........................................................................18

    3.    The specification supports Google's constructions ...............................19

E.    "in response to" .......................................................................................22

F.    "database" ...............................................................................................22

G.    "deducted from an account" .....................................................................24

H.    "account record" .....................................................................................24

I.    "from a/the searcher" ..............................................................................25

V.    CONCLUSION ..............................................................................................25

325441.02

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page(s)**

*All Dental Prodx, LLC v. Advantage Dental Products, Inc.*
309 F.3d 774 (Fed. Cir. 2002) ...................................................................................19

*Athletic Alternatives, Inc v. Prince Manufacturing, Inc.*
73 F.3d 1573 (Fed. Cir. 1998) .....................................................................................1

*Augustine Medical, Inc. v. Gaymar Industrial, Inc.*
181 F.3d 1291 (Fed. Cir. 1999) ...................................................................................3

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,*
334 F.3d 1294 (Fed. Cir. 2003) .................................................................................18

*Combined System, Inc. v. Defense Tech. Corp. of America*
350 F.3d 1207 (Fed. Cir. 2003) ...................................................................................5

*Deering Precision Instruments, L.L.C. v. Vector Distributing System*
347 F.3d 1314 (Fed. Cir. 2003) .................................................................................15

*Elkay Manufacturing Co. v. Ebco Manufacturing Co.*
192 F.3d 973 (Fed. Cir. 1999) ...................................................................................13

*Ferguson Beauregard/Logic Controls v. Mega Systems, LLC*
350 F.3d 1327 (Fed. Cir. 2003) .................................................................................20

*Guttman, Inc. v. Kopykake Enterprises, Inc.*
302 F.3d 1352 (Fed. Cir. 2002) ...................................................................................4

*Kemode Manufacturing Co. v. United States*
347 F.2d 315 (Ct. Cl. 1965) .......................................................................................19

*Kraft Foods, Inc. v. International Trading Co.*
203 F.3d 1362 (Fed. Cir. 2000) .................................................................................22

*Kumar v. Ovonic Battery Co.*
351 F.3d 1364 (Fed. Cir. 2003) ...................................................................................2

*Markman v. Westview Instrs., Inc.*
52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) ...........................................4

*North America Vaccine, Inc. v. American Cyanamid Co.*
7 F.3d 1571 (Fed. Cir. 1994) .....................................................................................22

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*
182 F.3d 1298 (Fed. Cir. 1999) .................................................................................23

*Renishaw PLC v. Marposs SpA*
158 F.3d 1243 (Fed. Cir. 1998) ................................................................................5, 6

*SciMed Life System v. Advanced Cardiovascular System, Inc.*
242 F.3d 1337 (Fed. Cir. 2001) ..............................................................................5, 20

iii

## TABLE OF AUTHORITIES

**Page(s)**

*Seattle Box Co. v. Industrial Crating & Packing, Inc.*
  731 F.2d 818 (Fed. Cir. 1984) ........................................................................................19

*Texas Digital Systems, Inc. v. Telegenix, Inc.*
  308 F.3d 1193 (Fed. Cir. 2002) .................................................................................4, 6, 19

*Vitronics Corp. v. Conceptronic, Inc.*
  90 F.3d 1576 (Fed. Cir. 1996) ........................................................................................12

*Vivid Techs., Inc. v. American Sci. & Engineering, Inc.*
  200 F.3d 795 (Fed. Cir. 1999) .........................................................................................3

### FEDERAL STATUTES

35 U.S.C. § 112, ¶ 2 .........................................................................................................19

37 C.F.R. § 1.104(e).........................................................................................................12

iv

325441.02

## I.   INTRODUCTION[1]

Overture's Opening Brief demonstrates a slavish devotion to selected dictionary definitions, while ignoring that such definitions are only one part of the claim construction inquiry. Overture's failure to address the intrinsic evidence leads to two fundamental problems. *First*, Overture frequently proposes that the Court simply replace each of the disputed words with synonyms found in dictionaries. These purported definitions may be unobjectionable in the abstract, but they fail to shed any light on the crucial interpretive disputes that must be resolved in order for the court (or a jury) to address the ultimate issues of invalidity and non-infringement. *Second*, by ignoring its own description of the purported invention, Overture seeks to enlarge the scope of some of the patent's claim terms in ways that are fundamentally inconsistent with the stated purpose of the invention. But for *other* claim terms, Overture proposes narrow definitions that are informed by the patent specification. Overture thus fails to follow the "predictable claim construction analysis [that] is essential to the patent system." *Athletic Alternatives, Inc v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1998).

## II.   BACKGROUND

### A.   Overview of the '361 Patent

The '361 patent claims a purportedly novel method of doing what search engines are supposed to do – "prioritize results in accordance with consumers' preferences." 2:66-67. According to the '361 inventors, pre-existing search engines that relied on relevance algorithms were ill-equipped to achieve their goals and often provided random or irrelevant search results. *See* 2:48-67. At the same time, the '361 patent specification posits that traditional Internet advertisement methods were ineffective. *See* 3:16-41 (criticizing prior art "banner" advertisements, including keyword-targeted advertisements). The '361 inventors propose a single solution to both these problems: "[W]eb site promoters should be able to control their placement in search result listings so that their listings are prominent in searches that are relevant

---

[1] Unless otherwise indicated, all citations herein are to the '361 patent, a copy of which appears as Overture *Markman* Exh. 1. Citations in the form ___:___ are to the column and line numbers indicated, respectively. Unless otherwise indicated, citations to *numbered* exhibits refer to Exhibits to the concurrently filed Declaration of Ravind S. Grewal, while citations to *lettered* exhibits refer to Exhibits to the Declaration of Christine P. Sun, filed under seal concurrently

1    to the content of their web site." 3:51-54.

2        In doing so, the '361 patent describes a shift in the paradigm of searching for information

3    on the Internet from one that is information-based to one that is commerce-based. Indeed, the

4    '361 patent states that the "search engine functionality of the Internet needs to be focused in a

5    new direction to facilitate an on-line marketplace." 3:54-56. Consistent with this commercial

6    marketplace approach, the '361 patent describes the people conducting the searches as

7    "consumers" rather than as "users." *See, e.g.,* 2:33; 2:40; 2:63; 2:66; 3:8; 3:11; 3:28; 3:49; 3:56;

8    3:59. And it describes the authors of the web sites listed in the search results as "web site

9    promoters" and "advertisers" rather than information providers. *See, e.g.,* 2:38-39; 2:59-60;

10   3:20-22; 3:33-34; 3:48; 3:51; 3:57-58; 3:65. In short, the '361 patent envisions a world where

11   the searcher is a "consumer" looking for commercial information whose ordering is influenced

12   by an advertiser, rather than a "user" looking for non-commercial information whose ordering is

13   influenced by mathematical algorithms.

14       The abstract succinctly describes the claimed invention: Advertisers submit "search

15   listings" having a description, at least one search term, and a bid amount. *See* Abstract.

16   Advertisers bid on search terms "through a continuous online competitive bidding process."

17   Abstract; *see also* 5:1-5. "A higher bid . . . will result in a higher rank value and a more

18   advantageous placement." Abstract.

19       Despite the relative youth of both the Internet and the search engine industry, the basic

20   concept of allowing web site promoters to control their placement did not originate with the '361

21   inventors. The inventors concede that others had previously used keywords to target

22   advertisements, such as "banner" ads that appear above or alongside the search results, to search

23   terms on search engines. 3:28-30; *see also* Fig. 7 (showing "At Hand" banner ad at top of web

24   page). Moreover, Open Text had previously sold placement in search engine results. Exh. 1 at

25   OVG 1371 (of record).[2] The pricing model chosen by the inventors – cost-per-click rather than

26   _____

herewith.

