KEKER & VAN NEST, LLP
JOHN W. KEKER - #49092
DARALYN J. DURIE - #169825
CHRISTINE P. SUN - #218701
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant and Counterclaimant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| OVERTURE SERVICES, INC., <br><br> Plaintiff and Counterdefendant, <br><br> v. <br><br> GOOGLE INC., <br><br> Defendant and Counterclaimant. | Case No. C 02-01991 JSW (EDL) <br><br> **NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY RE: PROSECUTION OF THE '361 PATENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF [*AMENDED* REDACTED VERSION]** <br><br> Date:     August 3, 2004 <br> Time:     9 a.m. <br> Courtroom: E, 15th Floor <br> Judge:     Hon. Elizabeth D. Laporte |

NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY
RE: PROSECUTION OF THE '361 PATENT [*AMENDED* REDACTED VERSION]
CASE NO. C 02-01991 JSW (EDL)

334678.01

Dockets.Justia.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

NOTICE OF MOTION AND MOTION ........................................................................... vi

MEMORANDUM OF POINTS AND AUTHORITIES .................................................1

I.      INTRODUCTION ................................................................................................1

II.     RELEVANT BACKGROUND ...........................................................................2

        A.      Overture Launches a "Pay for Performance" Search Engine ..................2

        B.      More Than a Year After The Launch of Its Paid Listing Search
                Engine, Overture Files The '361 Patent Application ................................3

                1.      Brinks Hofer Quickly Files a Petition To Make Special,
                        Supported by Mr. Davis' Rule 102 Declaration ..........................4

                2.      Relying on Overture's Pre-Critical Date System, The Examiner
                        Repeatedly Rejects The Patent Claims ........................................5

                3.      Overture Overcomes The Rejections By Mischaracterizing The
                        Pre-Critical Date System ...............................................................6

        C.      In the Present Litigation, Mr. Davis Reveals That He Lacked Personal
                Knowledge of the Pre-Critical Date System ............................................8

        D.      Mr. Rauch and Ms. Lee Disclose Attorney-Client Communications,
                Mental Impressions, and Legal Analysis During Their Depositions ........9

                1.      Mr. Rauch and Ms. Lee Testify About The Pre-Critical Date
                        System, Mr. Davis' Rule 132 Declaration, and Mr. Davis'
                        Knowledge ......................................................................................9

                        a.      Brinks Hofer's Assessment of The Pre-Critical Date
                                System and Its Effect On The Patentability of The '361
                                Application .........................................................................9

                        b.      Brinks Hofer's Assessment of and Communications
                                With Mr. Davis About The Accuracy of Mr. Davis'
                                Declarations ....................................................................12

                2.      Overture Belatedly Asserts Privilege On Its Privilege Log and
                        During Mr. Naughton's Deposition ..........................................13

III.    ARGUMENT ....................................................................................................14

        A.      Overture Has Waived Attorney-Client Privilege On The Subject of
                The '361 Patent Prosecution ....................................................................14

i

334678.01

## TABLE OF CONTENTS
### (continued)

1.  The Disclosures Revealed Substantive Attorney-Client Communications ................................................................14

2.  Overture's Disclosure Effects A Waiver Over The Subject Matter of The '361 Patent Prosecution .......................................15

B.  Google Is Entitled To "Work Product" Documents Related To The '361 Patent Prosecution ..............................................17

1.  Overture Has Not Made a Prima Facie Showing That Brinks Hofer's '361 Patent Prosecution Files Are Protected By The Work Product Immunity .................................................17

2.  Even If The Prosecution Files Constitute Attorney Work Product, Google Has a Compelling Need For The Documents ................17

3.  Overture Should Not Be Permitted To Selectively Apply The Privilege To Prohibit Mr. Naughton's Testimony ....................18

C.  Mr. Davis' Statements In Connection With The Petition To Make Special Waived Privilege ...........................................19

D.  The Crime-Fraud Exception Vitiates Any Privilege Over The '361 Prosecution Documents ............................................19

1.  Google Has Made a Prima Facie Showing That Mr. Davis' Statements About The Features of The Pre-Critical Date System Were Made With Deceptive Intent ..............................21

2.  Google Has Made a Prima Facie Showing That Mr. Rauch's Mischaracterization of Mr. Davis' Declaration Was Made With Deceptive Intent .................................................22

3.  Google Has Made a Prima Facie Showing That Mr. Davis' Statements Regarding His Knowledge Of The Pre-Critical Date System Were Made With Deceptive Intent ..............................23

IV.  CONCLUSION ......................................................25

334678.01

1
2

# TABLE OF AUTHORITIES

## FEDERAL CASES

3
4

*ACLARA Biosciences, Inc. v. Caliper Tech. Corp.,*
   2001 WL 777083 (N.D. Cal. June 16, 2000)........................................15, 16, 17, 18

5
6

*Bio-Rad Laboratoriess, Inc. v. Pharmacia, Inc.,*
   130 F.R.D. 116 (N.D. Cal. 1990)........................................................17, 18

7
8

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,*
   1998 WL 175929 (S.D.N.Y.)...............................................................21, 23

9
10

*Bulk-Lift International, Inc. v. Flexcon & System, Inc.,*
   122 F.R.D. 493 (W.D. La. 1988) ..............................................................20

11
12

*Chevron Corp. v. Pennzoil Co.,*
   974 F.2d 1156 (9th Cir. 1992) ...................................................................15

13
14

*Conner Peripherals, Inc. v. Western Digital Corp.,*
   1993 WL 726815 (N.D. Cal. June 8, 1993)................................................17

15
16

*General Electro Music Corp. v. Samick Music Corp.,*
   19 F.3d 1405 (Fed. Cir. 1994) ...................................................................21

17
18

*In re Brand Name Prescription Drugs Antitrust Litigation,*
   1995 WL 531805 at 1-2 (N.D. Ill. Aug. 18, 1995) ...................................15

19
20

*In re National Mortgage Equity Corp.,*
   116 F.R.D. 297 (C.D. Cal. 1987)...............................................................20

21
22

*Intel Corp. v. VIA Techs., Inc.,*
   176 F. Supp. 2d 991 (N.D. Cal. 2001) ......................................................23

23
24

*Kingsland v. Dorsey,*
   338 U.S. 318 (1949)...................................................................................23

25
26

*LaBounty Manufacturing, Inc. v. United States ITC,*
   958 F.2d 1066 (Fed. Cir. 1992) .................................................................22

27
28

*Libbey Glass, Inc. v. Oneida, Ltd.,*
   197 F.R.D. 342 (N.D. Ohio 1999) .......................................................14, 15

iii

334678.01

# TABLE OF AUTHORITIES

## FEDERAL CASES
### (continued)

*Monon Corp. v. Stoughton Trailers, Inc.*,
  169 F.R.D. 99 (N.D. Ill. 1996) ............................................................21, 22

*Paragon Podiatry Laboratories, Inc. v. KLM Laboratories, Inc.*,
  984 F.2d 1182 (Fed. Cir. 1993) .......................................21, 22, 23, 24, 25

*QST Energy, Inc. v. Mervyn's and Target Corp.*,
  2001 WL 777489 (N.D. Cal. May 14, 2001) ........................................15

*Rohm & Haas Co. v. Crystal Chemical Co.*,
  722 F.2d 1556 (Fed. Cir. 1983) ..........................................................20

*Starsight Telecast, Inc. v. Gemstar Development Corp.*,
  158 F.R.D. 650 (N.D. Cal. 1994) ........................................15, 16, 19, 20

*United States v. Clevenger*,
  733 F.2d 1356 (9th Cir. 1984) ...........................................................21

*United States v. de la Jara*,
  973 F.2d 746 (9th Cir. 1992) .........................................................20, 25

*Weil v. Investment/Indicators*,
  647 F.2d 18 (9th Cir. 1981) ..............................................................15

## DOCKETED CASES

*TV Interactive Data Corp. v. Microsoft Corp.*,
  U.S. District Court, Northern District of California,
  Case No. C-02-2385 ........................................................................19

## FEDERAL STATUTES

18 U.S.C. § 1001 ...................................................................................5

35 U.S.C. § 102(b) ..........................................................................6, 7, 8

35 U.S.C. § 103 .....................................................................................8

iv

334678.01

# TABLE OF AUTHORITIES

## FEDERAL STATUTES
### (continued)

37 C.F.R. §1.102(d) ............................................................................................4

37 C.F.R. § 1.132 ..............................................................................................7


## MISCELLANEOUS

Manual of Patent Examining Procedure § 708.02 ........................................20

*Mark A. Lemley, Rational Ignorance At The Patent Office,*
   95 Nw. U. L. Rev. 1495, 1500 (2001) ........................................................23

NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY
RE: PROSECUTION OF THE '361 PATENT [*AMENDED* REDACTED VERSION]
CASE NO. C 02-01991 JSW (EDL)

334678.01

1

## **NOTICE OF MOTION AND MOTION**

2    TO PLAINTIFF OVERTURE SERVICES, INC. AND TO ITS ATTORNEYS OF RECORD:

3        NOTICE IS HEREBY GIVEN that on August 3, 2004, at 9 a.m., or as soon thereafter as

4    counsel may be heard in the above-captioned Court, located at Courtroom E, 15th Floor, 450

5    Golden Gate, San Francisco, California, Defendant and Counterclaimant GOOGLE INC.

6    (hereinafter, "Google") moves this Court for an order compelling Plaintiff and Counterdefendant

7    OVERTURE SERVICES, INC (hereinafter "Overture") to produce all documents and

8    communications related to the prosecution of United States Patent 6,269,361 ("the '361 patent")

9    by the law firm, Brinks Hofer Gilson & Lione (hereinafter, "Brinks Hofer").  Google also moves

10    to compel testimony from Overture witnesses concerning the prosecution of the '361 patent.

