**EXHIBIT  D**

Dockets.Justia.com

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5

6    OVERTURE SERVICES, INC.,        )

7    a Delaware Corporation,         )

8              Plaintiff,            )

9       vs.                          ) CO2-01991 JSW

10   GOGGLE INC., a California        )

11   Corporation,                    )

12             Defendant.            )

13

14

15            The videotaped deposition of JOHN G.

16   RAUCH, taken before DEBORAH A. MILLER, a Notary

17   Public within and for the County of DuPage, State

18   of Illinois, and a Certified Shorthand Reporter of

19   said state, at Suite 3600, 455 North Cityfront

20   Plaza Drive, Chicago, Illinois, on the 23rd day of

21   July, A.D. 2003, at 9:08 a.m.

22

23                    ORIGINAL

24

08:18    1    drafted by Elaine Lee.

2        Q.    Did you have an understanding as to why

3    Ms. Lee was not continuing to work on the file?

4        A.    I did.

09:19    5    Q.    Which was what?

6        A.    She had left the firm.

7        Q.    Okay.  Did your starting work on the

8    GoTo.com application coincide with Ms. Lee's

9    departure?

09:19    10    A.    No, it did not.

11        Q.    Okay.  Was there a gap between when she

12    left and when you began working?

13        A.    Yes.

14        Q.    How long was that gap?

09:19    15    A.    I don't know the answer to that

16    question.

17        Q.    Could you give me any estimate?

18        A.    I would guess anywhere from a few weeks

19    to a couple of months.

09:19    20    Q.    Okay.  Do you know who at Brinks Hofer

21    was responsible for handling the prosecution of

22    the GoTo application during that period of time?

23        A.    I don't know the answer, no.

24        Q.    When you were involved in prosecuting

09:19    1    the GoTo application, did you work with any

2    attorneys from Brinks Hofer other than

3    Mr. Naughton?

4        A.    Not that I recall.

09:20    5        Q.    When you first began working on the

6    GoTo.com application, did you review the entirety

7    of the file history as it existed as of that time?

8        A.    What do you mean by "review"?

9        Q.    Did you read it?

09:20   10        A.    I read closely portions of the file

11    history.

12        Q.    Were there any portions of the file

13    history that you did not read?

14        A.    Yes.

09:20   15        Q.    What were those?

16        A.    The petition to make special and its

17    exhibits.

18        Q.    Why didn't you read the petition to

19    make special?

09:20   20        A.    Because I saw that the petition to make

21    special had been granted and didn't see a need to

22    study closely the contents of it.

23        Q.    What is your understanding as to the

24    criteria for when a petition to make special will

CONFIDENTIAL - UNDER PROTECTIVE ORDER

30

09:39    1    that would have suggested to you that it was not

2    necessary to perform any independent search for

3    prior art?

4        A.    No.

09:39    5        Q.    Did you ask anyone whether it would be

6    advisable to conduct a further search for prior

7    art in connection with the prosecution of this

8    patent application?

9        A.    No, I didn't.

09:40    10        Q.    Why not?

11        A.    I don't know.

12        Q.    Did you ever direct that any further

13    search for prior art be done either by Brinks

14    Hofer or by the client in connection with

09:40    15    prosecuting this patent application?

16        A.    I reminded inventors and others

17    involved in the prosecution of the obligation to

18    come forward with and disclose to the PTO any

19    information that we had documents and other

09:40    20    information, but I did not direct anyone to go out

21    and search for anything that I recall.

22        Q.    Okay.  When did you remind the

23    inventors of that obligation?

24        A.    Specific times I don't recall.  It's my

FIDENTIAL - UNDER PROT   IVE ORDER

46

10:14   1   more than one year prior to the filing date of the

         2   application?

         3       A.    I believe I saw press releases, other

         4   information that had been cited in an IDS

10:14   5   announcing some sort of system before the time,

         6   more than one year prior to the application.

         7       Q.    Did reviewing those press releases

         8   cause you to question whether the invention that

         9   was being claimed in the application might have

10:14  10   been in public use more than one year prior to the

        11   filing date?

        12       A.    It did.

        13       Q.    Did you conduct any investigation to

        14   determine whether the invention that was being

10:15  15   claimed in the application had been in prior

        16   public use more than one year prior to the filing

        17   date?

        18       A.    I didn't need to conduct an

        19   investigation.

10:15  20       Q.    Why not?

        21       A.    Because I had been told by Jim Naughton

        22   about a beta system that had been announced in

        23   press releases prior to filing the patent

        24   application.

CONFIDENTIAL - UNDER PROTECTIVE ORDER

47

10:15          1          Q.    What did Mr. Naughton tell you about

               2    that beta system?

               3          A.    At that time I think he simply told me

               4    that a beta system had been made available to the

10:15          5    public.  And that's all that I recall him telling

               6    me at that time.

               7          Q.    Okay.  What did you understand

               8    Mr. Naughton to mean by a beta system?

               9          A.    A system with some features of the

10:16         10    final system or perhaps a later system, a beta

              11    system.  I also understood to include only partial

              12    availability perhaps only to some -- some members

              13    of the public or some advertisers or customers, a

              14    test system.

10:16         15          Q.    Did Mr. Naughton tell you that the beta

              16    system had been available only to certain

              17    specified users?

              18          A.    I don't recall if he told me that or if

              19    I surmised that or drew that supposition from the

10:16         20    name beta system.

              21          Q.    Okay.  Did you draw any conclusions

              22    from this initial conversation with Mr. Naughton

              23    as to how many people had had access to this

              24    so-called beta system?