27   [2] Articles cited during the prosecution of a patent application are intrinsic evidence. *Kumar v.
     Ovonic Battery Co.,* 351 F.3d 1364, 1368 (Fed. Cir. 2003) (citing cases). In this brief, Google

28   will include "of record" parenthetical references when citing articles that were cited during
     prosecution. The first four pages of the '361 patent list articles and patents that were cited during

2

1  per-impression pricing, *see, e.g.,* 5:22-27 – was also someone else's idea; Proctor & Gamble had

2  bargained for cost-per-click advertisements on Yahoo! as early as 1996. *See* Exh. 2 at OVG

3  1216 (of record). Finally, others had sold advertisement placements through auctions before.

4  *See* Exh. 3 at OVG 1124 (of record) (citing articles from 1997 that described advertising

5  auctions). The '361 patent is thus not entitled to the broad construction that would attend a

6  pioneer patent in the field. *See Augustine Med., Inc. v. Gaymar Indus., Inc.,* 181 F.3d 1291, 1301

7  (Fed. Cir. 1999) ("non-pioneers . . . must craft narrow claims to evade the strictures of a crowded

8  art field").

9  **B.    Overview of Google AdWords Select[3]**

10       Google is one of the most popular search engines on the Internet. Hundreds of millions

11  of users visit Google because of its uncanny ability to rank search results using a complicated

12  and proprietary algorithm that includes Google's "PageRank" technology.[4] The search results

13  produced by Google's search engine have been lauded for their objectivity, since Google is one

14  of the few companies that does not allow commercial considerations to affect the ranking of its

15  search results. *See* <http://www.rankforsales.com/google-page-rank.html> (noting that "no one

16  can buy a higher PageRank").

17       Google also shows advertisements on the search results page in an effort to earn revenue

18  in much the same way that the '361 patent describes the prior art "traditional" search engines as

19  showing advertisements on search results pages, *see* 3:28-30. These advertisements are *not*

20  search results, just as the "banner" advertisements in prior art search engines were not search

21  results. These banner advertisements instead appear on the same page as but to the right of

22  search results, in small boxes that are clearly labeled 'sponsored links' to distinguish the

23  advertisements from the search results themselves. *See* <http://www.searchenginewatch.com/

24

25

26  prosecution.
   [3] The meaning of a claim term does not depend on the method or device accused of infringement.
   *See Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999).
27  However, because claim construction is for "resolution of disputed meanings," *see id.* (quotation
   marks and citation omitted), some familiarity with AdWords Select may be useful in order to
28  allow the Court better to understand the areas of dispute. *Id.*
   [4] *See* <http://www.google.com/technology/index.html> (describing PageRank).

325441.02

1    searchday/article.php/2159301>.[5]

2       In February 2002, Google introduced an advertising service, AdWords Select ("AWS"),

3    *see id.,* which Overture accuses of infringing the '361 patent. "AdWords advertisements appear

4    on search result pages when a query matches the keywords purchased by advertisers." *Id.*

5    Unlike the objective Google search results, the placement of AWS advertisements is based on a

6    variety of factors including the advertisement's click-through rate, the amount the advertiser is

7    willing to pay per click, and geographic targeting. AWS also incorporates a feature called the

8    "AdWords Discounter." *Id.* The AdWords Discounter "monitors all bids placed for keywords,

9    constantly on the lookout for changes. If a competitor's bid drops on a keyword, the discounter

10   automatically lowers your bid . . . ." *Id.*

11                            **III. LEGAL STANDARD**

12   **A.     Claim Interpretation Requires a Review of the Intrinsic Evidence**

13       Overture repeatedly cites *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193

14   (Fed. Cir. 2002), in support of its assertion that claim terms ought to be construed based on their

15   dictionary definitions. But *Texas Digital* cautions that one must also consult the intrinsic

16   evidence:

17        By examining relevant dictionaries, encyclopedias, and treatises to ascertain possible
        meanings that would have been attributed to the words of the claims by those skilled
18        in the art, *and by further utilizing the intrinsic record to select from those possible
        meanings the one or ones most consistent with the use of the words by the inventor,*
19        the full breadth of the limitations intended by the inventor will be more accurately
        determined and the improper importation of unintended limitations from the written
20        description into the claims will be more easily avoided.

21   308 F.3d at 1205 (emphasis added).

22       *Texas Digital's* recitation that the specification must be construed in defining disputed

23   claim terms is nothing new. As succinctly stated in *Markman v. Westview Instrs., Inc.,* 52 F.3d

24   967, 979 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996), "[c]laims must be read in view

25   of the specification, of which they are a part." And in fact, subsequent cases make clear that the

26   specification "is the single best guide to the meaning of a disputed term." *Guttman, Inc. v.*

27   *Kopykake Enters., Inc.,* 302 F.3d 1352, 1360 (Fed. Cir. 2002) (quotation marks and citation

28   ─────────────────────
    [5] SearchEngineWatch.com is a site that is well known as a source of independent analysis in the

1  omitted); *SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir.

2  2001) (specification's description of the "present invention" is "strong evidence" regarding the

3  scope of the claim).  As recently as two months ago, the Federal Circuit warned district courts

4  not to "read some isolated statements [regarding dictionaries] in certain recent opinions too

5  rigidly and in isolation from the entire body of our claim construction jurisprudence." *Combined*

6  *Sys., Inc. v. Defense Tech. Corp. of Am.*, 350 F.3d 1207, 1215 (Fed. Cir. 2003).

7      There are, of course, limits on how the specification may be used.  The specification may

8  be used in the claim construction process to define the words that actually appear in the claims.

9  *See Renishaw PLC v. Marposs SpA*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("[A] party wishing to

10  use statements in the written description to confine or otherwise affect a patent's scope must, at

11  the very least, point to a term or terms in the claim with which to draw in those statements.").

12  Thus if the specification clarifies the meaning of a claim term, courts are entitled to rely upon the

13  context provided by the specification to define the scope of the claims.  *See id.* at 1251-53

14  (construing "when" narrowly in light of the specification).  In contrast, the specification may not

15  be used to import limitations into the claims when the proposed limitations are divorced from the

16  claim terms.  *See id.* at 1248.

17      Overture itself relies on the specification to define claim terms, when that approach

18  works in its favor.  For example, Overture's construction of "bid amount" is stated in terms of a

19  "click."  Notably, this conclusion finds no support in the language of the claims, considered in

20  isolation.  Nor is it derived from dictionary definitions.  Instead, the *only* way one knows that a

21  bid amount is measured on a cost-per-click basis is the specification's repeated and consistent

22  explanation that the invention is based on a cost-per-click pricing model.  Google agrees that the

23  Court can construe "bid amounts" to be limited to cost-per-click bids.  But doing so requires

24  Overture (and the Court) to adopt a consistent methodology in construing the other disputed

25  terms and phrases.

26  **B.    Dictionary Definitions, Although Often Useful, Are Never Alone Determinative**

27      The Court should reject dictionary definitions that "hav[e] no relation to the claimed

28  _____

Internet search industry.

5

1  invention." *Texas Digital,* 308 F.3d at 1203. Instead, the Court should look for the definition

2  that is "is most consistent with the use of the words by the inventor." *Id.* Only if there are

3  multiple definitions that are "most consistent" with the usage in the specification should the

4  claims be construed to encompass all of those meanings. *See id.; see also id.* at 1205 (claim

5  construction requires selecting from ordinary meanings "the one or ones *most* consistent with the

6  use of the words by the inventor" (emphasis added)).