11        Google's motion is brought under Federal Rule of Civil Procedure 37, on the ground that

12    Overture has waived attorney-client privilege by permitting the patent attorneys who prosecuted

13    the '361 patent application to testify about the substance of their communications with Overture

14    employees.  Brinks Hofer has similarly waived attorney work product immunity, to the extent

15    that it applies, by permitting the patent attorneys to testify about their mental impressions and

16    legal analysis in prosecuting the '361 patent.  In light of Overture's and Brinks Hofer's waiver of

17    the attorney-client and work product privileges, Google is entitled to all documents and

18    communications on the subject matter of the '361 prosecution and to testimony from Overture

19    witnesses concerning those documents and communications.

20        In the alternative, Google is entitled to the requested documents and communications

21    because the crime-fraud exception to privilege applies.  The evidence gathered to date indicates

22    that Overture and the prosecuting attorneys submitted declarations from one of the named

23    inventors that not only misrepresented the features of the Overture system that had been in public

24    use more than one year prior to the filing date, but also misrepresented the competence of the

25    declarant to testify about that system.  Because evidence indicates that fraud was committed in

26    obtaining the '361 patent, Google is entitled to otherwise privileged documents and testimony

27    under the crime-fraud exception.

28        The motion is based upon this Notice of Motion and Motion, and Memorandum of Points

NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY
RE: PROSECUTION OF THE '361 PATENT [*AMENDED* REDACTED VERSION]
CASE NO. C 02-01991 JSW (EDL)

and Authorities attached hereto, the pleadings, records, and papers on file in this action, the *Amended* Declaration of Christine P. Sun ("Sun Decl."), the Declaration of Ravind S. Grewal ("Grewal Decl."), and the Supplemental Declaration of Ravind S. Grewal ("Supp. Grewal Decl.") filed concurrently herewith, and such argument and evidence as may be presented at the hearing on the Motion.

Dated:  July 6, 2004                                      KEKER & VAN NEST, LLP


                                                By:    /s/ John W. Keker
                                                       JOHN W. KEKER
                                                       Attorneys for Defendant and
                                                       Counterclaimant GOOGLE INC.

NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY
RE: PROSECUTION OF THE '361 PATENT [*AMENDED* REDACTED VERSION]
CASE NO. C 02-01991 JSW (EDL)

334678.01

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Overture has sued Google for allegedly infringing the '361 patent. Google contends that the '361 patent is unenforceable because Overture[1] and the attorneys at Brinks Hofer who prosecuted it committed inequitable conduct and fraud on the PTO.[2] The evidence available to date leads Google to believe that Overture and Brinks Hofer, among other things, misrepresented the features of Overture's pre-critical date "pay for performance" search engine and submitted misleading inventor testimony to the PTO.

In trying to defend against Google's inequitable conduct claim, Overture has permitted testimony about the substance of Brinks Hofer's communications with Overture employees. Overture has also permitted two of the three prosecuting attorneys to testify about their mental impressions and legal analysis covering a broad range of topics related to the '361 patent prosecution. Despite these disclosures, Overture refuses to produce hundreds of documents[3] related to the '361 patent prosecution on the grounds of attorney-client and work product privilege. Overture has also instructed one of the prosecuting attorneys not to provide testimony concerning the very conversations which Overture allowed his colleagues to disclose.

Overture cannot have it both ways. Overture cannot both use privileged information to defend against Google's inequitable conduct claims, but also prevent Google from obtaining the evidence that it needs in order effectively to cross-examine Overture witnesses at trial.

In the alternative, Google seeks the requested documents under the crime-fraud exception. While Google acknowledges the seriousness of this allegation, evidence gathered

---

[1] The patent was originally assigned to GoTo.com. GoTo.com changed its name to Overture in 2001. For simplicity, we refer to the company as "Overture" throughout.

[2] We do not suggest that Overture's new counsel, Heller Ehrman, were in any way involved in this misconduct.

[3] The withheld documents include documents explicitly specified in Overture's February 13, 2004 privilege log as being related to the '361 patent application, also identified as "U.S. patent application S/N 09/322,677," and documents specified in the log as being related to "enforcement of patent rights" dated prior to the issuance of the '361 patent. *See* Grewal Decl., Ex. A (Overture's privilege log). To the extent that Overture contends that some or all of the documents related to "patent enforcement" are not related to the '361 patent prosecution, Google requests that the Court order Overture to revise its log to make that distinction clear.

1   thus far indicates that it is warranted here.  Google believes that the Court need not decide this

2   issue because Overture has waived privilege, but should the Court reject that argument, the Court

3   should nonetheless compel Overture to produce otherwise privileged documents related to the

4   '361 patent prosecution for *in camera* review.

## II.    RELEVANT BACKGROUND

6       In order to understand Overture's waiver of privilege, it is necessary to understand the

7   facts underlying Google's inequitable conduct claim.  Thus, we begin by summarizing facts

8   relevant to Google's inequitable conduct claim.

**A.    Overture Launches a "Pay for Performance" Search Engine**

10      Overture was founded in late 1997 to provide a search engine that, unlike traditional

11  search engines, would rank search listings based on the money paid by the sites listed.  *See*

12  Grewal Decl., Ex. B.  On Overture's system, a web site promoter could "bid for higher

13  placement within a list of search results for any given topic," by offering to pay a certain price if

14  a user "clicked-through" to its web site.  *Id.* at 74.

15      On February 21, 1998, Overture introduced the "proof of concept" version of its search

16  engine at the eighth annual TED ("Technology, Entertainment, and Design") conference in

17  Monterey, California.  Grewal Decl., Ex. C at 2.  That same day, Overture issued a press release

18  announcing the launch of its search engine that listed 19 different "charter advertisers" of its new

19  marketplace driven search system, including iVillage.com, City Search, Shopping.com, eToys,

20  and the Wedding Channel.  Grewal Decl., Ex. B.  Three days later, a *Wired* article reported that

21  "[s]ince the launch of the site, only days ago, GoTo has signed-on companies at a rate of one

22  every 10 minutes," according to then Overture CEO Jeffrey Brewer.  Grewal Decl., Ex. D at 79.

23  The article quantified the number of subscribers as topping 500.  *Id.*

24      Overture immediately began making money from the paid listings in its new search

25  engine.  A draft February 1998 business plan [----------------------------------------------------------

26  -----------------------------------------------------------------------------------------------------------

27  ------------------------------------------ [REDACTED] -----------------------------------------------

28  -----------------------------------------------------------------------------------------------------------

2

334678.01

1  [-----------------------------------------------------------------------------------------

2  ------------------------------------------------------------------------------------------

3  ------------------------------------------------------------------------------------------

4  ----------------------------------- [REDACTED] ------------------------------------

5  ------------------------------------------------------------------------- [4] -------------

6  ------------------------------------------------------------------------------------------

7  -----------------------------------------------[5]------------------------------------------

8  -----------------------------------------------------------------------------------------].

9    A May 19, 1998 press release about Overture's first round of financing again touted the

10  financial success of Overture's search engine.  *See* Grewal Decl., Ex. C.  Overture attributed the

11  investor interest in the company to the "Enormous User Growth" in its search engine.  *Id.* at 1.

12  As in its earlier press releases and the February 1998 business plan, Overture emphasized its

13  "open-market bidding system" and the fact that advertisers "pay only for actual visits to their

14  sites instead of for simple 'exposures'" as major advantages of its new search engine.  *Id.* at 1.