CONFIDENTIAL - UNDER PROTECTIVE ORDER

50

10:30   1   one year prior to the filing date?

2        A.    He indicated that he had been aware

3   along with Elaine Lee in preparing the patent

4   application of the beta system and that the patent

10:20   5   application had taken that into account.

6        Q.    In terms of evaluating the

7   patentability of the claims that were then pending

8   in the application, did you deem the fact that

9   Mr. Naughton referred to the prior system as a

10:21   10   beta system to be in any way significant?

11       A.    I'll say yes, I did.

12       Q.    How so?

13       A.    My understanding of the term "beta

14   system" is that it has limited functionality,

10:21   15   maybe exposed to a limited number of customers,

16   and probably not including all of the features

17   that are ultimately included.

18       Q.    I take it then that you did not

19   understand the beta system to constitute an

10:21   20   experimental use?

21       MR. BERENZWEIG:  May I hear that question

22   back, please.  I believe there is a double

23   negative in there, and I want a clarification if

24   that's the case.

(CONFIDENTIAL - UNDER PROTECTIVE ORDER

57

1              (WHEREUPON, the record was

2              read by the reporter.)

3    BY THE WITNESS:

4         A.    You asked if I did not do anything, and

10:32    5    I don't think that's true.

6    BY MS. DURIE:

7         Q.    Okay.  What did you do in order to try

8    to ascertain which elements had not been in prior

9    public use or had not been invented prior to

10:33    10    commencing to prepare the Rule 132 declaration?

11         A.    I think it probably came up as a matter

12    of discussion between me and Mr. Naughton at

13    different times, and as we talked about different

14    aspects of the system, I became aware of it in

10:33    15    that way.

16         Q.    Okay.  What do you recall Mr. Naughton

17    telling you during those conversations about which

18    elements of the claims had either not been in

19    prior public use or had not been invented until

10:33    20    less than a year prior to the filing date?

21         A.    I recall being told that the direct

22    on-line advertiser access to their -- the

23    advertiser's search listings was not available in

24    the beta system.  That a -- an editorial process

CONFIDENTIAL - UNDER PROTECTIVE ORDER

58

10:14

1    was available prior to the development of a

2    subsequent system.

3         Q.    What did you understand that editorial

4    process to be?

10:34    5    A.    The editorial process involved an

6    advertiser who wanted to make a change to a search

7    listing of the advertiser, making that change by

8    contacting a representative of GoTo either by

9    E-mail, telephone, or perhaps some other way, and

10:34    10   specifying the change to be made.  In response to

11   that contact, an Overture -- I'm sorry, a GoTo

12   editor would make the change on behalf of the

13   advertiser and the search listing would be updated

14   that way.

10:35    15   Q.    Is there anything else that you can

16   recall learning from Mr. Naughton prior to when

17   you commenced drafting the Rule 132 declaration

18   about which elements of the claims were new?

19   A.    Nothing that I recall right now.

10:35    20   Q.    Okay.  And is there anything that you

21   did to learn which elements of the claims were new

22   prior to drafting the Rule 132 declaration other

23   than talking to Mr. Naughton?

24   MR. BERENZWEIG:  May I hear that question

10:37   1       A.      No, I don't.  I'm afraid I don't.

2       Q.      Can you recall the substance of any of

3   your conversations with Mr. Metzger which took

4   place during this same time frame between when you

10:38   5   started working on the application and when you

6   started drafting the Rule 132 declaration?

7       A.      My conversations with Mr. Metzger

8   tended to be about the status of the application,

9   progress through the U.S. Patent and Trademark

10:38   10   Office, the examining process, and other -- other

11   patent matters.

12       Q.      Can you remember any specifics?

13       A.      At some point in time, and I don't know

14   if this falls into the time frame you're asking

10:38   15   about, the foreign filing of this application

16   became an issue.  I know we talked quite a bit

17   about that, and the opportunity for filing

18   applications overseas.

19       Q.      What were the issues surrounding the

10:38   20   foreign filing of this application?

21       MR. BERENZWEIG:  I'm going to object at this

22   point on the basis of privilege.  I've allowed you

23   to inquire into this area because it's relevant to

24   the file history; but once you're going beyond the

ESQUIRE DEPOSITION SERVICES - CHICAGO
(312) 782-8087

10:43      1    a result of your conversations with Mr. Soulanille

          2    as to the nature of his duties at GoTo?

          3        A.    Yes, I did.

          4        Q.    Did you discuss with Mr. Soulanille

10:43      5    during these conversations prior to the filing of

          6    the Rule 132 declaration whether he had

          7    contributed in any way to the invention that was

          8    being claimed?

          9        A.    I'm sorry.  Could you ask it once

10:43    10    again?  I lost the first few words.

        11        Q.    Yes.

        12        During the conversations that you had

        13    with Mr. Soulanille prior to the filing of the

        14    Rule 132 declaration, did you discuss with him

10:44    15    whether he had contributed in any way to the

        16    invention that was being claimed in the

        17    application?

        18        A.    No.

        19        Q.    Why not?

10:44    20        A.    I had no reason to discuss inventorship

        21    or any contribution he might have made to that

        22    subject matter.