7      "[I]f the inventor has disavowed or disclaimed scope of coverage, by using words or

8  expressions of manifest exclusion or restriction," the inventor's description of his invention will

9  control. *Id.* at 1204. Even where there is no expression of "manifest" exclusion, if the

10  specification "uses the words in a manner clearly inconsistent with . . . a dictionary definition,"

11  that definition should be rejected. *Id.* Thus, "the construction that stays true to the claim

12  language and most naturally aligns with the patent's description of the invention will be, in the

13  end, the correct construction." *Renishaw PLC,* 158 F.3d at 1250.

## IV.  ARGUMENT

15  **A.    "search listing" and "search result list"**

16      Google has defined the term "search listing" as "an entry that is or is intended to be in a

17  search result list," and the term "search result list" as a series of such entries arranged one after

18  the other (i.e. a "list").[6] Overture has recently revised its definitions of these terms, purportedly

19  to "moot" some of Google's objections and to "clarify" its proposals.[7] Overture has, for

20  example, revised "search listing" in response to Google's argument that requiring the inclusion

21  of "at least one search term" was neither supported by the specification nor internally consistent.

22  Overture has also made clear that a search listing may be "paid or unpaid." As to the other term,

---

[6] The precise definitions proposed by the parties for these and other disputed claim terms are set
forth in the Joint Claim Construction Statement, which was filed on June 24, 2003 and
purportedly revised by Overture by letter on January 20, 2004. *See* Exh. 4.
[7] Although Overture has had many months to contemplate Google's objections, as set forth in
Google's responsive claim construction brief filed in August 2003, Overture only informed
Google that it desired to revise its constructions 10 days ago and provided no argument in favor
of its new constructions. Because Google will not have had the opportunity to address
Overture's fully briefed arguments in Google's one claim construction brief, Google requested
that Overture stipulate to Google's filing of a sur-reply of no more than 5 pages, limited to these
two search terms. *See* Request for Misc. Administrative Relief, p. 1 (concurrently filed with this
brief). Overture refused to stipulate, despite its inability to explain why it would be prejudiced

325441.02

1    Overture has apparently conceded that a "search result list" is an *ordered series* of "search

2    listings," rather than merely a *set*. Although Overture's concessions have partially eliminated

3    Google's concerns, they have not completely resolved the disputes between the parties.

4    **1.    A "search listing" is an entry in (or intended to be in) a search result list**

5        The parties dispute whether a search listing must be a "collection of information," as

6    Overture urges, or may be simply understood as an "entry" in a search result list.[8] The Court

7    should reject Overture's proposed construction as inconsistent with the plain meaning of the term

8    as well as the specification.

9        While it may be correct that a search listing will in practice almost always be a

10   "collection of information," such as the search term, web site description, URL, and bid amount,

11   Overture's attempt to import the requirement that a search listing *must* contain multiple bits of

12   information should be rejected. The '361 patent does not purport to have invented the concept of

13   a "search listing," only a method for ordering search listings in a search result list. *See* 2:33-35

14   (prior art search engines "enable consumers to search the Internet for a listing of web sites based

15   on a specific topic, product, or service of interest"); 3:51-54 ("Ideally, web site promoters should

16   be able to control their placement in search result listings so that their listings are prominent in

17   searches that are relevant to the content of their web site."). In early prior art bid-for-placement

18   systems, a search listing may have included only the URL of the advertiser's web site, which

19   Overture would presumably argue is not a "collection of information." Overture's proposed

20   construction of "search listing" should be rejected as artificially narrower than its ordinary

21   meaning.

22       The specification also confirms that a "search listing" may be simply understood as an

23   entry in (or intended to be in) a search result list, and places no limitation on the kinds or amount

24   of information that must be included in a "listing":

25   by a sur-reply. *See id.*

26   [8] Overture's Opening Brief emphasizes that search listings exist independent of whether they are
     included in a search result list. *See, e.g.,* Opening Brf. at 8:9-11. This is not disputed. Google's

27   definition includes entries that are "in *(or intended to be in)* a search result list" (emphasis
     added). Thus, a search listing can exist even before it is included in a search result – and, indeed,

28   even if it is never included in a search result list. Overture also contends that Google asserts that
     a search result list *must* be displayed. Google's definition, however, does not anywhere use the

7

325441.02

1
2
3

> The web site description **354** is a short textual description (preferably less than **190** characters) of the content of the advertiser's web site and *may be* displayed as part of the advertiser's *entry in a search result list*. The *search listing* **344** *may also* contain a title **360** of the web site that may be displayed as the hyperlinked heading to the advertiser's *entry* in a search result list.

4   12:56-62 (emphases added); *see also* 13:1-2. Thus, consistent with its ordinary meaning and

5   Google's definition, the specification permits but does not require that a search listing be a

6   collection of information.

7      **2.**   **Google's construction of "search result list" is consistent with the ordinary meaning of the claim terms, as used in the specification**

8

9      **a.**   **A "search result" is something obtained in response to a search submitted by a consumer using an Internet search engine**

10      The parties also dispute whether the search result list must be responsive to the searcher's

11  inquiry. Google contends that the search result list must be in fulfillment of the consumer's

12  request for information, whereas Overture's proposed construction includes no analogous

13  limitation.[9]

14      Overture's *latest* definition of "search result" – "search listings . . . obtained as a

15  consequence of the examination of data" – is unhelpful. Substituting Overture's definition of

16  "search listing" in its definition of "search result list" yields the following definition: a "search

17  result list" is "a series of [a collection of information that can be included in a search result list

18  and which may be paid or unpaid] that is obtained as a consequence of the examination of data."

19  In short, Overture's definition is circular: it has defined "search result list" in terms of search

20  listing, and "search listing" in terms of a search result list.

21      Moreover, Overture's latest definition is overbroad and inconsistent with the

22  specification. As illustrated in Figure 7 of the '361 patent, a search results page includes many

23  things besides the search results. For example, it may contain the GoTo.com logo; the banner

24  _____

word "display."

25  [9] This dispute is relevant to infringement because the list generated by AWS is not in response to the search request and therefore is not a "search result list." Instead, a searcher using Google's

26  site requests and receives a list generated by a Google "web search" server – that is, search listings from Google's neutral and unpaid database of web sites, ordered using Google's

27  PageRank algorithm. The searcher also receives a list of advertisements displayed next to the PageRank results, which is *not* the information that the searcher has requested. In fact, those

28  advertisements are no more "search results" than the advertisements that are distinguished from search results in the '361 patent.

1   advertisement at the top of the page; the search box; the "Find It!" button; etc. None of those can

2   reasonably be called a "search result," and yet each is "obtained as a consequence of the

3   examination of data." Since not everything on a search result page is a "search result," any

4   definition of "search result" must help differentiate a search result from the non-search result

5   content that may appear on the page.

6        The term "search result" is best understood in reference to the concept of "search." A

7   "search" happens when a user is looking for a particular piece or type of information and a

8   "search result" is the information provided in response to that search.[10] 2:32-35 ("search

9   services enable consumers to search the Internet for a listing of web sites based on a specific

10  topic, product, or service of interest"). The entire '361 patent is devoted to a methodology for

11  conducting user-requested searches so as to increase the relevance to the searcher of the results

12  of his or her searches. *See* 3:54-58. Consistent with that purpose, the '361 specification

13  repeatedly demonstrates that the term "search result" refers to the outcome (i.e., *result*) of a

14  *search* requested by a user. *See, e.g.,* 2:42-46; 4:60-64; 9:42-45; 10:16-21; 13:13-16; Fig. 7 and

15  accompanying description at 17:53-61. So a "search result" is the information provided in

16  response to the searcher's query, not other information that may also be included on the results

17  page such as banner or tile advertisements.