**B.    More Than a Year After The Launch of Its Paid Listing Search Engine, Overture Files The '361 Patent Application**

16    The '361 patent application was filed more than one year later, on May 28, 1999, by

17  Elaine K. Lee, who was then an associate at Brinks Hofer.  *See* Grewal Decl., Ex. E at GOG

18  31579.  The application described "a system and method for influencing a position on a search

19  result list generated by a computer network search engine."  *Id.* at GOG 31491.  The inventors

20  disclosed a search engine wherein listings are ranked pursuant to an amount that a web site

21  promoter agrees to pay.  Echoing the February 1998 press releases and Overture business plan,

22  the '361 inventors claimed that their invention had the advantage that web site promoters would

23  only pay for click-throughs to their sites, and not for mere exposures.  *Id.* at GOG 31495.

[4] A March 1998 Overture draft business plan included another 20 plus "Testimonials" from web site promoters, in the form of emails praising the new search engine.  *See* Supp. Grewal Decl., Ex. A at OVG 047263 – OVG 047271.  One email complimented the search engine as a "good way to ensure placement," further noting that "it only cost us $25 for 2500 potential clickthrus . . . ."  *Id.* at OVG 047265.  The email also stated, "So, do I recommend GoTo.com?  At $.01-.05 per click thru, you're damn right!"

[5] "URL" stands for Uniform Resource Locator and is the address of a web side on the World

334678.01

1

### 1.   Brinks Hofer Quickly Files a Petition To Make Special, Supported by Mr. Davis' Rule 102 Declaration

2

Shortly after filing the patent application, on October 22, 1999, Ms. Lee filed a request

3

that the PTO "make special," or expedite, the prosecution of the '361 application on the basis of

4

actual infringement by several of Overture's competitors in the search engine market. *See*

5

Grewal Decl., ¶7, Ex. F; *see also* 37 C.F.R. §1.102(d). In support of Overture's request, Ms. Lee

6

submitted a declaration by inventor Darren Davis (the "Rule 102 Declaration"). Grewal Decl.,

7

Ex. G. In the Rule 102 Declaration, Mr. Davis provided several examples of publicly available

8

search engines that allegedly infringed the claims of the '361 patent application. *Id.* at ¶¶ 2-7.

9

Notably, Mr. Davis specifically testified about how he was able to determine that these

10

other search engines practiced the limitations of the patent claims, including the requirement of

11

receiving and recording click-throughs. One of the infringing search engines identified by Mr.

12

Davis was the system offered by SearchUp.Inc., which Mr. Davis declared, "upon information

13

and belief," was discovered by Overture employees on or about May 20, 1999. *Id.* at ¶ 3. Mr.

14

Davis also asserted that Hitsgalore.com infringed the patent claims. *Id.* at ¶ 7. Mr. Davis

15

asserted that claim 1 of the '361 application "would unquestionably be infringed" by

16

Hitsgalore's system. *Id.* at ¶ 8. With respect to the limitation "recording a retrieval request event

17

in the database corresponding to the searcher's retrieval request," Mr. Davis explained that

18

Hitsgalore's website stated that each time a searcher "clicks through" a search listing, the bid

19

amount corresponding to that search listing is deducted from the appropriate web site owner's

20

account. *Id.* at ¶ 7(c). "A 'click through' is therefore a retrieval request from the searcher to

21

retrieve information associated with a search listing in the search result list." *Id.* Mr. Davis

22

further explained that "in order for the bid amount to be properly deducted from the web site

23

owner's account, this retrieval request is received and *recorded* by the hitsgalore.com service in

24

conjunction with the searcher's browser's retrieval of information from the selected web site."

25

*Id.* (emphasis added). Mr. Davis thus asserted to the PTO (and later confirmed in his deposition

26

testimony) that Hitsgalore *must* have received and recorded retrieval requests from the user

27

28

Wide Web.

NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY
RE: PROSECUTION OF THE '361 PATENT [*AMENDED* REDACTED VERSION]
CASE NO. C 02-01991 JSW (EDL)

because the service charged web site promoters by "click throughs" to their web sites.  *See* Supp. Grewal Decl., Ex. B at 159:21-160:1 ("I can see no other way that they [Hitsgalore] can fulfill the claim that . . . they will let advertisers, quote, pay for what they get, unquote, without recording a retrieval request event.").[6]

Mr. Davis also testified about the state of the prior art.  He represented that a "careful and thorough search of the prior art" relating to the '361 application had been made and that the relevant results of that search had been disclosed to the patent examiner in an Information Disclosure Statement filed in August 1999.  Grewal Decl., Ex. G at ¶ 9.  Mr. Davis further testified that "the invention described in the Davis et al. application was [not] in public use or on sale in the United States of America more than one year prior to the filing date of this application."  *Id.* at ¶ 10.

Mr. Davis concluded his Rule 102 Declaration by affirming: "I declare that the foregoing statements made of my own knowledge are true, and that the foregoing statements made on information and belief are believed to be true; and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine, or imprisonment, or both, under 18 U.S.C. § 1001; and may jeopardize the validity of the Davis, et al. application, or any patent issuing therefrom."  *See* Grewal Decl., Ex. G at ¶ 12.

In reliance on Mr. Davis' statements concerning actual infringement by SearchUp, Hitsgalore, and other search engines and affirming the validity of the claimed invention, the PTO granted Overture's petition to make special in December 1999.  *See* Grewal Decl., Ex. H.

## 2.    Relying on Overture's Pre-Critical Date System, The Examiner Repeatedly Rejects The Patent Claims

About one month after granting the Petition to Make Special, the examiner rejected all 68 pending claims.  *See* Grewal Decl., Ex. I.  The examiner cited Overture's own May 19, 1998 press release describing Overture's publicly available search engine system, which

---

[6] Notably, in a declaration submitted to the PTO eleven months later, Mr. Davis would take the exact opposite position by asserting that Overture's pre-critical date system did *not* record retrieval requests, even though Overture had represented to the press and to its investors that the system charged promoters only for actual click-throughs to their websites.  *See* Section II.B.3., *infra.*

notwithstanding the supposed "careful and thorough search of prior art," had not been submitted to the PTO.  *Id.* at 1-3; *see also* Grewal Decl., Ex. C.  The examiner relied on the press release's explanation that: "Bidding for higher placement offers big benefit to advertisers . . . Any advertiser can increase a bid for a listing in order to obtain a higher ranking."  *See* Grewal Decl., Ex. I at 2-3.  The examiner rejected the claims as being anticipated by the pre-critical date press release, pursuant to 35 U.S.C. § 102(b).[7]  *Id.*

Around the same time as the January Office Action, Ms. Lee left Brinks Hofer.  *See* Supp. Grewal Decl., Ex. C at 10:16-17.  Some time after Ms. Lee's departure, another Brinks Hofer associate, John Rauch, began handling the prosecution of the '361 patent application.  *See id.*, Ex. D at 14:7-19; 14:24-15:4.  In April 2000, Mr. Rauch filed a response to the January Office Action, arguing that none of the prior art, including the May 19, 1998 press release, contained the limitation "a modifiable bid amount that is independent of other components of the search listing."  *See* Grewal Decl., Ex. J at 2.  Then, for each independent claim, Mr. Rauch identified other limitations that purportedly were not disclosed by the May 19 press release.  *Id.*  For claim 1, Mr. Rauch asserted that the press release did not disclose the limitation, "recording a retrieval request event in a database corresponding to the searcher's retrieval request."  *Id.*

The examiner remained unconvinced that the May 19 press release did not anticipate the claimed inventions, and once again rejected all 68 claims.  *See* Grewal Decl., Ex. K at 2-3.  At this point, having previously rejected the application on the same grounds, the examiner made his second rejection of all the claims "final."  *Id.* at 4.

### 3. Overture Overcomes The Rejections By Mischaracterizing The Pre-Critical Date System

About three months after the "final" rejection, Mr. Rauch and a Brinks Hofer partner, James Naughton, participated in a telephone interview with the examiner.  *See* Grewal Decl., Ex. L.  According to the examiner's summary, Overture agreed to: i) submit an affidavit "to *clarify features that were not present* in the prior system as described in the press release 5/19/98" and

---

[7] Section 102(b) states in relevant part that a person shall be entitled to a patent unless "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent

ii) "amend claim 1, for further clarification of features discussed." *Id.* (emphasis added). The examiner agreed to withdraw the finality of the last office action. *Id.*

Shortly thereafter, in September 2000, the applicants submitted their second amendment to independent claims 1, 11, and 13-15. *See* Grewal Decl., Ex. M. As part of the remarks to the amendments, Mr. Rauch again denied that the pre-critical date system embodied the claimed inventions. *Id.*, Ex. M at 5. He cited, as sole evidence of this "fact," a declaration by Mr. Davis submitted pursuant to 37 C.F.R. § 1.132 (the "Rule 132 Declaration"). *Id.*

With respect to claim 1, Mr. Davis alleged in the Rule 132 Declaration that the pre-critical date system did not implement the limitation "recording a retrieval request event in an account database corresponding to the searcher's retrieval request." *See* Grewal Decl., Ex. N. But, as Mr. Davis conceded during his deposition, it is *essential* to record a click in order to charge an advertiser for a click through. *See* Supp. Grewal Decl., Ex. B at 162:9-19. Indeed, in his earlier Rule 102 Declaration, Mr. Davis had explained that Hitsgalore *must* have received and recorded retrieval requests from the user because the service charged web site promoters by "click throughs" to their web sites. *See* Grewal Decl., Ex. G at ¶ 7(c). And, just like Hitsgalore, Overture's pre-critical date system charged web site promoters per "click through." *See* Grewal Decl., Ex. B ("Web sites will pay only for actual visits to their sites . . . .).[8]

As with his Rule 102 Declaration, Mr. Davis concluded his Rule 132 Declaration by attesting, under the penalty of perjury, that "all statements made herein of my knowledge are true and that all statements made upon information and belief are believed to be true . . . ." Grewal Decl., Ex. N at ¶ 12.