        23        Q.    And was that because someone else had

        24    already made a decision about who would be listed

10:44

```
 1    as the inventors on the application?

 2         A.    In part, yes.

 3         Q.    What were the other reasons?

 4         A.    His involvement in development of that

 5    invention was not something we discussed at that

 6    time.

 7         Q.    I understand that.  But was there any

 8    reason for your not asking him about that other

 9    than that someone else had already made a decision

10    about who the inventors on the application would

11    be?

12         A.    There was -- there was no reason for me

13    to inquire, so I guess the answer to your question

14    is no.

15         Q.    Did it occur to you when you spoke with

16    Mr. Soulanille during this time frame, based upon

17    the nature of his job responsibilities, that he

18    might have had some involvement in the invention

19    that was being claimed?

20         A.    No.

21         Q.    During this time frame prior to the

22    filing of the Rule 132 declaration, did you have

23    an understanding of any of the specific

24    contributions of any of the inventors who were
```

10:44

10:45

10:45

10:45

CONFIDENTIAL - UNDER PROTECTIVE ORDER

68

1           (WHEREUPON, the record was

2           read by the reporter.)

3    BY THE WITNESS:

4        A.    I had no reason to doubt that the

5    correct inventors and all the correct inventors

6    had been listed.

7    BY MS. DURIE:

8        Q.    But you were simply relying on whatever

9    it was that Ms. Lee and Mr. Naughton had done,

10   correct?

11       A.    That's correct.

12       Q.    Did you yourself have any knowledge

13   apart from simply relying on the work that they

14   had done that the correct inventors had been

15   listed?

16       A.    When?

17       Q.    At any time.

18       A.    After the patent was granted,

19   Mr. Soulanille inquired of me about inventorship,

20   what goes into being an inventor.

21           I explained to him my understanding of

22   that determination, and he said, "Then I should

23   probably --" meaning Mr. Soulanille should

24   probably be listed as an inventor.

ESQUIRE DEPOSITION SERVICES - CHICAGO
(312) 782-8087

10:48   1          Q.     Do you know what it was that prompted

        2    Mr. Soulanille to ask that question?

        3          A.     I really don't.

        4          Q.     Okay.   Prior to the conversation with

10:49   5    Mr. Soulanille in which he inquired as to the

        6    criteria for inventorship, did you have any basis

        7    for believing that the patent application recited

        8    the correct inventors other than simply relying

        9    on the work that had been done by Ms. Lee and

10:49   10   Mr. Naughton?

        11         A.     No.

        12         Q.     Okay.   Had you had any conversations

        13   with Mr. Soulanille about his involvement in the

        14   development of the GoTo system prior to the

10:50   15   conversation in which he asked about the criteria

        16   for inventorship?

        17         A.     No.

        18         Q.     How many times had you spoken with him

        19   up to that point?

10:50   20         A.     At what point?

        21         Q.     The point at which he inquired about

        22   the criteria for inventorship.

        23         A.     Perhaps 10 to 20 times.

        24         Q.     If you added up those 10 to 20 times,

10:50

1  how many hours are we talking about?

2      A.    About one to two hours, I would guess.

3      Q.    During the entirety of the

4  prosecution of the application, did you ever ask

10:51

5  Mr. Soulanille whether he had contributed in any

6  way to the development of the GoTo system?

7      MR. BERENZWEIG:  Can you define "GoTo

8  system"?

9      MS. DURIE:  Fair enough.

10  BY MS. DURIE:

11      Q.    Let me define the GoTo system as being

12  whatever GoTo system was that was up on its Web

13  site at a particular point in time.

14      MR. BERENZWEIG:  What is that particular

10:51

15  point in time as to your question?

16      MS. DURIE:  The system changed over time, so

17  I'm including all the various iterations of the

18  system as they existed at various points in time.

19      MR. BERENZWEIG:  And what is your question

20  now?

21  BY MS. DURIE:

22      Q.    My question is:  During the period of

23  time when you were prosecuting the patent

24  application, did you ever ask Mr. Soulanille

10:52    1    whether he had made any contributions to the GoTo

         2    system as it may have changed over time?

         3         A.    What -- what do you mean by

         4    "contributions"?

10:52    5         Q.    Whether he had had any role whatsoever

         6    in the development of that system.

         7         A.    I didn't ask him about that, no.

         8         Q.    Did you have an understanding as to

         9    that?

10:52   10         A.    Over the course of the prosecution of

        11    this application, my awareness of his position at

        12    GoTo came to be one that he was a supervisor of

        13    technical people.  I didn't know with any degree

        14    of certainty his technical involvement or

10:53   15    technical contribution or if he was just a manager

        16    or what.

        17         Q.    What was Mr. Soulanille's title during

        18    the prosecution -- during your involvement in the

        19    prosecution of the patent application?

10:53   20         A.    I'm not certain, but I think that it

        21    was chief engineer.

        22         Q.    When did you learn what

        23    Mr. Soulanille's title was?

        24         A.    I think during correspondence with him

10:53

1    regarding a continuing application that we filed

2    on his behalf.

3         Q.    Do you remember when that was?

4         A.    Either shortly before or shortly after

5    this patent was granted.

6         Q.    Okay.  When you first had conversations

7    with Mr. Soulanille, do you recall whether you

8    asked him, "Hey, what's your title"?

9         A.    I recall that I didn't ask him that

10   question.

11        Q.    Do you recall whether you asked him

12   what his job was?

13        A.    I recall that I didn't ask him that.

14        Q.    Why not?

15        A.    Because we were talking about technical

16   issues, and I believe he called me with questions

17   about patent matters, patent application matters,

18   and so forth.

19        Q.    During the time that you were

20   prosecuting the patent application, did you ever

21   ask anyone at GoTo who the head of engineering

22   was?