18        Indeed, the specification specifically excludes banner advertisements from the scope of

19  the term "search result." *Compare* 3:16-17 (prior art relies on "current paradigms for generating

20  web site traffic, such as banner advertising") *with, e.g.,* 3:51-54 ("Ideally, web site promoters

21  should be able to control their placement *in* search result listings . . . .") (emphasis added).

22  Keyword triggered banner advertisements are also excluded. *See* 3:28-30 (prior art targets

23  banners to search terms). Because Overture's proposed definition would encompass within the

24  same banners that are explicitly distinguished from search results in the specification, it cannot

25  be correct.

26        The extrinsic evidence confirms that search results consist of the information the searcher

---

[10] The title of the patent refers to a "search result list" as being generated by a "search engine." Internet search engines represent one solution – well known at the time the application was filed – to allow Internet users to find information they are looking for among the "seemingly limitless

325441.02

1  is seeking and exclude other information such as banner or tile advertisements that may appear

2  on the same page as search results.


**REDACTED**


**b.   A "list" is a series of entries, arranged one after the other**

By its revisions, Overture appears to have conceded that a "list" is, as Google proposes,

an *ordered* series of entries, and not merely a "set" of search listings.  To the extent that Overture

does not agree that the claim language requires that the entries (i.e. the search listings) be

arranged in an order, the Court should reject Overture's definition in favor of Google's, which is

consistent with the ordinary meaning of the word "list."[12]

Google's definition is also consistent with the language of the claims, each of which

indicates that a "list" is what one gets after placing search listings *in an order*.[13]  The context

supplied by the patent specification also supports Google's definition.  The specification

consistently uses the term "search result list" to refer to an *ordered* set of search listings.  *See,*

*e.g.,* Abstract (advertisers can "influence a position for a search listing within search result list,"

---

number of web pages" available on the World Wide Web.  2:26-35.

[11] This distinction is important, because Google's AWS takes a different approach.  Instead of
including advertisers' listings *in* search results, AWS places advertisements *next to* search
results.  "The main difference between the two programs is the way in which their ads are listed
– Google's are highlighted alongside the regular Google search results, and Overture's appear
AS regular search results."  Exh. 5 at GOG 32243 (capitalized emphasis in the original).

[12] American Heritage defines a "list" as "a series of names, words, or other items written,
printed, or imagined one after the other[.]"  Exh. 6 at 1021.  The New Oxford Dictionary of
English similarly defines a list as "a number of connected items or names written or printed
consecutively, typically one below the other[.]"  Exh. 7 at 1076.

[13] 23:11-12 (claim 1, "ordering the identified search listings into a search result list"); 24:1
(claim 11, same); 24:27-28 (claim 13, same); 25:33-35 (claim 14, "the search result list arranged
in an order determined using the bid amounts"); 27:2-3 (claim 30, "the search result list arranged
in an order corresponding to the bid amounts"); 28:50-51 (claim 52, same).

10

1  because position is determined by "rank," which is in turn determined by the "bid amounts" of

2  the search listings); 4:3-4 ("The higher an advertiser's position on a search result list, the higher

3  likelihood of a 'referral'"); 5:11-12 (invention allows advertisers "to pinpoint the placement of

4  their web site description within the search results").

5  **B.     "[modifiable] bid amount"**

6      **1.    A bid amount is the amount a successful bidder will pay**

7          The parties dispute whether "bid amount" means the amount that an advertiser will

8  actually pay if the user clicks on an advertisement (Google's position) or whether it means the

9  maximum amount the advertiser is willing to pay if a user clicks on an advertisement (Overture's

10  position). This is significant because AWS advertisers set a *maximum* bid, but the bid amount

11  they actually pay depends on a variety of other factors and is therefore not independent of other

12  components of the search listing as required by all of the claims.

13          **a.    Both the ordinary meaning and the specification confirm that "bid amount"
              is the amount the advertiser *will* pay**

14

15          The dictionary definitions cited by the parties overwhelmingly favor Google. For

16  example, Random House defines bid, in its verb form, to mean "to offer (a certain sum) as the

17  price one will pay or charge: *They bid $25,000 and got the contract.*" Exh. 8 at 204 (Random

18  House's italics).[14] If a collector sends an buyer to a Sotheby's auction with instructions to bid no

19  more than $10 million for a Picasso, and the buyer submits a winning bid of $5 million, no one

20  would argue that the collector's "bid amount" was $10 million rather than $5 million.[15]

21          The patent specification unequivocally demonstrates that the "bid amount" is the amount

22  an advertiser will pay. In particular, the specification defines the cost of a search listing as the

23  bid amount multiplied by the number of click-throughs:

24          The system calculates the projections based on a cost projection algorithm . . . using
            [any of] a number of different algorithms known in the art. However, *since the cost*

---

25  [14] *See also* Exh. 9 at 136 (bid (again in the verb form) means "to offer (a certain sum) as the price
    or fee that one will pay or accept"); Exh. 10 at 111 (bid is "a statement of what one will give or
26  take for something"); Exh. 11 at 170 (bid means "an offer of a price").
    [15] Overture argues that Google's definition is contrary to the ordinary meaning of "bid," in which
27  only the winning bidder pays the amount bid. Opening Brf. at 14:5-11. Google, however, has
    defined "bid amount" to mean the amount the advertiser will pay *upon a triggering event.* If that
28  triggering event (a click-through) occurs, the advertiser necessarily has "won," and thus "will"
    pay the bid amount.

1    *of a search listing is calculated by multiplying the bid amount by the total number of*
2    *clicks received by the search listing at that bid amount during a specified time*
     *period,* every cost projection algorithm must generally determine an estimated
3    number of clicks per month (or other specified time period) for a search listing.

4    21:4-13 (emphasis added).  If the bid amount were anything other than the actual cost per click

5    (i.e., the amount the advertiser *will* pay for each click-through), the cost of a search listing would

6    *not* be the bid amount multiplied by the number of clicks.  Thus, the italicized assertion is *only*

7    true if Google's proposed construction is correct.[16]  Because Overture's proposed construction

8    for this term is at odds with the patent specification, it cannot be adopted as a matter of law.

9    *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("A patentee may not

10   proffer an interpretation for the purposes if litigation that would alter the indisputable public

11   records consisting of the claims, the specification and the prosecution history and treat the claims

12   as a 'nose of wax.'") (citation and quotation marks omitted).