With respect to all the independent claims, Mr. Rauch further asserted that Mr. Davis' declaration "*specifie[d] limitations* of each independent claim, claim 1 as amended herein and claims 11, 14, 15, 30, 52 and 68 that were not disclosed in the May 19, 1998 press release." Grewal Decl., Ex. M at 5. (emphasis added). Mr. Rauch's remarks were false. In the Rule 132

---

in the United States." 35 U.S.C. §102(b).

[8] *See also* Grewal Decl., Ex. D (" . . . GoTo charges listing companies for delivering actual visits to their site. . . . Currently click-through prices range from 1 cent to 10 cents, with the number of click-throughs extending possibly into the thousands per day, according to Brewer."); Sun Decl.,

1   Declaration, Mr. Davis did generically attest that "[i]n May, 1998, at least some of the features

2   claimed in the independent claims of the subject application were not yet implemented or in the

3   public domain." *See* Grewal Decl., Ex. N at ¶3.  But for four of the eight independent claims –

4   claims 15, 30, 52, and 68 – Mr. Davis did *not* specify limitations that were neither disclosed by

5   the May 19, 1998 press release nor part of the pre-critical date system. *See id.* at ¶¶ 8-11.

6   Instead of identifying specific limitations that were not disclosed, Mr. Davis instead stated only

7   that the "subject matter of the claim as a whole" was not disclosed. *Id.*

8       Nevertheless, in reliance on Mr. Rauch's remarks and Mr. Davis' declaration, the

9   examiner withdrew the finality of the previous § 102(b) rejection based on the May 19 press

10  release.  Although the examiner continued to question the patentability of the inventions on

11  obviousness grounds, 35 U.S.C. § 103, after Mr. Rauch's September 28, 2000 remarks, the

12  examiner dropped any consideration of what features were actually present in Overture's pre-

13  critical date system.  In the end, the Patent Office allowed all the independent claims, except for

14  pending claim 14.  The patent issued on July 31, 2001.

15  **C.    In the Present Litigation, Mr. Davis Reveals That He Lacked Personal Knowledge
        of the Pre-Critical Date System**

16

17      As noted above, in his Rule 102 Declaration, Mr. Davis carefully stated that his

18  testimony about the Searchup.com system was made "upon information and belief."  But in both

19  his Rule 102 and Rule 132 Declarations, Mr. Davis included no such caveats when testifying

20  about the features of the pre-critical date system.  Instead, Mr. Davis purported to provide to the

21  examiner in those Declarations first-hand information about the features of the pre-critical date

22  system.  During Mr. Davis' deposition on May 21 and 22, 2003, Google questioned Mr. Davis

23  about the basis for his testimony to the PTO about the pre-critical date system.  That testimony

24  revealed that Mr. Davis lacked personal knowledge of the features of the pre-critical date system

25  because he did not even start working at Overture until October, 1998, several months after the

26  critical date.  *See* Supp. Grewal Decl., Ex. B at 172:16-22 (Davis' understanding of what features

27  were in the pre-critical date system is based on discussions and "various means" after joining the

28  Ex. A at 51 [-------------------------- REDACTED --------------------------------------].

8

1   company).[9]

2   **D.     Mr. Rauch and Ms. Lee Disclose Attorney-Client Communications, Mental
            Impressions, and Legal Analysis During Their Depositions**

3
4           **1.      Mr. Rauch and Ms. Lee Testify About The Pre-Critical Date System, Mr.
                      Davis' Rule 132 Declaration, and Mr. Davis' Knowledge**

5           On July 18, 2003 and July 23, 2003, Google took the depositions of Ms. Lee and Mr.

6   Rauch, respectively.  During their depositions, both attorneys testified extensively about the

7   prosecution of the '361 patent, including Brinks Hofer's and Overture's investigation of the pre-

8   critical date system and its effect on the patentability of the claimed inventions and the

9   preparation and accuracy of the Rule 102 and Rule 132 Declarations.  In an attempt to rebut

10  Google's inequitable conduct claims, the Brinks Hofer attorneys revealed both their mental

11  impressions and their communications with Mr. Davis about these key issues.  Indeed, during

12  their depositions, Mr. Rauch and Ms. Lee disclosed privileged information on a wide range of

13  topics related to the '361 patent.  Their disclosures include Mr. Rauch's conversations with

14  Thomas Soulanille and mental impressions about whether Mr. Soulanille should be listed as an

15  inventor, Supp. Grewal Decl., Ex. D at 65-66, 68-72; Mr. Rauch's instructions to the '361

16  inventors about the prior art search, *id.* at 30; Mr. Rauch's conversations with Joshua Metzger,

17  Overture's in-house counsel at the time, about the status of the '361 application and the filing of

18  foreign patent applications, *id.* at 60; Ms. Lee's conversations with Mr. Soulanille about

19  inventorship issues and the drafting of the '361 application, Supp. Grewal Decl., Ex. C at 31-33;

20  and Ms. Lee's investigation and communications with Overture employees about the prior art

21  search, *id.* at 61-64.

22          **a.      Brinks Hofer's Assessment of The Pre-Critical Date System and Its
                      Effect On The Patentability of The '361 Application**

23
24          During their depositions, both Ms. Lee and Mr. Rauch testified that they were aware of

25  the pre-critical date Overture system but had concluded that the early system was not in public

26  use more than one year prior to the filing of the '361 application.  Both denied that they had any

27  ───────────────
    [9] *See also* Supp. Grewal Decl., Ex. B at 19:17-18 (Davis did not join the company until October
28  1998); *id.* at 86:14-87:23 (Davis admitted that his knowledge of the Overture system prior to
    October 1998 could have been based, in part, on what he heard around the company

                                              9

334678.01

1    reason to believe that Overture's and Mr. Davis' representations about the features of the pre-

2    critical date system were false.

3        Specifically, during her deposition, Ms. Lee asserted that she had conducted an

4    investigation into whether the pre-critical date invalidated the '361 application.  Ms. Lee claimed

5    that based on that investigation, it was her understanding that not all of the features of the

6    claimed inventions were embodied in the pre-critical date system:

7        Q  -- do you recall conducting any investigation into the features of the system
         that had previously been made available on the GoTo website or otherwise made
8        publicly available?

9        A  Yes.

10       Q  Okay.  What do you recall learning as a result of that investigation?

11       A  That there -- you know, I just learned about certain features that had been --
         that were made publicly available and that they had -- they were working on a
12       newer version that had some additional features.

13   *See* Supp. Grewal Decl., Ex. C at 42:21-43:7.  Regarding her communications with her clients

14   about the pre-critical date system, Ms. Lee testified that based on her discussions "at length"

15   with "various of the ['361] inventors" that at the time she filed the patent application, she

16   believed the claims "encompassed new material" that was not part of the publicly available pre-

17   critical date system.  *See id.* at 50:11-16.

18       When pressed about the accuracy of his statements to the PTO about the pre-critical date

19   system, Mr. Rauch admitted that he was ignorant about the features of the pre-critical date

20   system, but attempted to defend his ignorance by relying on what he had been told by Mr.

21   Naughton.  Mr. Rauch claimed that when he took over the prosecution of the '361 patent, Mr.

22   Naughton had represented to him that the early Overture system was a "beta system."  Mr. Rauch

23   testified that, as a result, he did not believe that it was necessary to undertake his own

24   investigation into the features of the pre-critical date system:

25       Q.  Did you conduct any investigation to determine whether the invention that
         was being claimed in the application had been in prior public use more than one
26       year prior to the filing date?

27       A.  I didn't need to conduct an investigation.

28   _____
     "watercooler").

Q.   Why not?

A.   Because I had been told by Jim Naughton about a beta system that had been announced in press releases prior to filing the patent application.

Q.   What did Mr. Naughton tell you about that beta system?

A.   At that time I think he simply told me that a beta system had been made available to the public.  And that's all that I recall him telling me at that time.