23        A.    No.

24        Q.    When you were prosecuting the patent

CONFIDENTIAL - UNDER PROTECTIVE ORDER

11:19

1          MR. BERENZWEIG:   And you're talking about

2     this --

3          MS. DURIE:   The second conversation.

4          MR. BERENZWEIG:   Second.   Okay.

5     BY THE WITNESS:

6          A.    I would estimate 15 to 20 minutes.

7     BY MS. DURIE:

8          Q.    What did you and he discuss?

9          A.    I explained to him the status of the

11:19     10     application at that point.  I explained to him the

11     interview that we had had with the examiner.   I

12     explained to him the examiner's request for more

13     information about the differences between the

14     systems.   I guess I should say between the claims

11:19     15     and the beta system.  I asked him if he had

16     information about that and could help me prepare

17     that, the necessary declaration.   I explained that

18     we concluded that a declaration on the part of

19     someone at GoTo was the appropriate way to respond

11:20     20     to the examiner's request for information.

21          Q.    Did you tell Mr. Davis anything about

22     the qualifications that the person signing that

23     declaration would need to have other than

24     employment at GoTo?

CONFIDENTIAL - UNDER PROTECTIVE ORDER

90

11:26   1          Q.    Okay.   Other than the assumption that

2      you made based upon the fact that Mr. Davis was

3      listed as an inventor and whatever information you

4      gleaned from reading the petition to make special,

11:26   5      did you have any other basis for assuming that he

6      had worked at GoTo from time immemorial as you put

7      it?

8          A.    No.

9          Q.    During this conversation with

11:27  10      Mr. Davis, do you recall whether he told you

11      anything about the features of the GoTo beta

12      system?

13          A.    I believe he told me that the beta

14      system was just an editorial driven system, that

11:27  15      what they referred to as the DTC system or the

16      on-line access provided to advertisers was --

17      wasn't existing in the beta system.

18          Q.    Can you recall anything else that

19      Mr. Davis told you during that conversation?

11:28  20          A.    During that conversation, Mr. Davis and

21      I at our respective locations looked at each of

22      the independent claims, and I asked him to tell me

23      in each respective claim what was not existing, at

24      least one limitation that was not existing in the

11:28    1    beta system.

2        This was what the examiner had asked

3    for, and this was already explained, and I needed

4    to -- from Mr. Davis in order to complete the

11:28    5    declaration.  And this was specifically what I

6    asked him for, and that's what he told me.

7      MS. DURIE:  Okay.  Let me mark as Exhibit 28

8    a copy of a response.  It's bates stamped GOG31652

9    and it's part of the file history in the case.

10         (WHEREUPON, a certain document

11         was marked Rauch Deposition

12         Exhibit No. 28, for identification,

13         as of 7/23/03.)

14    BY MS. DURIE:

11:29    15      Q.    Mr. Rauch, do you recognize what's been

16    marked as Exhibit 28?

17      A.    Yes.

18      Q.    Did you draft it?

19      A.    Yes, I did.

11:30    20      Q.    I'd like you to turn to the second page

21    under claim rejections, and I'd like to direct

22    your attention to the second paragraph.  Please

23    read it to yourself.

24      A.    Okay.

1    away?

2         A.    Yes.

3         Q.    Okay.   When you read -- well, strike

4    that.

5              Obviously you were aware of the

6    existence of Exhibit 10 as of the date that you

7    drafted Exhibit 28, right?

8         A.    Yes.

9         Q.    Okay.   When you read Exhibit 10, did it

10   raise any concerns in your mind as to whether the

11   invention that was being claimed in any of the

12   claims of the patent application had been in prior

13   public use more than a year before the filing

14   date?

15        A.    Yes, it did.   It made me wonder about

16   that.

17        Q.    Did you conduct any investigation to

18   satisfy yourself that that was not the case?

19        A.    I spoke to Jim Naughton.   I showed him

20   a copy of the Office Action, including the

21   rejection and the references cited, and discussed

22   the nature or the basis of the rejection.

23        Q.    What did Mr. Naughton tell you?

24        A.    I'm trying to recall completely.   All I

11:45    1    recall is that he said this related to the beta

2    system which was announced publicly before the

3    time, a year before the patent application was

4    filed, and that the currently claimed system was

11:46    5    different from that.

6           Q.     Did Mr. Naughton tell you why he

7    believed that the currently claimed system was

8    different from the system disclosed in Exhibit 10?

9           A.     I don't recall what he stated about

11:46    10    that.

11           Q.     Okay.  You see that the date of

12    Exhibit 10 is May 19th, 1998?

13           A.     I see that.

14           Q.     I will represent to you that the patent

11:46    15    application was filed on May 28th, 1998.

16           A.     Okay.

17           Q.     I mean, 1999.  I'm sorry.

18           A.     I understand.

19           Q.     If I referred then to May 28th, 1998,

11:47    20    as "the critical date," will you understand what I

21    mean by that?

22           A.     I do.

23           Q.     Okay.  Did you have any discussion with

24    Mr. Naughton about whether the patent application

NFIDENTIAL - UNDER PROT   TIVE ORDER

171

0    14    1    application, the subject matter of this claim as a

2    whole was not disclosed in the May 19th, 1998

3    press release."

4         First of all, did you draft this

02:44    5    declaration?

6         A.    Yes, I did.

7         Q.    Okay.  Is there a reason that with

8    respect to Claim 15 you did not recite the

9    limitation that you had recited in Exhibit 28 in

02:44    10    Mr. Davis' declaration?

11         A.    I was repeating in this declaration

12    what Mr. Davis told me in response to my request

13    conveyed to him from the examiner.

14         Q.    Okay.  Did you ask Mr. Davis whether

02:45    15    the limitation that you had specified in

16    Exhibit 28 for Claim 15 was present in the GoTo

17    beta system?

18         A.    I did not.

19         Q.    Why not?

02:45    20         A.    I asked him to review each of the

21    independent claims and tell me what was new in the

22    claim.