13        **b.    The prosecution history confirms the meaning of "bid amount"**

14        Overture and its attorneys have on several occasions confirmed that "bid amount" means

15   the amount an advertiser actually pays for a click.  First, for example, in the Examiner's reasons

16   for allowance filed at the conclusion of the prosecution of the '361 patent application, the

17   Examiner stated that "the bid amount correspond[s] to a money amount that is deducted from an

18   account . . . upon receipt of a retrieval request for the network location." Exh. 13 at 3.  Overture

19   did not file a response or otherwise take exception to this assertion, as it was entitled to do.  *See*

20   37 C.F.R. § 1.104(e).  By failing to respond, Overture acquiesced in the Examiner's

21   ---
     [16] The '361 specification also consistently uses "bid amount" to mean the amount the advertiser
22   actually *will* pay, rather than an amount it is *willing* to pay.  *E.g.,* 5:23-26 (advertiser's bid is "a
     money amount the advertiser *will* pay . . . each time a searcher clicks on the advertiser's
23   hyperlinked listing" (emphasis added)); 9:46-49 (bid amount is "a money amount that *is*
     deducted from the account of the advertiser for each time the advertiser's web site is accessed via
24   a hyperlink on the search result list page" (emphasis added)).
          Moreover, the appendix to the patent application, *see* 1:8-14, includes a file that defines
25   "bids" as "the price you agree to pay per click-through for each search term." *See* Exh. 12 at 2;
     *see also* :        **REDACTED**              :.  Overture's citation to a different
26   statement in the appendix is not to the contrary. *See* Overture *Markman* Exh. 9 ("the bid price is
     the amount you're willing to pay").  In Overture's original system, the amount an advertiser was
27   charged per click was always the same as the amount that the advertiser told the system it would
     be "willing" to pay.  However, as the rest of the evidence makes clear, although the bid amount
28   in the original Overture system happened to be the same as the amount the advertiser indicated it
     was willing to pay, the thing that made that amount the "bid amount" was the fact that the

---
12

325441.02

1  understanding.  *See Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 979 (Fed. Cir. 1999).

2

3

4

5

6

7                                   **REDACTED**

8

9

10

11

12

13

14

15        c.    **Overture has confirmed that "bid amount" refers to the actual price that will be paid**

16        In a patent application that is "related" to the '361 patent application, Overture was faced

17  with the need separately to describe the minimum, maximum, and actual cost per click.  Exh. 14

18  ¶¶ 35-40.  Overture chose to call the *actual cost per click* the "bid amount."  *Id.* ¶ 35.[17]

19        The related application describes an embodiment in which the minimum, maximum, and

20  actual cost per click are all distinct parameters.  *Id.* ¶¶ 35-40.  The advertiser chooses a "bid

21  cap," which is "the maximum dollar amount at which a bid may be set by the system."  *Id.* ¶ 40.

22  The system then sets "[b]id amounts" that are "less than or equal to the bid cap."  *Id.*  The bid,

23  however, will "never be lower than the minimum bid of $0.05."  *Id.*  In this application, Overture

24  described the advertiser's *actual cost* as the "bid amount," and the *cap* on the advertiser's cost

25  the "bid cap."  In short, until it decided to sue Google, Overture understood "bid amount" to

26  ──────────────────────────────────────────

27  advertiser *was in fact* charged that amount per click.
[17] Darren J. Davis, the first-named inventor on the '361 patent, is listed as a co-inventor on this
28  application, and it is being prosecuted by attorneys at Brinks Hofer, the same firm that
     prosecuted the '361 patent application.  Exh. 14 (face page).

                                            13
325441.02

1    mean the *actual* cost per click.  Overture should not be allowed to switch course now to satisfy

2    the exigencies of the current litigation.

3              **d.    The extrinsic evidence supports Google's construction**

4              The extrinsic evidence offers still further support for Google's definition of "bid

5    amount."  When Overture introduced a Google-style bidding mechanism (in which advertisers

6    can set a ceiling on a cost per click rather than directly setting the actual cost per click), it

7    implicitly adopted Google's proposed definition of "bid amount" both in *naming* and *describing*

8    that new system.  The summer after Google introduced AWS, Overture added a new feature to

9    its system, called "Auto Bidding," that borrowed heavily from the AWS bidding system.  *See*

10   Exh. 15 at GOG 32256.  In AWS, the advertiser sets a maximum cost per click, and the system

11   discounts the actual cost (i.e. the amount the advertiser will pay) as much as possible without

12   sacrificing positional ranking.  Exh. 16 at GOG 32255 (AWS includes "an automatic discounter,

13   which lowers your bid amount every time there's a gap"); Exh. 5 at GOG 32244 (AWS

14   "automatically keeps your bid one penny ahead of the competition, up to your stated maximum

15   amount").

16             Overture's Auto Bidding feature was immediately recognized as being similar to AWS.

17   *Id.* at GOG 32245 ("Overture has taken the hint and has implemented a similar tool, referred to

18   as its 'Auto Bidding' tool").  One industry report described Overture's Auto Bidding system like

19   this:

20             This new system is similar to the way bidding works on eBay.  When you bid on
              eBay . . . you put in the most you're willing to pay.  *The actual bid is the most*
21            *necessary to be the leader in the auction.*  If someone bids higher than your revealed
              bid, *your bid is adjusted* to maintain your winning position.  Ebay will continue
22            doing that until someone bids higher than the highest bid you've put in.  (Ebay calls
              this proxy bidding.)[18]

23   Exh. 15 at GOG 32256 (emphases added).  This explanation equates the "actual bid" with the

24   amount one *will* pay, distinct from the "maximum bid."  *See also* Exh. 18 at GOG 32231 (when

25

26   _____

     [18] The eBay online auction system – which was already quite popular at the time the '361 patent
27   application was filed – is one of the best known examples of an Internet system in which the
     maximum cost (i.e. the cost one is *willing* to bear) and the actual cost (i.e. the cost one *will* bear)
28   are distinct.  And, consistent with Google's proposed construction, eBay calls a buyer's
     maximum cost the "maximum bid," and the buyer's actual cost (assuming the buyer wins the

1  using Auto Bidding, "[t]he max bid is not always the actual bid price").

2

3  **REDACTED**

4

5  *See also*

6  Exh. 18 at GOG 32231 (explanation, by a third party, that "Auto Bidding will change your bid

7  price for you automatically up to a Max Bid amount you have selected").

8  **REDACTED**

9

10

11  **2.   "Modifiable" means the bid amount can be changed by the web site promoter**

12         The parties agree that "modifiable" includes the concept of "changeable." Google

13  contends this refers to the *advertiser's* control over its bid amount, while Overture argues that it

14  merely means that the bid amount can be changed – by anyone. The context provided by the

15  specification, however, makes clear that the claims are referring to changes *under the control of*

16  *the advertiser*.

17         That context demonstrates that the *purpose* of the claimed invention is to allow

18  advertisers precisely to control placement of their advertisements, which can be achieved only if

19  changes to bid amounts are controlled by the advertisers. As the inventors explain, "Ideally, web

20  site promoters should be able to control their placement . . . ." 3:51-52. To do this, one should

21  provide an "on-line marketplace[ in which] companies selling products, services, or information

22  bid in an open auction environment for positions on a search result list . . . ." 3:62-64. In the

23  claimed invention, "The bidding process occurs when an advertiser enters a new bid . . . .

24  Preferably, the promoter's bid is then processed in real time." 5:62-65. The inventors' failure to

25  describe the act of the *advertiser* entering a new bid as merely preferable – in contrast with real-

26  time processing, which is expressly identified as preferable – is illuminating. *See Deering*

27  *Precision Instruments, L.L.C. v. Vector Distrib. Sys.,* 347 F.3d 1314, 1323-24 (Fed. Cir. 2003)

28  
auction) the "bid" or the "current bid." *See* Exh. 17 at GOG 32225.

15

325441.02

1    (rejecting the plaintiff's construction where two meanings were possible and the specification

2    included no disclosure suggesting the plaintiff's construction).[19]

3         In sum, the ordinary meaning of the claim terms, supported by and consistent with the

4    '361 specification as well as other intrinsic and extrinsic evidence, makes clear that the "bid

5    amount" is the actual amount paid by an advertiser for a click and that "modifiable bid amount"

6    means a bid amount that can be changed by the advertiser.