Q.   Okay.  What did you understand Mr. Naughton to mean by a beta system?

A.   A system with some features of the final system or perhaps a later system, a beta system.  I also understood it to include only partial availability perhaps only to some -- some members of the public or some advertisers or customers, a test system.

Supp. Grewal Decl., Ex. D at 46:13-47:14; *see also id.* at 50:2-5 (Naughton indicated that he and Elaine Lee had "taken [the beta system] into account" in preparing the patent application); *id.* at 50:6-17 (Rauch understood Naughton's use of the term "beta system" to mean that the early Overture search engine had "limited functionality, maybe exposed to a limited number of customers, and probably not including all of the features that are ultimately included;" *id.* at 57:21-58:2 (Rauch recalled being told by Naughton that direct on-line advertiser access to the advertiser's search listings was not available in the beta system); *id.* at 100:9-101:5 (Naughton told Rauch that the "currently claimed system was different from [the beta system]").

Mr. Rauch also attempted to justify his ignorance about the features of the pre-critical date system on the grounds that in his communications with Mr. Davis, Mr. Davis had represented that the early Overture search engine did not invalidate the '361 application:

Q.   During this conversation with Mr. Davis, do you recall whether he told you anything about the features of the GoTo beta system?

A.   I believe he [Davis] told me that the beta system was just an editorial driven system, that what they referred to as the DTC system or the on-line access provided to the advertisers was—wasn't existing in the beta system.

Supp. Grewal Decl., Ex. D at 90:9-17; *see also id.* at 173:16-174:17-18 (referring to Claims 15, 30, 52, and 68, Davis was "very adamant that the whole thing wasn't existent—wasn't existing then."); *id.* at 175:11-24 (based on conversation with Davis, Rauch understood Claim 15 "as a whole was new, the whole method in this case was new.").

11

b.    **Brinks Hofer's Assessment of and Communications With Mr. Davis About The Accuracy of Mr. Davis' Declarations**

Similar to their testimony about their knowledge of the features of the pre-critical date system, both Mr. Rauch and Ms. Lee attempted to defend the accuracy of Mr. Davis' declarations by relying on their communications with Mr. Davis and their legal conclusions based on those communications.

Specifically, with respect to Mr. Davis' representations in his Rule 132 Declaration about the purportedly missing features in the pre-critical date system, Mr. Rauch explained that he had thoroughly discussed with Mr. Davis the purpose of the declaration:

> Q.   What did you and he [Davis] discuss?
>
> A.   I explained to him [Davis] the status of the application at that point.  I explained to him the interview that we had had with the examiner.  I explained to him the examiner's request for more information about the difference between the systems.  I guess I should say between the claims and the beta system.  I asked him if he had information about that and could help me prepare that, the necessary declaration.  I explained that we concluded that a declaration on the part of someone at GoTo was the appropriate way to respond to the examiner's request for information.

Supp. Grewal Decl., Ex. D at 85:8-20.

Mr. Rauch then testified that in response to his instructions, Mr. Davis told Mr. Rauch that the pre-critical date search engine did not contain certain features of the claimed inventions:

> Q.   Can you recall anything else that Mr. Davis told you during that conversation?
>
> A.   During that conversation, Mr. Davis and I at our respective locations looked at each of the independent claims, and I asked him to tell me in each respective claim what was not existing, at least one limitation that was not existing in the beta system.  This was what the examiner had asked for, and this was already explained, and I needed to -- from Mr. Davis in order to complete the declaration. *And this was specifically what I asked him for, and that's what he told me.*

Supp. Grewal Decl., Ex. D at 90:18-91:6 (emphasis added); *see also id.* at 171:11-13 (referring to the Rule 132 Declaration, "I was repeating in this declaration what Mr. Davis told me in response to my request conveyed to him from the examiner."); *id.* at 184:21-185:2 ("What I understood was that Mr. Davis identified this particular claim limitation of Claim 1 as being something not present in the beta system, and the overall systems of -- forgive me, method of Claim 15 as defined by the entire claim in its entirety starting at the preamble.").

12

334678.01

1     When pressed on the issue of Mr. Davis' competency to testify about the features of the

2  pre-critical date system, Mr. Rauch similarly relied on what Mr. Davis told him:

3        Q.   At the time that Mr. Davis executed Exhibit 12, did you have a belief as to
         whether he had personal knowledge of the facts that are set forth in Exhibit 12?
4
         A.   I think it was my belief that he did, yeah.
5
         Q.   What was the basis of that belief?
6
         A.   My awareness of his responses to the request for information that I presented
7        to him in order to prepare this declaration, his level of involvement in the file
         history before, making the previous affidavit in connection with the previously
8        filed petition, his status as an inventor of the application.

9  Supp. Grewal Decl., Ex. D at 196:17-197:6.  Mr. Rauch admitted that, had Mr. Davis revealed

10  that his knowledge of the system was secondhand, Mr. Rauch would have made clear in the Rule

11  132 Declaration that the information was being provided on information and belief.  *See id.* at

12  203:2-11.

13     Similarly, Ms. Lee testified that she had no reason to believe that Mr. Davis' statements

14  in the Rule 102 Declaration were false or that he was incompetent to make the Declaration.  Ms.

15  Lee testified in her deposition that, based on her discussions with Mr. Davis, she believed that he

16  was competent to testify about the differences between that system and the invention claimed in

17  the '361 patent.  *See* Supp. Grewal Decl., Ex. C at 92:24-93:4 ("These statements say whether he

18  knows or believes something and -- I mean, whether or not something happened. I mean, I think

19  that's -- I think everything that he said -- I mean, I've -- *I asked him if he's -- if he can attest to the*

20  *truthfulness of those and he said, you know, he did*.") (emphasis added); *see also id.* at 94:3-11.

21  Had Mr. Davis told her the truth, Ms. Lee acknowledged that she might have drafted his

22  assertions about the pre-critical date differently.  *Id.* at 97:15-98:2.

23        **2.    Overture Belatedly Asserts Privilege On Its Privilege Log and During Mr.
              Naughton's Deposition**
24
25     Despite this testimony revealing attorney client communications and Brinks Hofer's work

26  product, Overture has made a blanket assertion of privilege over more than 300 documents

27  encompassing Mr. Rauch's, Ms. Lee's, and Mr. Naughton's "notes" and their communications

28  with Mr. Davis and other employees at Overture related to the prosecution of the '361

13

NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY
RE: PROSECUTION OF THE '361 PATENT [*AMENDED* REDACTED VERSION]
CASE NO. C 02-01991 JSW (EDL)

334678.01

1    application.  *See* Grewal Decl., Ex. A (Overture's privilege log).

2        In addition, at Mr. Naughton's recent deposition, Overture instructed Mr. Naughton not

3    to answer any questions about conversations with Mr. Rauch, Mr. Davis, or others at Overture –

4    including the very conversation about which Mr. Rauch *was* allowed to testify.  *See* Grewal

5    Decl., Ex. Q at 210:11-212:6.  Thus, even though Overture permitted Mr. Rauch to testify that he

6    did not investigate the features of the pre-critical date system in reliance on Mr. Naughton's

7    purported assurances that it was a "beta system," Overture then prohibited Mr. Naughton from

8    giving his account of those conversations or even confirming whether they had taken place.

9    Similarly, Overture refused to permit Mr. Naughton – but not Mr. Rauch or Ms. Lee – to testify

10   about the conversations he had with Mr. Davis and the other inventors about the early Overture

11   search engine.  *See e.g.*, *id.* at 76:7-11; 166:20-23; 213:3-10.

### III.    ARGUMENT

### A.    Overture Has Waived Attorney-Client Privilege On The Subject of The '361 Patent Prosecution

#### 1.    The Disclosures Revealed Substantive Attorney-Client Communications

Overture argues that there has been no waiver of the attorney client privilege.  *See*
Grewal Decl., Ex. O (citing *Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342, 346-47 (N.D.
Ohio 1999) (no waiver where party discloses "opaque references" and "passing allusions" to
privileged communications and work product).  Contrary to Overture's assertions, these
disclosures are hardly opaque.  A closer look at *Libbey Glass*, the lone case cited by Overture
during meet and confer, highlights the differences between disclosures that do not waive
privilege and those that do.

In *Libbey Glass*, plaintiff alleged that defendant infringed the trade dress covering
plaintiff's best-selling glassware patterns.  *Libbey Glass*, 197 F.R.D. at 344.  During discovery,
defendant allowed its company officials to testify that its lawyers had given the "green light" on
the manufacture of the alleged infringing product and that the company had "come as close as
possible to the appearance of Libbey's [glasses] without copying" because of the "legal
ramifications" of copying.  *Id.* at 346.