23         Q.    Did you ask him whether the statement

24    that you had made to the examiner about Claim 15

01:47   1   for Claim 30 was present in the beta system?

2       A.   No, I did not.

3       Q.   Was there any reason you didn't ask him

4   that?

02:47   5       A.   No reason that I'm aware of.

6       Q.   And I take it your answers would be the

7   same with respect to Claim 52 and Claim 68?  You

8   didn't ask him and you don't know why?

9       A.   I didn't ask him.  I asked him other

02:47   10  questions.  I didn't ask him that specific

11  question you're inquiring about.

12      Q.   What other questions did you ask him?

13      A.   I asked him with respect to each claim

14  what's new in this claim that wasn't present in

02:48   15  the beta system.

16      Q.   And with respect to Claims 15, 30, 52,

17  and 68, he told you the subject matter of the

18  claim as a whole?

19      A.   He told me the whole thing.  This

02:48   20  didn't exist at that time.

21      Q.   Okay.  Did you ask him on a

22  limitation -- did you understand that to mean that

23  each and every limitation of the claim was not

24  present in the beta system?

CONFIDENTIAL - UNDER PROTECTIVE ORDER

174

```
0 18      1          A.    The claim as a whole, the whole claim.

          2          Q.    Okay.  I understand that, but -- I

          3   understand those words, but I want to make sure

          4   that I understand what you mean by those words.

02:48     5                When Mr. Davis said the whole thing is

          6   new, did you understand that to mean that none of

          7   the limitations in those claims were present in

          8   the prior system?

          9          A.    No.  I understood that to mean that the

02:49    10   system or method that is claimed or defined by

         11   that claim wasn't present.

         12          Q.    Okay.  Did you ask Mr. Davis to be more

         13   specific as to which features or aspects of that

         14   system were new?

02:49    15          A.    I did not.

         16          Q.    Why not?

         17          A.    He was very adamant that the whole

         18   thing wasn't existent -- wasn't existing then.

         19          Q.    Okay.  Did you understand that there

02:49    20   were at least some elements of Claim 15 that had

         21   existed in the prior system?

         22          A.    I don't know that I really considered

         23   it.  I asked him for the information and he

         24   provided it -- provided it to me.
```

CONFIDENTIAL - UNDER PROTECTIVE ORDER

175

0    49    1         Q.    Okay.   If you take a look at Claim 15,

        2    leaving the preamble to one side, the first

        3    limitation is "maintaining an account database

        4    having --"

02:50    5         MR. BERENZWEIG:   Which Claim 15?

        6         MS. DURIE:   Claim 15 as it existed.   I'm

        7    looking at the January 18th, 2000 preliminary

        8    amendment.

        9    BY THE WITNESS:

02:50   10         A.    Okay.

       11    BY MS. DURIE:

       12         Q.    Okay.   So if you take a look at

       13    Claim 15 in the January 18th, 2000 preliminary

       14    amendment, the first limitation after the preamble

02:50   15    is:   "maintaining an account database having at

       16    least one account record for each of a plurality

       17    of network information providers, said account

       18    record including."

       19              Was it your understanding that what

02:50   20    Mr. Davis was telling you was that that element

       21    was new?

       22         A.    My understanding was that the claim as

       23    a whole was new, the whole method in this case was

       24    new.

NFIDENTIAL - UNDER PRO1   TIVE ORDER

184

01   )2     1    retrieval request event, et cetera, as being new,

          2    correct?

          3         A.    Correct.

          4         Q.    With respect to Claim 15, he told you

03:03     5    the claim as a whole is new --

          6         A.    Correct.

          7         Q.    -- correct?

          8              Okay.  Did you -- when Mr. Davis told

          9    you that the claim as a whole is new, did you

03:03    10    understand that to mean something different from

         11    there being at least one new limitation in the

         12    claim?

         13         A.    Yes, I did.

         14         Q.    Okay.  What was the difference?

03:03    15         A.    The difference is what Mr. Davis told

         16    me as being --

         17         Q.    But I want to understand what you --

         18    what you understood that difference to be, not

         19    just the -- not the words he used, but what you

03:03    20    understood it to be.

         21         A.    What I understood was that Mr. Davis

         22    identified this particular claim limitation of

         23    Claim 1 as being something not present in the beta

         24    system, and the overall systems of -- forgive me,

NFIDENTIAL – UNDER PRO      TIVE ORDER

185

0:  )4    1    method of Claim 15 as defined by the entire claim

2    in its entirety starting at the preamble.

3        Q.    Okay.  Based on what Mr. Davis told

4    you, would it have been accurate to summarize it

03:04    5    as to Claim 1 by saying the system as a whole is

6    new?

7        A.    It could have been.  I don't know.

8        Q.    Well, as you sit here today, do you

9    have any reason to think that that would not have

03:05    10    been an accurate way to summarize what Mr. Davis

11    told you with respect to Claim 1?

12        A.    The system -- the method defined by

13    Claim 1 is novel, and that includes previously

14    known features.

03:05    15        Q.    Okay.  So when Mr. Davis told you with

16    respect to Claim 15 a system as a whole is new,

17    what you understood that to mean was the system as

18    a whole had some novelty; is that right?

19        A.    Right.

03:05    20        Q.    Okay.  Is there any reason that you --

21    with respect to Claim 1 specified a limitation and

22    with respect to Claim 15 simply said the invention

23    as a whole -- the invention claimed as a whole is

24    new?

CONFIDENTIAL — UNDER PROTECTIVE ORDER

01:05    1    A.    There is a reason.