7    **C.**      **"a modifiable bid amount that is *independent of* other components of the search listing"**

8

9         Overture's proposed construction of "independent of" is a non-definition; it provides no

10    more clarity on this issue than does the phrase to be construed. In contrast, Google's definition

    clarifies that other components of the search listing have *no* effect on the bid amount.[20]

11

12         Google's definition best captures the invention described by the inventors. According to

13    the inventors, one problem with prior search systems was that their ranking of search listings was

14    based on "multiple criteria such as keyword density and keyword location," which could yield

15    "random and even irrelevant" results. 2:52-55. The specification establishes that the disclosed

16    invention represents a clean break from the prior art, which relied on multiple criteria derived

17    from the websites themselves, in favor of a market-based approach that looks to the amount each

18    advertiser will pay for a click-through. As explained in the '361 abstract, "A higher bid by a

19    network information provider *will* result in . . . more advantageous placement." Abstract

20    (emphasis added). This point is confirmed in the summary of the invention. 5:35-37 ("The

21    higher the bid, the more advantageous the placement"). Although the inventors often preface

22    statements with the word "preferably," which appears in the specification no less than forty-nine

23    times, the foregoing statement is offered without reservation.

24         Google's definition correctly highlights that the bid amount must be freely determinable

25    by the advertiser – unconstrained by other factors, such as keyword density, or algorithmic

---

26 [19] Overture's definitions are also internally inconsistent. According to Overture, a "bid amount" is the amount an advertiser is *willing* to pay, while "modifiable" means that the bid amount is

27 changeable *by anyone.* That makes no sense. The amount an advertiser is *willing* to pay cannot be changed *by someone other than the advertiser.*

28 [20] *See, e.g.,* Exh. 19 at 970 (equating "independent" with "unconstrained"); *see also id.* (independent means "not influenced or controlled by others," or "not influenced by the thought

1    determinations of the relevance of a web site to a search term. Were this not the case, the "free

2    market" bidding system advocated by the inventors would, in fact, be saddled with the same

3    problems for which they criticize prior art search systems.[21]  That is, if one's bid amount is

4    constrained or affected by the popularity of one's search listing, that is not the "open auction" the

5    specification speaks of. 3:63-64. If an advertiser's ability to choose a bid amount is constrained

6    by other aspects of its listing, it cannot "pinpoint" its placement. 5:11. If the bid amount is itself

7    a function, even in part, of factors such as keyword density, then the inventors' criticisms of the

8    prior art also apply to the system itself.

9

10

11                                   **REDACTED**

12                                   ‑‑  ‑‑‑  ‑  ‑‑‑‑‑

13

14

15

16   **D.    The Ordering Limitations**

17        For each of the three ordering limitations ("in accordance with," "determined using," and

18   "corresponding to"), the parties' central dispute is the same:  Does a search listing order that

19   does not match the bid amount order fall within the scope of the claims?

20        **1.    The dictionary definitions fail to resolve all ambiguities about the definitions of
             the ordering terms**

21

22        As is true for most of its claim construction arguments, Overture's support for its

23   constructions of the ordering limitations comes primarily from a rote stringing together of

24   dictionary definitions of single words considered in isolation.  The fundamental problem with a

     _____

25   or action of others."); Exh. 20 at 686.
     [21] Articles about Overture's system, submitted during prosecution of the '361 patent application,
26   confirm that the "bid amount" must be free from constraint by other aspects of the search listing.
     *See* Exh. 21 at OVG 1222 (of record) (Overture's system is different because "it ranks Web sites
27   based on how much the sites are willing to pay . . . rather than based on keyword density or some
     other mathematical formula"); Exh. 22 at OVG 1226 (of record) (bid amount is determined by
28   "[s]upply and demand"); Exh. 23 at OVG 1232 (of record) (Overture's bids are based on "the
     free market"); Exh. 24 at OVG 1366 (of record) ("Those willing to pay more can appear higher

                                            17

1    blind reliance on dictionary definitions is that the words at issue are often susceptible to widely

2    varying meanings, depending on the context in which they are used. Take as an example the

3    phrase "black sheep." If one were to take the definitions of "black" and "sheep" separately, the

4    phrase would literally mean a very dark farm animal. While such a definition would make sense

5    in the sentence, "There are black sheep in the pasture," it would be totally off the mark in the

6    sentence, "Andy is the black sheep of the family."

7          Here, both Overture's and Google's proposed definitions find support in the dictionaries

8    cited by the parties. For "accordance," the dictionaries cited by the parties variously use the

9    words "agreement," "conformity," or "harmony" to define this word. Google has selected

10    "conformance" as the word best suited to define "accordance," in the context of the '361 patent,

11    while Overture points to "agreement." For "determined," the parties again look to different parts

12    of the cited dictionary definitions. Google borrows from definitions that use the word

13    "establish," while Overture looks to the word "ascertain."[22] For "corresponding," Google relies

14    on definitions that require conformity, while Overture asserts that mere similarity suffices.

15          But when viewed in the context of the invention described by the inventors in the

16    specification, only Google's position – that the order of the search listings must match the bid

17    amounts – gives the correct meaning to the terms. *See Brookhill-Wilk 1, LLC v. Intuitive*

18    *Surgical, Inc.,* 334 F.3d 1294, 1300 (Fed. Cir. 2003) ("the correct meaning of a word or phrase is

19    informed only by considering the surrounding text."). Indeed, as explained below, Overture's

20    purely dictionary-derived constructions are so vague as to render the terms meaningless and

21    ultimately, invalid for indefiniteness.

22       **2.   Overture's definitions would render the claims invalid as being indefinite to the**
              **extent they seek to broaden the scope of these terms beyond strict ordering**

23

24          Overture's proposed definitions for "corresponding to" and "determined using" should be

25    in the search results.").
    [22] Overture argues that Google's definition improperly replaces "using" with "by." The

26    requirement of strict ordering, however, derives from the word "determined" itself, which
    Google defines as "established." When an appellate court instructs that an issue be "determined

27    using" a three-part test, surely it does not contemplate that the trial court might consider the three
    prongs of that test, but then conclude that some fourth factor (never mentioned by the appellate

28    court) outweighs the result compelled by the first three. There may be other possible definitions
    for "determined using," when it is considered in isolation, but Google's definition is the one that

325441.02

1  rejected as rendering the claims invalid for indefiniteness under 35 U.S.C. § 112, ¶ 2. "The

2  primary purpose of the definiteness requirement is to . . . give notice to the public of the extent of

3  the legal protection afforded by the patent . . . ." *All Dental Prodx, LLC v. Advantage Dental*

4  *Prods., Inc.,* 309 F.3d 774, 779 (Fed. Cir. 2002). Claims are indefinite if they are not stated with

5  "sufficient clarity that the metes and bounds thereof can be determined." *Kemode Mfg. Co. v.*

6  *United States,* 347 F.2d 315, 319 (Ct. Cl. 1965). Although limitations may sometimes be defined

7  using words of degree (such as "about" or "substantially") that do not convey numerical

8  specificity, "[d]efiniteness problems often arise when words of degree are used in a claim."