14

334678.01

1    The court found that there was no waiver of attorney-client privilege because the officials

2    had only made "passing allusions" to their communications with counsel.  *Id.*  In other words,

3    the defendant's disclosures did not "illuminate[] the facts and analysis" underlying its counsel's

4    advice.  *Id.*; *see also In re Brand Name Prescription Drugs Antitrust Litigation*, 1995 WL

5    531805 at *1-*2 (N.D. Ill. Aug. 18, 1995) (waiver did not occur by statements revealing

6    "counsel's direction to comply with the law generally"); *Starsight Telecast, Inc. v. Gemstar Dev.*

7    *Corp.*, 158 F.R.D. 650, 653 (N.D. Cal. 1994) ("'A mere denial of intent, without more, is

8    insufficient to constitute a waiver.'").

9    In stark contrast to the disclosures which the *Libbey Glass* court and others have found

10   insufficient to effect a waiver, here Mr. Rauch and Ms. Lee revealed the substance of their

11   communications with Mr. Davis and others at Overture about the prosecution of the '361 patent.

12   Had Mr. Rauch and Ms. Lee merely disclosed that they informed their clients to "follow the law

13   generally" or generally denied an intent to deceive the PTO, the Court could conclude that

14   Overture had not waived privilege.  But Overture permitted Mr. Rauch and Ms. Lee to rely upon

15   the *content* of their communications with Mr. Davis and to *explain* how those communications

16   informed their legal analysis in prosecuting the patent.

17       **2.    Overture's Disclosure Effects A Waiver Over The Subject Matter of The
                 '361 Patent Prosecution**

18

19   Voluntary disclosure of the content of attorney-client communications constitutes waiver

20   of the privilege as to all other communications on the same subject.  *Weil v. Inv./Indicators*, 647

21   F.2d 18, 24 (9th Cir. 1981).  A party may not use the privilege as both a sword, by disclosing

22   testimony that it deems helpful to its case, and a shield, by withholding evidence that could

23   impeach that testimony.  *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir.

24   1992); *see also QST Energy, Inc. v. Mervyn's and Target Corp.*, 2001 WL 777489, *4-*5 (N.D.

25   Cal. May 14, 2001) (compelling production of communications between testifying expert and

26   counsel on subject matter of testimony).  The doctrine prohibiting selective waiver applies in full

27   force to the testimony of patent prosecution counsel.  *See ACLARA Biosciences, Inc. v. Caliper*

28   *Tech. Corp.*, 2001 WL 777083 (N.D. Cal. June 16, 2000) (finding waiver of attorney-client

---

15

1   privilege where party accused of inequitable conduct permitted substantive testimony by

2   prosecution counsel); *see also Starsight Telecast*, 158 F.R.D. at 654 (waiver where prosecution

3   attorney testified that prior art was "totally different and less relevant than art that was previously

4   before the patent office.").

5     The *ACLARA* decision illustrates how testimony in response to inequitable conduct

6   charges can result in waiver.  In that case, defendant Caliper asserted inequitable conduct as a

7   defense to infringement.  *See ACLARA*, 2001 WL 777083 at *1.  Specifically, Caliper alleged

8   that ACLARA's attorney and his law firm, which was also counsel to Caliper, engaged in

9   inequitable conduct by using confidential Caliper information in prosecuting a patent owned by

10   ACLARA.  *Id.*  In defense to the inequitable conduct allegation, ACLARA voluntarily disclosed

11   all communications between ACLARA and the attorney, which evidently confirmed ACLARA's

12   contention that the attorney had not disclosed Caliper's trade secrets.  *Id.* at *2.  ACLARA then

13   refused to produce the remaining documents related to the patent prosecution, arguing that any

14   waiver had been limited to communications between the attorney and ACLARA.  *Id.*

15     The Court rejected ACLARA's attempt to waive privilege selectively.  *Id.* at *6.  Because

16   ACLARA voluntarily revealed its communications with the attorney, the Court ordered

17   ACLARA to produce all communications between attorneys at the law firm and ACLARA,

18   finding that "it would be unfair to allow disclosure of only the communications that ACLARA

19   cho[o]ses."  *Id.*

20     Overture cannot choose the subset of attorney-client communications it wants to disclose

21   to Google.  Overture has permitted Mr. Rauch and Ms. Lee to reveal the substance of some

22   communications with Mr. Davis and other '361 inventors.  Overture will argue that because Mr.

23   Davis assured them that the early Overture system was a "beta system" and thus did not practice

24   the inventions claimed in the '361 application, Mr. Rauch and Ms. Lee did not have the intent to

25   deceive the PTO about the features of the pre-critical date system.  Overture will also argue that

26   Mr. Rauch and Ms. Lee did not intentionally mislead the PTO about Mr. Davis' knowledge of

27   the pre-critical date system because they had good reason to believe that Mr. Davis could testify

28   about the differences between that search engine and the claimed inventions.  *See* Section II.D.,

16

NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY
RE: PROSECUTION OF THE '361 PATENT [*AMENDED* REDACTED VERSION]
CASE NO. C 02-01991 JSW (EDL)

*supra.* Google is entitled to the withheld documents and testimony so that it can effectively

challenge Overture's version of these events.

**B.    Google Is Entitled To "Work Product" Documents Related To The '361 Patent Prosecution**

   **1.    Overture Has Not Made a Prima Facie Showing That Brinks Hofer's '361 Patent Prosecution Files Are Protected By The Work Product Immunity**

   Overture's privilege log includes tens of entries for attorney "notes" related to the '361

patent prosecution which are purportedly covered by the attorney work product privilege.

Overture has not made a prima facie case that these withheld documents constitute attorney work

product.  The work product doctrine protects only those materials prepared "in anticipation of

litigation."  *Conner Peripherals, Inc. v. Western Digital Corp.*, 1993 WL 726815 at *4 (N.D.

Cal. June 8, 1993).  In the context of patent prosecution files, "the work product immunity does

not apply if the primary concern is with the claims raised in the *ex parte* patent application

prosecution."  *Id.*

   **2.    Even If The Prosecution Files Constitute Attorney Work Product, Google Has a Compelling Need For The Documents**

   Under Federal Rule of Civil Procedure 26(b)(3), some work product is discoverable

"upon a showing that the party seeking discovery has substantial need of the materials in

preparation of the party's case and that the party is unable without undue hardship to obtain the

substantial equivalent of the materials by other means."  Fed. R. Civ.P. 26(b)(3).  Work product

that contains an attorney's mental impressions is discoverable if the party seeking discovery

makes a showing that the "information is directly at issue and the need for production is

compelling."  *See Bio-Rad Labs., Inc. v. Pharmacia, Inc.*, 130 F.R.D. 116, 122 (N.D. Cal. 1990)

(citation and quotation marks omitted).

   Here, even if the work product privilege were to apply to the '361 prosecution files,

Overture has made those documents discoverable by permitting Mr. Rauch and Ms. Lee to reveal

the prosecuting attorneys' mental impressions about the events that are at the core of Google's

inequitable conduct allegations.  *See ACLARA Biosciences, Inc.*, 2001 WL 777083 at *9

(compelling need for discovery where patentee disclosed thoughts and impressions of

17

prosecuting attorneys in defense to inequitable conduct allegations); *see also Bio-Rad Labs., Inc.*, 130 F.R.D. at 123 (exceptional need for discovery where patentee voluntarily engaged prosecuting attorney as an expert).  In particular, Mr. Rauch testified that he did not believe that he needed to conduct an investigation into the pre-critical date system because of what he had learned from Mr. Naughton and Mr. Davis.  *See* Supp. Grewal Decl., Ex. D at 46:13-47:14, 50:2-5, 50:6-17, 57:21-58:2, 90:9-17.  Mr. Rauch also purported to explain the basis for his erroneous belief that Mr. Davis had personal knowledge of the pre-critical date system.  *Id.* at 196:23-197:6.  Ms. Lee testified that her investigation revealed that the "beta system" did not include all the features of the claimed invention and that Overture was "working on a newer version that had some additional features."  *See* Supp. Grewal Decl., Ex. C at 42:21-43:7, 50:11-16.

Because Overture has permitted such testimony from Mr. Rauch and Ms. Lee favorable to its defense to inequitable conduct, Overture has placed the content of Brinks Hofer's work product squarely at issue.  Google has a compelling need for the withheld documents as they may contradict or cast doubt on Mr. Rauch's and Ms. Lee's testimony.  *See ACLARA Biosciences, Inc.*, 2001 WL 777083 at *9 ("Without discovery of work product, Caliper may well find it impossible to challenge ACLARA's [version of events].").  Accordingly, the Court should order Overture to produce the withheld '361 prosecution documents, even if they would otherwise be protected by the attorney work product privilege.