          2    Q.    Which is what?

          3    A.    That's what Darren told me.

          4    Q.    Okay.

03:06    5    A.    I was drafting Mr. Davis' declaration

          6    using the information he gave me.

          7    Q.    And although you understood -- well,

          8    strike that.

          9    I want to be clear.  So when Mr. Davis

03:06   10    said to you the invention of Claim 15 as a whole

        11    is new, what you understood that to mean is at

        12    least -- at least one of the elements of Claim 15

        13    was new?

        14    A.    What I understood that to mean is that

03:06   15    the entire invention defined by Claim 15 was new.

        16    Q.    Let's say that with respect to

        17    Claim 15 -- strike that.

        18    Let's say you had a claim and one

        19    aspect of it was new and other aspects of it were

03:07   20    not, would it be misleading in any way to say with

        21    respect to that claim the invention as a whole is

        22    new?

        23    MR. BERENZWEIG:  Objection speculative,

        24    hypothetical.

ᵢFIDENTIAL - UNDER PROT  ᵢIVE ORDER

196

0 __ 9    1    understand?

2        A.    That's not my practice.

3        Q.    Okay.  Did you discuss Paragraph 12

4    with Mr. Davis?

03:20    5        A.    I did.

6        Q.    What did you tell him?

7        A.    I explained that the paragraph at the

8    end is a recitation of his legal obligation under

9    U.S. patent law to make truthful statements.

03:20    10    That's the conventional explanation I give to

11    inventors when they're signing declarations for

12    their patent applications and other documents as

13    well.

14        Q.    Did Mr. Davis ask you any questions

03:20    15    about what Paragraph 12 meant?

16        A.    Not that I recall.

17        Q.    At the time that Mr. Davis executed

18    Exhibit 12, did you have a belief as to whether he

19    had personal knowledge of the facts that are set

03:21    20    forth in Exhibit 12?

21        A.    I think it was my belief that he did,

22    yeah.

23        Q.    What was the basis of that belief?

24        A.    My awareness of his responses to the

CONFIDENTIAL - UNDER PROTECTIVE ORDER

197

03:21

1    request for information that I presented to him in

2    order to prepare this declaration, his level of

3    involvement in the file history before, making the

4    previous affidavit in connection with the

03:21  5    previously filed petition, his status as an

6    inventor of the application.

7        Q.    Is your belief that he had personal

8    knowledge of the facts recited in Exhibit 12 the

9    reason that you did not identify any statements in

03:22  10    Exhibit 12 that were being made on information and

11    belief?

12        A.    No, that's not -- that information and

13    belief language is not something I have used

14    before, so it's not part of my practice to use it.

03:22  15        Q.    Have you ever before submitted an

16    affidavit where a witness was relying on

17    secondhand information where you did not specify

18    that the witness' declaration was being made on

19    information and belief?

03:22  20        A.    I have not.

21        Q.    Okay.  Do you understand that it is

22    your obligation as an attorney in drafting a

23    declaration to specify if statements are being

24    made on information and belief?

01:30    1      A.    That sounds reasonable, yes.

2      Q.    Okay.  So if you were to learn that

3  Mr. Davis had only secondhand knowledge about the

4  features of the beta system and today you were

03:30    5  drafting a declaration for him to sign, would you

6  specify that the information that he was providing

7  was being provided on information and belief?

8      MR. BERENZWEIG:  Objection, hypothetical.

9  BY THE WITNESS:

03:30    10     A.    At this time I suppose I would change

11  it.

12      MR. BERENZWEIG:  Daralyn, we've been going

13  for almost an hour and a half.

14      MS. DURIE:  Fine.  That's fine.  We can take

03:31    15  a break.

16      THE VIDEOGRAPHER:  Off the record at 3:31

17  p.m.

18          (WHEREUPON, a recess was had.)

19      THE VIDEOGRAPHER:  Back on the video record

03:39    20  at 3:39 p.m.

21  BY MS. DURIE:

22      Q.    Mr. Rauch, I'm looking at Exhibit 31,

23  Page 6, the first paragraph.  It says, "Claim 1 is

24  amended to clarify that a retrieval request event

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3              SAN FRANCISCO DIVISION

 4

 5   OVERTURE SERVICES, INC.,        )

 6   a Delaware Corporation,         )

 7            Plaintiff,             )

 8      vs.                          )  CO2-01991 JSW

 9   GOGGLE INC., a California       )

10   Corporation,                    )

11            Defendant.             )

12            I hereby certify that I have read the

13   foregoing transcript of my deposition given at the

14   time and place aforesaid, consisting of Pages 1 to

15   252, inclusive, and I do again subscribe and make

16   oath that the same is a true, correct and complete

17   transcript of my deposition so given as aforesaid,

18   and includes changes, if any, so made by me.

19

20                              JOHN G. RAUCH

21   SUBSCRIBED AND SWORN TO

22   before me this        day

23   of                , A.D. 200  .

24            Notary Public
```

ESQUIRE DEPOSITION SERVICES - CHICAGO
(312) 782-8087

CONFIDENTIAL - UNDER PROTECTIVE ORDER

```
 1    STATE OF ILLINOIS )

 2                      )  SS:

 3    COUNTY OF C O O K )

 4              I, DEBORAH A. MILLER, a Notary Public

 5    within and for the County of DuPage, State of

 6    Illinois, and a Certified Shorthand Reporter of

 7    said state, do hereby certify:

 8              That previous to the commencement of

 9    the examination of the witness, the witness was

10    duly sworn to testify the whole truth concerning

11    the matters herein;

12              That the foregoing deposition

13    transcript was reported stenographically by me,

14    was thereafter reduced to typewriting under my

15    personal direction and constitutes a true record

16    of the testimony given and the proceedings had;

17              That the said deposition was taken

18    before me at the time and place specified;

19              That I am not a relative or employee or

20    attorney or counsel, nor a relative or employee of

21    such attorney or counsel for any of the parties

22    hereto, nor interested directly or indirectly in

23    the outcome of this action.