9  *Seattle Box Co. v. Industrial Crating & Packing, Inc.,* 731 F.2d 818, 826 (Fed. Cir. 1984). In

10  that event, the Court must "determine whether the patent's specification provides some standard

11  for measuring that degree." *Id.*

12        Overture's definitions of "corresponding to" and "determined using" flunk this test. Both

13  definitions seek to expand the ordering of search listings beyond strict ordering. According to

14  Overture, "corresponding to" only requires that the order of the search listings must be "similar"

15  to that of the bid amounts. And "determined using" only requires that the order of the search

16  listings is "ascertained by an analysis that utilizes" the bid amounts. Neither the specification

17  nor Overture's Opening Brief explains what either of these definitions means, or how much

18  ordering is enough. Those proposed definitions therefore fail to provide the standard required by

19  *Seattle Box* for measuring degree and do not provide the threshold clarity required by paragraph

20  2 of section 112 to place the public on notice about the metes and bounds of the invention.[23]

21      **3.    The specification supports Google's constructions**

22      As the Federal Circuit recently explained,

23  Words often have different meanings to different people and in different contexts,
   accounting for the multiple ordinary meanings found in dictionaries. Dictionary

24  definitions, while reflective of the ordinary meanings of words, do not always
   associate those meanings with context . . . . The words used in the claims must be

25  considered in context and are examined through the viewing glass of a person skilled

---

26  "is most consistent with the use of the words by the inventor." *Texas Digital,* 308 F.3d at 1203.

   [23] It appears that Overture is conceding that "in accordance with" means that the search listings

27  must be in the same order as the bid amounts. If so, the parties are in substantive agreement,
   though they disagree over the language that best expresses this meaning. However, if Overture

28  is advocating some broader meaning for "in accordance with," then the indefiniteness arguments
   stated above apply with equal force to its definition for "in accordance with."

325441.02

1   in the art.

2   *Ferguson Beauregard/Logic Controls v. Mega Systems, LLC,* 350 F.3d 1327, 1339 (Fed. Cir.

3   2003).

4   Again and again, the specification explains that the order of the search listings *must*

5   conform to the order of the bid amounts, as proposed by Google's definitions. The summary of

6   invention could not be more clear:

> *The higher the bid, the more advantageous the placement* in the search result list that
> is generated when the bidded search term is entered by a searcher using the search
> engine. *The search result is arranged in order of decreasing bid amount,* with
> the search listing corresponding to the highest bids displayed first to the searcher.

9   5:35-40 (emphasis added);[24] *see also* 9:42 ("higher bids receive more advantageous

10  placement").[25]

11

12  Moreover, the only way to achieve the stated purpose of the invention is to arrange the

13  order of the search listings in the same order as their bid amounts. This is the only way to ensure

14  that the advertiser can "control" (3:51), "easily predict" (5:7), and "pinpoint" (5:11) the

15  placement of its search listing. Any other ordering scheme would be inconsistent with the '361

16  abstract's bold assertion that "[a] higher bid by a network information provider *will result* in a

17  higher rank value and a more advantageous placement." Abstract (emphasis added). The

18  abstract states that it describes the "present invention" itself, *id.,* rather than a preferred

19  embodiment. *SciMed,* 242 F.3d at 1343 (specification's description of the "present invention" is

20  "strong evidence" for purposes of claim construction).[26]

21  The *only* passage from the specification upon which Overture relies states, "When an

22  Internet user enters the search terms in a search engine query, the search engine will generate a

23  search result list with the web site promoter's position influenced by *one or more parameters*

---

24  [24] Notably, the quoted text does not purport to describe a "preferred" embodiment, in contrast to the very next sentence. *Compare* 5:40-42 *with* 5:35-40; *compare also* 9:42-45 *with* 9:45-49.

25  [25] Again, the *following* sentence is described as applying to a "preferred embodiment," but the explanation of the method of ordering is not so limited. 9:45-49.

26  [26] The Federal Circuit requires district courts to walk a fine line in construing claims, reading the specification to understand and breathe life into claim terms but not importing new limitations from the specification into the claims. Overture would have the Court avoid reading the specification at all to avoid improper importation of limitations. This is error. Similarly, it would be error to read every nuance of the specification into the claims. Google's claim interpretation takes a middle ground. Google looks to the specification to see how the inventors contemplated using bid amounts to determine the ordering of search results.

325441.02

1  defined by the promoter." 4:60-64 (Overture's emphasis). But Google's definition does not

2  preclude reliance on multiple factors. So long as an ordering algorithm never results in an order

3  that was contrary to the order of the bid amounts, it can rely on many factors. For example, one

4  might order search listings first by bid amounts and use time of submission to resolve situations

5  where two advertisements have identical bid amounts. Multi-factor ordering schemes of this sort

6  – in which the resulting orders are always consistent with the order demanded by one primary

7  factor – are commonplace (e.g., alphabetical ordering, which examines initially only the first

8  letter in each word and considers second and subsequent letters only in the event of a "tie" that

9  results when two words begin with the same letter) and are described in the specification and the

10  claims. *See, e.g.,* 18:23-26 (describing a preferred embodiment where, in the event of a bidding

11  tie, the search listing for which the bid was first received is placed first); *see also* 26:8-18 (claim

12  19) (claims with the same bid amount are ordered by creation time). Therefore, the definitions

13  proposed by Google are both consistent with the ordinary and abstract dictionary meaning of the

14  terms as well as the specification, while Overture's are not.

15      Finally, contrary to Overture's arguments, claim differentiation does not counsel against

16  Google's construction, because claims 52, 63 and 64 all vary in scope under Google's

17  constructions, as do claims 30, 46 and 47. Every claim, including claims 30 and 52, requires that

18  the search listings be positioned in the same order as their respective bid amounts. Claims 46

19  and 63 require that the claims be ordered *from highest to lowest* bid amounts. Arranging listings

20  from *lowest to highest* bid amounts therefore falls within the scope of the ordering limitations in

21  claims 30 and 52, but not claims 46 and 63.[27] Claims 47 and 64 require that each search listing

22  be assigned a "rank value," and that the rank value order correspond to the bid amount order.

23  Thus, if the search listing with the *highest* bid amount is assigned the *lowest* rank value, and so

24  on, that is outside the scope of claims 47 and 64, while it may be within the scope of claims 30,

25  46, 52 and 63.

26  _____

27  [27] This reverse ordering scheme is not inconsistent with the specification's repeated admonition that higher bid amounts will result in more advantageous placement, because in some (admittedly rare) situations the most "advantageous" position may be the last position. For example, a search result list might be presented as a "top ten" list, with the tenth "best" search listing presented first, followed by the ninth, and so on, with the "best" search listing presented

28

1  In any event, claim differentiation is an interpretative guideline, not a rigid rule. *See,*

2  *e.g., North Am. Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1577 (Fed. Cir. 1994)

3  ("the dependent claim tail cannot wag the independent claim dog"). As the Federal Circuit has

4  explained,

> That the patentee chose several words in drafting a particular limitation of one
> claim, but fewer (though similar) words in drafting the corresponding limitation in
> another, does not mandate different interpretations of the two limitations, since
> defining a state of affairs with multiple terms should help, rather than hinder,
> understanding.

8  *Kraft Foods, Inc. v. International Trading Co.,* 203 F.3d 1362, 1368 (Fed. Cir. 2000).

9  **E.    "in response to"**

10  The claim language and the context supplied by the specification confirm that a

11  "response," as that term is used in the patent, must include the search results the searcher is

12  looking for – i.e. must be in fulfillment of the searcher's search, as proposed by Google. *See,*

13  *e.g.,* 22:60-62 (claim 1, a search result list must be generated "in response to" a searcher's

14  search). As the specification explains, that means the search engine should "prioritize results in

15  accordance with *consumers' preferences*." 2:65-67 (emphasis added). As a result, the searcher

16  "find[s] companies or businesses that offer the products, services, or information *that the*

17  *consumer is seeking*." 3:60-62 (emphasis added).