### 3.    Overture Should Not Be Permitted To Selectively Apply The Privilege To Prohibit Mr. Naughton's Testimony

The Court should also order Overture to permit Mr. Naughton to testify about the substance of his communications with Mr. Rauch.  As discussed above, Mr. Rauch has attempted to justify his ignorance of the features of the pre-critical date system by relying on his conversations with Mr. Naughton.  According to Mr. Rauch, Mr. Naughton assured him that the early Overture search engine was a "beta system," that he and Ms. Lee had "taken the [beta system] into account" in preparing the patent application, and that the beta system did not incorporate direct on-line advertiser access.  *See* Section II.D.1.a., *supra*.  Overture cannot seriously contend that Mr. Naughton's version of this conversation is privileged, but Mr. Rauch's

18

is not.

**C.    Mr. Davis' Statements In Connection With The Petition To Make Special Waived Privilege**

Mr. Davis' statements in his Rule 102 Declaration provide an independent reason for finding waiver.  In his declaration, Mr. Davis affirmatively represented that all relevant prior art known to Overture and its attorneys had been disclosed to the PTO: "I have knowledge of that a careful and thorough search of the prior art relating to the Davis et al. application was made.  The results of this search, as well as other prior art known to the *attorneys of the assignee* of the Davis et al. application that may be relevant to patentability of the claims of the Davis et al. application, was cited to the Examiner in an Information Disclosure Statement filed on August 27, 1999."  Grewal Decl., Ex. G, ¶ 9.  Mr. Davis' statement waived any privilege over documents and information relied on or considered and rejected by Mr. Davis in the time leading up to his representation regarding the prior art search and disclosure thereof in the Rule 102 Declaration.  *See TV Interactive Data Corp. v. Microsoft Corp.*, Order Granting In Part And Denying In Part Plaintiff's Motion To Compel and Granting In Part And Denying In Part Defendant's Motion To Compel, No. C-02-2385 JSW (EDL) (filed November 21, 2003), attached as Ex. P to Grewal Decl., at 5.  Accordingly, at a minimum, the Court should compel Overture to produce any documents and information within the scope of that waiver.[10]  The Court should also compel Mr. Naughton's testimony concerning his communications with Mr. Davis about the prior art search reflected in the August 1999 disclosure statement, testimony that Overture has thus far precluded on the grounds of privilege.  *See, e.g.,* Grewal Decl., Ex. Q at 76:7-11; 166:20-23; 210:11-212:6; 213:3-10.

**D.    The Crime-Fraud Exception Vitiates Any Privilege Over The '361 Prosecution Documents**

Documents which otherwise are protected by the attorney-client or work product privilege may be discoverable if produced in furtherance of a crime or fraud.  *See Starsight*

---

[10] Based on discovery thus far, Google believes that in addition to Brinks Hofer, attorneys at O'Donnell & Shaeffer and a patent searcher named Richard Turer may have been involved in the prior art search for the '361 patent application.

NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY
RE: PROSECUTION OF THE '361 PATENT [*AMENDED* REDACTED VERSION]
CASE NO. C 02-01991 JSW (EDL)

1   *Telecast*, 158 F.R.D. at 655 (attorney-client); *In re National Mortgage Equity Corp.*, 116 F.R.D.

2   297, 301 (C.D. Cal. 1987) (work product).  In the context of patent prosecution documents,

3   privilege is pierced if the party seeking discovery establishes a *prima facie* cases of fraud on the

4   patent office.  *Starsight Telecast, Inc.*, 158 F.R.D. at 655.  Specifically, the party must make a

5   *prima facie* showing of "(1) a knowing, willful, and intentional act of misrepresentation or

6   omission before the PTO, (2) that the misrepresentation or omission was material, and (3)

7   reliance."  *Id.; see also Bulk-Lift Int'l, Inc. v. Flexcon & Sys., Inc*., 122 F.R.D. 493, 496 (W.D.

8   La. 1988) (affirming abrogation of privilege where patentee fraudulently failed to disclose

9   manufacture and sale of bags which had a very similar design to the design sought to be

10  patented)*.*  A *prima facie* showing requires "nonprivileged evidence that is sufficient to support a

11  reasonable belief that *in camera* review may yield evidence that establishes the exception's

12  applicability."  *United States v. de la Jara*, 973 F.2d 746, 748 (9th Cir. 1992).

13         Google has made a *prima facie* showing that Overture committed fraud on the PTO by: i)

14  misrepresenting the features of the pre-critical date system; ii) misrepresenting Mr. Davis'

15  statements concerning the Overture pre-critical date system; and iii) misrepresenting Mr. Davis'

16  knowledge of the pre-critical date system.  It cannot be seriously disputed that the

17  misrepresentations were material and that they were relied upon by the PTO.  The examiner

18  repeatedly rejected the '361 application on the grounds that the claimed invention was in public

19  use more than one year prior to the filing date.  And, as shown above, the PTO relied upon the

20  statements by Mr. Rauch and Mr. Davis about the features of the pre-critical date system in

21  allowing the patent to issue.  *See Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571

22  (Fed. Cir. 1983) ("In contrast to cases where allegations of fraud are based on the withholding of

23  prior art, there is no room to argue that submission of false affidavits is not material.").

24  Moreover, it cannot be disputed that the PTO relied on Mr. Davis' material representations in his

25  Rule 102 Declaration[11] about the prior art and the pre-critical date system when it granted

26

27  ───────────────────

28  [11] At the time that Overture filed its petition, the Manual of Patent Examining Procedure §
    708.02 required that an applicant support a petition to make special with an oath or declaration
    alleging facts showing, *inter alia*, that "he or she has made or caused to be made a careful and
    thorough search of the prior art or has good knowledge of the pertinent prior art."

NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY
RE: PROSECUTION OF THE '361 PATENT [*AMENDED* REDACTED VERSION]
CASE NO. C 02-01991 JSW (EDL)

1   Overture's petition to make special. *See General Electro Music Corp. v. Samick Music Corp.*, 19

2   F.3d 1405, 1410-11 (Fed. Cir. 1994) ("We conclude as a matter of law that a false statement in a

3   petition to make special is material if, as in the case here, it succeeds in prompting the expedited

4   consideration of the application."); *see also Monon Corp. v. Stoughton Trailers, Inc.*, 169 F.R.D.

5   99, 103 (N.D. Ill. 1996) (noting the heightened duty of candor when application is made special).

6       The only issue that reasonably may be disputed, therefore, is whether Google has met its

7   burden of making a *prima facie* showing of deceptive intent. For the purposes of establishing

8   fraud, intent need not be shown by direct evidence. *United States v. Clevenger,* 733 F.2d 1356,

9   1358 (9th Cir. 1984). "'Smoking gun' evidence is not required in order to establish an intent to

10   deceive." *Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.*, 984 F.2d 1182, 1189-90 (Fed. Cir.

11   1993). Rather, intent to deceive is "most often proven by a showing of acts, the natural

12   consequence of which is presumed to be intended by the applicant." *Monon Corp.*, 169 F.R.D. at

13   102 (inferring intent to deceive where patentee failed to disclose known offer for sale to PTO);

14   *see also Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,* 1998 WL 175929, at *7

15   (S.D.N.Y.), *vacated on other grounds*, 155 F.3d 569 (Fed Cir. 1998) (intent to deceive patent

16   office inferred by evidence of lawyer's motive not to disclose inconsistent test results and

17   knowledge of the inconsistent test results during prosecution of patent application).

18       **1.    Google Has Made a Prima Facie Showing That Mr. Davis' Statements About**
        **The Features of The Pre-Critical Date System Were Made With Deceptive**
19       **Intent**

20       During the prosecution of the patent, Mr. Davis repeatedly insisted that the pre-critical

21   date system was a "beta system" and did not contain all of the features of the claimed invention.

22   Specifically, with respect to claim 1, Mr. Davis asserted that the early Overture search engine did

23   not implement the limitation "recording a retrieval request event in an account database

24   corresponding to the searcher's retrieval request." *See* Section II.B.3., *supra*. That assertion

25   was, at best, seriously misleading. In his earlier Rule 102 Declaration concerning

26   Hitsgalore.com, Mr. Davis had conceded that limitation is met whenever a web site promoter is

27   charged on a "cost per click" basis. *See* Section II.B.1., *supra*; *see also* Supp. Grewal Decl., Ex.

28   B at 160:2-9; Grewal Decl., Ex. G at ¶ 7(c). Overture had represented to its investors and the

21

1  public that it had signed up dozens, if not hundreds, of web site promoters in the three months

2  prior to the critical date and told those web site promoters they were being charged on a cost per

3  click basis.  *See* Grewal Decl., Exs. B & C.  And Overture kept track of how many "clicks" each

4  advertiser was receiving well prior to the critical date.  Sun Decl., Exs. B & C (exhibits to the

5  deposition of Overture's 30(b)(6) witness).  Overture never disclosed these pre-critical date web

6  site promoter account records to the PTO, despite their materiality to the patent application.