24              IN WITNESS WHEREOF, I do hereunto set
```

255

1    my hand and affix my seal of office at Chicago,

2    Illinois, this 28th day of July, 2003.

3

4

5                   Notary Public, DuPage County, Illinois.

6         My commission expires 3/01/06.

7

8

9    C.S.R. Certificate No. 84-3889.

10

> OFFICIAL SEAL
> DEBORAH A MILLER
> NOTARY PUBLIC, STATE OF ILLINOIS
> MY COMMISSION EXPIRES:03/01/06

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Jason C. White
312-321-4225
E-mail: jcw@brinkshofer.com

**BRINKS**

**HOFER**

**GILSON**

**& LIONE**

A PROFESSIONAL CORPORATION
INTELLECTUAL PROPERTY ATTORNEYS

August 27, 2003

NBC TOWER · SUITE 3600
455 N. CITYFRONT PLAZA DRIVE
CHICAGO, ILLINOIS 60611-5599
brinkshofer.com
FAX 312-321-4299
TELEPHONE 312-321-4200

VIA FACSIMILE (312) 704-4950

SAN JOSE, CA
INDIANAPOLIS, IN
ANN ARBOR, MI
ARLINGTON, VA

Deborah A. Miller
Esquire Deposition Services
155 N. Wacker Drive, 10th Floor
Chicago, Illinois 60606

Re:    **John G. Rauch Deposition Transcript**
       **July 23, 2003**
       **Overture Services, Inc. v. Google Inc.**

Dear Ms. Miller:

Enclosed herewith are an errata sheet (6 pages) indicating the changes to be made to John Rauch's deposition transcript and a signature page for Mr. Rauch's transcript.

Please note that in addition to the changes detailed in the errata sheet, page 8, line 9 through page 9, line 9 and page 11, line 19 through page 251, line 24 should be classified as CONFIDENTIAL. The remainder of the transcript should be non-confidential.

Please feel free to contact me if you have any questions.

Sincerely,

Jason C. White

enclosures

cc  Michael S. Kwun w/enclosures (via facsimile 415-397-7188)

**Errata Sheet**

Deletions are in [brackets], additions are <u>underlined</u>

Page 5, lines 20-21:
Arizona State University [,] <u>and the</u> University of Minnesota

Page 5, lines 21-22
Illinois Institute of Chicago [in] Chicago[,]<u>-</u>Kent College of Law.

Page 10, line 18
the [graded] <u>Davis</u> patent itself

Page 11, line 22-23
[Erickson] <u>Ericsson</u> Incorporated

Page 12, line 1
[Trader] <u>Schrader</u>

Page 18, line 7
[petition's] <u>petitions</u>

Page 21, lines 16-17
office<u>, being</u> given special treatment

Page 22, line 3
generally<u>, to see</u>

Page 23, line 22
[supposed] <u>posed</u>

Page 29, line 7:
because <u>of</u> the negatives

Page 40, line 22
[past] <u>passed</u>

Page 42, line 8
[preferences] <u>references</u>

Page 47, line 11
I also understood <u>it</u> to include

Page 67, line 4
[inventors] <u>inventors'</u>

1

**Errata Sheet**

page 71, line 12
[one]

Page 81, line 13
differences <u>and</u>

Page 88, line 23
[He] <u>It</u> was clear that

Page 108, lines 20-24
[That—to] <u>To me,</u> that sentence is drawing a distinction between advertisers paying for
[the word] "exposures", as it's used here, or its analog, impressions, versus paying for,
what it says, actual visits to sites of an advertiser.

Page 110, line 17
[the] <u>a</u> retrieval request event

Page 111, lines 12-15
[I was going to state that for] <u>For</u> the exemplary embodiment described in this patent
application, [I guess its] line 29 of page 15 states that

Page 112, lines 13-16
[And a – well limited to] <u>The term "retrieval request event" also includes</u> other
embodiments I might not be aware of, as I sit here, without going through [it] <u>the patent</u>
<u>application</u> more closely, and [equivalence] <u>the term "retrieval request event" also</u>
<u>includes</u> equivalents of this disclosed embodiment.

Page 115, lines 21-22
[with a] <u>of that</u> claim limitation

Page 116, line 9
[a distinguished --] a prior art

Page 118, line 8
advertiser [system] <u>systems</u>

Page 125, line16
Positions,

Page 128, lines 14-16

[I guess the first question] I have to ask <u>you</u> [is] when?, <u>at what time are you asking</u>
<u>about?</u> [And the second, could you -- it] <u>It</u> sounded

2

**Errata Sheet**

Page 129, line 11
[Internet --] conventional Internet technology

Page 139, lines14-15
and say, "this isn't there,"

Page 139, line 20
Related to that, one other reason is just the general

Page 148, line9
"receiving from a network information provider a

Page 148, line 11
Information provider's account," is receipt over an

Page 149, lines 3-6
I think [at -- as the term] that as the terminology we're discussing here is used in this
patent application, [it's -- ] it doesn't include that option of making a telephonic request.

Page 149, lines 8-10
Well, I don't think it's described that way in here.  It's described in the patent application
as an on-line access.  Also, making a telephonic request to change a listing was in the
prior art beta system.  A claim can not be interpreted so broadly as to read on the prior
art, so claim 15 can not include that option.

Page 150, lines 5-8
[And equivalence yeah, and any other embodiments that might be described that aren't –
that aren't jumping off the page at me now].  The scope of the claim element "updating a
search listing" should be interpreted to have the full range of its ordinary meaning as
understood by persons ordinarily skilled in the art to which the invention pertains.  The
ordinary meaning may be determined using sources such as dictionaries and treatises.  If
necessary, the intrinsic record should be consulted to identify which of different possible
dictionary meanings of the claim element "updating a search listing" is consistent with
the inventors' meaning.  Also, the intrinsic record should be consulted to determine
whether the presumption that the ordinary and customary meaning intended for the claim
element "updating a search listing" has been rebutted.

3