18  Overture's definition fails to acknowledge the context of the claimed invention.

19  According to Overture, *anything* delivered in reaction to a searcher's search request is "in

20  response to" that request. For example, if the search engine crashes, presumably the standard

21  "This page cannot be found" error message[28] would fall within the scope of Overture's definition

22  of a "response to" a searcher's request.

23  **F.    "database"[29]**

24  Overture's definition of this term is too narrow, as well as inconsistent with the

25  last.

26  [28] *See* <http://www.cand.uscourts.gov/foo.html> (the web page this link points to does not exist, and thus will lead to a "not found" error message).

27  [29] Overture proposes a longer definition for the term "account database." Neither party identified "account database" as a disputed term; Overture added its definition of "account database"

28  during the meet-and-confer process that led to the filing of the Joint Claim Construction Statement. Google does not believe that a special definition for "account database" is necessary.

22

325441.02

1  specification. First, by its reference to "related data," Overture may be attempting to limit the

2  term "database" to certain specific, high-end databases called "relational databases." In a

3  relational database, data concerning the same subject matter may be stored in two or more

4  different "tables," and queries that depend on the "relations" between the data in the tables can

5  be made using an appropriate query language (such as, "structured query language").[30]

6        The term "database" is a technical term, and thus Federal Circuit cases encourage the

7  Court to refer to treatises or textbooks to better understand its ordinary meaning. *Pitney Bowes,*

8  *Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1309 (Fed. Cir. 1999). The classic database

9  textbook by C.J. Date explains that a "database system" is "nothing more than a computer-based

10  recordkeeping system." Exh. 25 at 3. The Chamber Science and Technology Dictionary defines

11  a database as a "[c]ollection of structured data independent of any particular application." Exh.

12  26 at 228. Even the Elmasri and Navathe textbook cited by Overture explains that a database can

13  take many forms:

> You may have recorded this data in an indexed address book, or you may have
> stored it on a diskette using a personal computer and software such as DBASE III or
> Lotus 1-2-3. This is a collection of related data with an implicit meaning and hence
> is a database.

14
15
16

17  Exh. 27 at 3. None of these definitions limits "database" to any particular class of databases,

18  such as relational databases.

19        Moreover, the specification confirms that the inventors intended a broad meaning for the

20  term "database." The inventors describe the World Wide Web as "a unique distributed database

21  designed to give wide access to a large universe of documents." 1:44-45. As the inventors note,

22  documents on the web are "dispersed across countless individual computer systems" and the

23  database that is the web "has no recognizable organization or morphology." 1:51. More often

24  than not, web pages are *not* stored in relational databases.[31]

25        Second, to the extent that Overture is arguing that advertisers must be able to access,

---

26  An account database is a database of accounts.

27  [30] *See generally* <http://hotwired.lycos.com/webmonkey/99/13/index1a_page2.html?tw=backend> (tutorial on relational databases).

28  [31] *See* <http://ourworld.compuserve.com/homepages/ken_north/dsud_ddw.htm> (describing a relational database that can be used to store web pages, in contrast to the "traditional method of organizing Web pages" in "individual files managed by the operating system").

325441.02

1    manage, and update their information in an "account database" by computer, it is incorrect. A

2    "database" need not be designed to be manageable or updateable – indeed, the World Wide Web,

3    has "no recognizable organization or morphology," 1:51, and thus cannot readily be "managed."

4    In sum, the ordinary meaning of the term "database," as informed by the '361 specification, is

5    simply "a computer based system for recording and maintaining information."

6    **G.    "deducted from an account"**

7            The Court's construction of this term is relevant to the infringement analysis because

8    Google does not require that AWS advertisers use prepaid accounts. Instead, AWS generally

9    keeps track of click-throughs, and generally charges advertisers when they have exceeded their

10   credit limit.

11           The New Oxford Dictionary of English defines "deduct" to mean to "subtract or take

12   away (an amount or part) from a total: *tax has been deducted from the payments*." Exh. 28 at

13   480 (italics in original). Webster's New World College Dictionary offers a similar definition.

14   Exh. 29 at 360 ("to take away or subtract (a quantity)"). Merriam-Webster's On-Line Dictionary

15   focuses on the same two points – *subtracting* from a *total*. Exh. 30.

16           The inventors use "deduct" specifically to refer to prepaid accounts (that is, the "total"

17   from which one subtracts must be positive):

18           The bid amount **358** preferably is a money amount bid by an advertiser for a listing.
             This money amount is *deducted from the advertiser's prepaid account* **or** *is*
19           *recorded for advertiser accounts that are invoiced* for each time a search is executed
             by a user on the corresponding search term and the search result list hyperlink is
20           used to refer the searcher to the advertiser's web site.

21   13:4-9 (emphases added). Thus, while bid amounts are "deducted" from prepaid accounts," they

22   are "recorded" for credit-based accounts.[32]

23   **H.    "account record"**

24           Google believes that the terms "account" and "record," as used in the '361 patent, simply

25   have their ordinary meanings.[33] Nothing in the specification suggests otherwise – Overture's

26   ――――――――――――――――――――――――――
     [32] Overture argues that this portion of the specification supports its construction, because
27   Google's construction fails to include the disclosed idea of invoiced, non-prepaid accounts.
     However, many of the claims do not include the "deduct" limitation, and thus *those* claims may
28   include non-prepaid accounts. *See, e.g.,* 28:10-52 (claim 52).
     [33] Google's main concern with Overture's definition was whether Overture was perhaps

                                                    24
325441.02

1  Opening Brief fails to cite *anything* from the specification. Google believes that its proposed

2  construction better captures the meaning of the term "account record," but does not specifically

3  take issue with Overture's construction. Overture appears likewise merely to prefer its own

4  choice of words. Google respectfully suggests that the proper course of action for the Court may

5  simply be to declare that no construction is necessary for this term.

6  **I.    "from a/the searcher"**

7       The purported invention of the '361 patent relates to *searches* conducted with a *search*

8  *engine. See* Title. The '361 patent is concerned with and describes only one type of search – a

9  search using a search engine. In this context, a "searcher" is one who uses a search engine – a

10  point confirmed by the patent's consistent description of a "searcher" as one who uses a search

11  engine.[34] One skilled in the art would thus understand that "from a/the searcher" means "input

12  by the individual using the search engine to perform a search."

13                              **V.    CONCLUSION**

14       For the foregoing reasons, Google respectfully requests that the Court adopt Google's

15  (and reject Overture's) proposed constructions of the disputed claim terms.

16

17  Dated:  January 30, 2004                    KEKER & VAN NEST, LLP

18

19                                    By:    /s/ Daralyn J. Durie
20                                          DARALYN J. DURIE
                                          Attorneys for Defendant and
                                          Counterclaimant GOOGLE INC.

21

22

23

24  attempting implicitly to alter the meaning of the claim term, thereby artificially narrowing the
    term. Having reviewed Overture's Opening Brief, Google now believes that the parties' dispute
25  over the term "account record" amounts to no more than a difference of opinion concerning the
    best words to express a simple idea.
26  [34] 5:25-27 ("each time search clicks on the . . . listing in the search result list generated by the
    search engine"); 5:37 ("searcher using the search engine"); 6:4-5 ("when the search term is
27  entered into the query box on the search engine by the searcher"); 10:9-10 ("The searchers may
    access, through their browsers **16**, a search engine web page **36** residing on web server **24**.");
28  10:13-14 ("the searcher may query the search engine web server"); 17:19-20 ("a remote searcher
    accesses the search query page on the search engine web server").

                                          25

325441.02