7          The failure to disclose these account records and to point out their significance to the

8  PTO gives rise to the reasonable inference of intent to deceive the PTO.  *See Paragon Podiatry*,

9  984 F.2d at 1193 ("Absent explanation, the evidence of a knowing failure to disclose sales that

10  bear all the earmarks of commercialization reasonably supports an inference of the inventor's

11  attorney intended to mislead the PTO.").  The duty of candor demands that an applicant disclose

12  material information to the PTO, even if the applicant has a good faith belief that the information

13  does not defeat patentability of the claim invention.  *See LaBounty Mfg., Inc. v. United States*

14  *ITC*, 958 F.2d 1066, 1076 (Fed. Cir. 1992) ("Close cases should be resolved by disclosure, not

15  unilaterally by the applicant.").  The concealment of these records suggesting that Overture's

16  pre-critical date system recorded "clicks" is "particularly egregious because, unlike an

17  applicant's failure to disclose, for example, a material patent reference, the examiner ha[d] no

18  way of securing the information on his own."  *Paragon Podiatry*, 984 F.2d at 1193*; see also*

19  *Monon Corp.*, 169 F.R.D. at 103-04 (abrogating attorney client privilege under crime-fraud

20  exception where applicant failed to disclose a known offer for sale prior to the critical date).

21          **2.      Google Has Made a Prima Facie Showing That Mr. Rauch's
22               Mischaracterization of Mr. Davis' Declaration Was Made With Deceptive
               Intent**

23          In response to the examiner's request for the identification of specific features present in

24  the pre-critical system, Mr. Rauch represented that Mr. Davis' Rule 132 Declaration "*specifie[d]*

25  *limitations* of each independent claim, claim 1 as amended herein and claims 11, 14, 15, 30, 52

26  and 68 that were not disclosed in the May 19, 1998 press release."  Grewal Decl., Ex. M at 5

27  (emphasis added).  Mr. Rauch's characterization of Mr. Davis' Declaration was false:  for four of

28  the eight independent claims – claims 15, 30, 52, and 68 – Mr. Davis did not disclose any such

22

1   specific limitation, but merely attested that the "subject matter of the claim as a whole" was not

2   disclosed.  *See* Grewal Decl., Ex. N at ¶¶ 8-11.; *see also* Section II.B.3., *supra*.  Thus, as to

3   claims 15, 30, 52, and 68, Mr. Davis' Declaration provided no new information:  indeed, Mr.

4   Davis' Declaration provided *less* information than Mr. Rauch's previous arguments, because Mr.

5   Rauch *had* identified specific limitations that purportedly were neither disclosed by the press

6   release nor present in the pre-critical date system.

7          The Court may infer the requisite intent to deceive from Mr. Rauch's false statement.

8   Prosecution counsel owe the highest degree of candor to the PTO.  *See Kingsland v. Dorsey*, 338

9   U.S. 318, 319 (1949) ("[T]he relationship of attorneys to the Patent Office requires the highest

10  degree of candor and good faith.  In its relation to applicants, the Office . . . must rely upon their

11  integrity and deal with them in a spirit of trust and confidence . . . ."); *see also* Mark A. Lemley,

12  *Rational Ignorance At The Patent Office*, 95 Nw. U. L. Rev. 1495, 1500 (2001) (noting that the

13  total average time an examiner spends in prosecution of a patent application is 18 hours).  An

14  attorney's duty of candor is particularly important because patent prosecution proceedings are

15  conducted *ex parte*.  *See Intel Corp. v. VIA Techs., Inc.,* 176 F. Supp. 2d 991, 1001 (N.D. Cal.

16  2001); *see also Bristol-Myers Squibb Co.*, 1998 WL 175929 at *7 (finding circumstantial

17  evidence of fraudulent intent sufficient to abrogate privilege where patentee failed to point out

18  significance of article before the examiner).

19          **3.      Google Has Made a Prima Facie Showing That Mr. Davis' Statements
                    Regarding His Knowledge Of The Pre-Critical Date System Were Made
20                  With Deceptive Intent**

21          Mr. Davis submitted two declarations to the PTO attesting that all "statements made

22  herein of my knowledge are true and that all statements made on information and belief are

23  believed to be true."  *See* Grewal Decl., Ex. G at ¶ 12; Ex. N at ¶ 12.  Mr. Davis' statements were

24  false, or at the very least materially misleading, because he did not in fact have personal

25  knowledge of the pre-critical date system which was the subject of his declarations.  The Court

26  may infer from the submissions of these false declarations that Mr. Davis had the requisite intent

27  to deceive the PTO sufficient to find that the crime-fraud exception applies.

28          The Federal Circuit's decision in *Paragon Podiatry* is instructive.  Defendant KLM

23

alleged that the patent holder, Paragon Podiatry, committed inequitable conduct by submitting deceptive affidavits to the PTO.  *See Paragon Podiatry*, 984 F.2d at 1190-91.  After a personal interview with Paragon's counsel, the examiner ordered Paragon to provide a Rule 132 affidavit "from a disinterested third party" on the issue of whether the claimed invention was obvious in light of the prior art.  *Id.* at 1191.  Paragon submitted affidavits from three professionals in the field who attested to the advantages of the claimed invention over prior art devices.  *Id.*  As part of the affidavits, each of the affiants averred that, "I have not been in the past employed by nor do I intend in the future to become employed by Paragon Podiatry Laboratories, a corporation which I understand is the assignee of interest in the above captioned patent application."  *Id.*  During litigation, it was discovered that the affiants had each held stock in Paragon and that at least one of them had consulted for, though were not technically employed by, Paragon.  *Id.*  KLM brought a summary judgment motion for inequitable conduct, alleging *inter alia* that the false affidavits were sufficient to infer deceptive intent.  *Id.* at 1190-91.

The district court granted summary judgment in favor of the defendant and the Federal Circuit affirmed.  The court concluded that the false affidavits were sufficient to establish deceptive intent, despite the lack of direct evidence.  *Id.* at 1192.  The court rejected the inventor's explanation that he did not consider the three affiants "interested parties in the sense that their opinions should not be given full weight" because they were not "employed by Paragon."  *Id.* at 1192.  Instead, the court found that the representation that the affiants were not "employed" by Paragon as "the classic example of a half truth."  *Id.*  "We need not quibble about whether a 'consultant' is or is not 'employed' by a company. . . . None was a 'disinterested' party in any recognized sense of the word."  *Id.*  Even viewing the evidence in the light most favorable to Paragon, the district court properly inferred the requisite deceptive intent from the submission of the false affidavits.  *Id.*

Mr. Davis' false statements to the PTO about his knowledge of the pre-critical date system certainly establish the requisite intent to deceive under the more relaxed standard that applies here.  Mr. Davis knew how to distinguish between facts which he knew "upon information and belief" and those within his personal knowledge:  he did so in his Rule 102

24

1   Declaration.  Nonetheless, Mr. Davis continued falsely to represent to the patent office that he

2   had personal knowledge of the early Overture system.  Mr. Davis' protestations that he was

3   merely confused about his obligations to the PTO are entitled to no more weight that the similar

4   protestations of the inventor in *Paragon Podiatry*.  *Id.* at 1193.  The Court "need not quibble"

5   about the extent and the basis for Mr. Davis' knowledge; Mr. Davis has admitted that his

6   knowledge of the relevant features of the system was premised on information that he heard from

7   other Overture employees.  *See, e.g.,* Supp. Grewal Decl., Ex. B at 86:14-87:23.  Under no

8   reasonable definition of the phrase was Mr. Davis' statements about those features within his

9   personal knowledge.  Accordingly, the Court may infer from the submission of the false

10  statements that Mr. Davis had the requisite intent to deceive.  *Paragon Podiatry,* 984 F.2d at

11  1192.

12          In sum, because the evidence thus far "support[s] a reasonable belief that an in camera

13  review may yield evidence that establishes the [crime-fraud] exception's applicability," *de la*

14  *Jara*, 973 F.2d at 748, the Court should inspect the communications between Mr. Davis and Mr.

15  Rauch and Mr. Rauch's notes about the '361 prosecution in order to determine whether they

16  should be produced to Google under the crime-fraud exception.

17                          **IV.    CONCLUSION**

18          For the reasons stated above, Google requests that the Court find that Overture has

19  waived the attorney-client and work product privileges on the subject matter of the '361 patent

20  prosecution.  In the alternative, the Court should find that Google has made a *prima facie*

21  showing that the crime-fraud exception applies, and compel Overture to produce the

22  communications between Mr. Davis and Mr. Rauch and Mr. Rauch's notes about the '361

23  prosecution for *in camera* inspection by the Court.

24  Dated:  July 6, 2004                          RESPECTFULLY SUBMITTED,

25                                                KEKER & VAN NEST, LLP

26                                      By:    /s/ John W. Keker
                                               _____
27                                             JOHN W. KEKER
                                               Attorneys for Defendant and
28                                             Counterclaimant GOOGLE INC.

                                        25