**Errata Sheet**

Page 150, line 14
And [equivalence thereof, yes.] My understanding is that the scope of that claim element should be interpreted to have the full range of its ordinary meaning as understood by persons ordinarily skilled in the art. The ordinary meaning may be determined using sources such as dictionaries and treatises. If necessary, the intrinsic record should be consulted to identify which of different possible dictionary meanings of that claim element is consistent with the inventors' meaning. Also, the intrinsic record should be consulted to determine whether the presumption that the ordinary and customary meaning intended for that claim element has been rebutted.

Page 150, lines 19-22
[It could be. I think, if there's a suggestion here that --that said alternatively it could be. Alternatively, it could done by receiving an E-mail.]
I'm not sure what the question means by the words "to do an on-line to pick up the phone and call someone...." This language is confusing and seems contradictory. However, in my view, "picking up the phone and calling someone and asking that account information be changed" would not be an equivalent to receiving a change request for a search listing, since a claim can not encompass as an equivalent subject matter which is in the prior art. Here, receiving a phone call was part of the GoTo beta system, so the scope of claim 15

Page 152, line 5
[I think it probably would be yes. ] No, it would not be equivalent since that was part of the prior art beta system, and a claim's scope can not be extended under the doctrine of equivalents to cover something in the prior art.

Page 152, lines 12-14
[I think my understanding is that the – what you – what I believe] It is my understanding that what you just described was present in the beta system, and the scope of Claim 15 could not encompass such a prior art system under the doctrine of equivalents.
Therefore, the scope of Claim 15 can not encompass a system in which a search listing is updated by picking up the phone and calling an account administrator and asking that a change to the search listing.

Page 152, line 23- page 153 line 3

Focusing just on this claim limitation, [because] as I understand it, that feature was a part of the beta system. [, the] The scope of Claim 15 could not include that feature as I understand you're describing it.

**Errata Sheet**

Page 156, line 3
From the perspective of the embodiments and equivalents thereof that are described in
the specification, updating a search listing could hypothetically include updating a search
listing telephonically, to the extent that does not read on the prior art. However, as
previously stated, that was disclosed in the beta system. Under the Doctrine of
Equivalents, considering both what is described in the specification and what is in the
prior art, the range of equivalents can not be so broad as to include updating a search
listing telephonically.
[Equivalently, yes, I do].

Page 157, line 4
stated in response to these questions, including that my understanding is that a search
listing updated telephonically was part of the GoTo beta system and therefore in the prior
art, so that the range of equivalents for the term "updated search listing" Claim 15 can not
encompass a search listed updated telephonically.

Page 159, line 18
[promoter] promoters

Page 173, lines 19-20
He told me, "the whole this. This didn't exist at that time."

Page 177, line 14
To the best of my knowledge, he [didn't] did.

Page 183, lines 16-18
limitation "recording a retrieval request [--excuse me, retrieval request] event in an
account database corresponding to the searcher's retrieval request."

Page 185, lines 12-14
The [system — the] method defined by Claim 1, taken as a whole, is novel, and that
includes previously known features.

Page 189, lines 18-19
I think the language, "was not yet in existence" means that it had not yet been invented,

Page 206, line 5
April 6th, I think was the date I [saw] called him.

Page 223, line 23 – page 224, line 2
telephonic interview. I don't know if the [The] phone call was initiated [I don't know]
from our end or from the examiners calling us. The supervisor, Mr. Millin stated that he
and [seen] reviewed with Mr. Nguyen our draft

**Errata Sheet**

Page 224, line 5
that we proposed [it had] <u>to add</u>.

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                       SAN FRANCISCO DIVISION

4

5    OVERTURE SERVICES, INC.,          )

6    a Delaware Corporation,           )

7              Plaintiff,              )

8       vs.                            )  CO2-01991 JSW

9    GOGGLE INC., a California .       )

10   Corporation,                      )

11             Defendant.              )

12             I hereby certify that I have read the

13   foregoing transcript of my deposition given at the

14   time and place aforesaid, consisting of Pages 1 to

15   252, inclusive, and I do again subscribe and make

16   oath that the same is a true, correct and complete

17   transcript of my deposition so given as aforesaid,

18   and includes changes, if any, so made by me.

19                                     _____

20                                     JOHN G. RAUCH

21   SUBSCRIBED AND SWORN TO

22   before me this  27th day

23   of  August        , A.D. 2003 .

24        Notary Public

     ┌─────────────────────────────────┐
     │     "OFFICIAL SEAL"             │
     │     BRENDA S. SKINNER           │
     │ NOTARY PUBLIC, STATE OF ILLINOIS│
     │ MY COMMISSION EXPIRES 3-3-07    │
     └─────────────────────────────────┘

            ESQUIRE DEPOSITION SERVICES - CHICAGO
                    (312) 782-8087

                                        TOTAL P.09