ROBERT T. HASLAM (#71134)
ROBERT D. FRAM (#126750)
M. PATRICIA THAYER (#90818)
S. ELIZABETH MITCHELL (#187053)
ANDREW C. BYRNES (#191516)
HELLER EHRMAN WHITE & MCAULIFFE LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268

BRINKS HOFER GILSON & LIONE
JACK C. BERENZWEIG
WILLIAM H. FRANKEL
JASON C. WHITE
NBC Tower – Suite 3600
455 North Cityfront Plaza Drive
Chicago, Illinois 60611
Telephone: (312) 321-4200
Facsimile: (312) 321-4299

Attorneys for Plaintiff,
OVERTURE SERVICES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| OVERTURE SERVICES, INC., | **E-Filing Case No.**: 02-01991 JSW (EDL) |
| Plaintiff and Counterdefendant, | **PLAINTIFF OVERTURE SERVICES, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT GOOGLE INC.'S MOTION TO COMPEL [CORRECTED MOTION]** |
| v. | |
| GOOGLE INC., | |
| Defendant and Counterclaimant. | Hearing Date: August 10, 2004 |
| | Hearing Time: 9 a.m. |
| | Hon. Elizabeth D. Laporte |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .......................................................................................................... 1

II.   BACKGROUND ........................................................................................................... 2

    A.    Depositions and Documents in the Case ............................................................ 2

    B.    Posture and Deficiencies of Google's Motion .................................................... 3

    C.    The Invention and Prosecution of the '361 Patent ............................................ 4

        1.    Overture's Development Work in 1998 .................................................. 4

        2.    Overture's Alleged Revenues from its Bidded Search
            Engine ...................................................................................................... 6

        3.    Preparation and Prosecution of the '361 Patent .................................... 7

III.  ARGUMENT ................................................................................................................. 9

    A.    At the Time of Its Filing, Google's Motion Failed to Comply
        with Fed. R. Civ. P. 37, Local Rule 37-1(a), and This Court's
        Standing Orders. ................................................................................................ 9

    B.    Google Cannot Establish a *Prima Facie* Case of Fraud
        Sufficient to Justify the Broad Exception to Privilege It Seeks. ...................... 10

        1.    The Features Of The Beta System ......................................................... 11

        2.    Rauch's Characterization of the Second Davis
            Declaration ............................................................................................. 14

        3.    Davis' Personal Knowledge of the Beta System .................................. 15

    C.    Google's Alternative Ground For Compelling Discovery Fails
        Because The Waiver of Privilege, If Any, Was Modest,
        Unintended and Narrow ..................................................................................... 16

        1.    The Vast Majority of The Testimony Google Cites Does
            Not Disclose Any Privileged Communications. ................................... 16

        2.    Even The Few Excerpts Referring to Attorney-Client
            Communications Do Not Trigger a Waiver .......................................... 18

i

3. Even Assuming Arguendo That A Waiver Occurred, Its Scope Is Extremely Limited .......................................................... 20

D. Google Is Not Entitled to the Work Product of Overture's Patent Attorneys ............................................................................................. 21

1. Overture Has Not Voluntarily Placed Mr. Rauch's State of Mind At Issue ......................................................................... 22

E. The Remedy Sought by Google Is Impermissibly Broad ..................... 25

IV. CONCLUSION .................................................................................................. 25

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*ACLARA Biosciences, Inc. v. Caliper Tech. Corp.*,
    2001 WL 777083 (N.D. Cal. June 16, 2000)................................................20, 21, 22, 23

*Allergan Inc. v. Pharmacia Corp.*,
    2002 WL 1268047 (D. Del. May 17, 2002)................................................................. 22

*Bio-Rad Labs., Inc. v. Pharmacia, Inc.*,
    130 F.R.D. 116 (N.D. Cal. 1990) ....................................................................... 22, 23, 24

*Burlington Indus., Inc. v. Dayco Corp.*,
    849 F.2d 1418 (Fed. Cir. 1988) ...............................................................................1

*Canel v. Lincoln Nat'l Bank*,
    179 F.R.D. 224 (N.D. Ill. 1998) ............................................................................. 25

*For Your Ease Only, Inc. v. Calgon Carbon Corp.*, et al,
    2003 U.S. Dist. LEXIS 7131 (N.D. Ill. April 24, 2003)............................................ 14

*Fox v. California Sierra Financial Services*,
    120 F.R.D. 520 (N.D. Cal. 1988) ............................................................................ 22

*Handgards, Inc. v. Johnson & Johnson*,
    413 F.Supp. 926 (N.D. Cal. 1976) .......................................................................... 23

*In re Brand Name Prescription Drugs Antitrust Litigation*,
    1995 WL 531805 (N.D. Ill. Aug. 8, 1995)...........................................................16, 19

*In re Savitt/Adler Litig.*,
    176 F.R.D. 44 (N.D.N.Y. 1997) .............................................................................. 24

*In re Spalding Sports Worldwide, Inc.*,
    203 F.3d 800 (Fed. Cir. 2000) ........................................................................ 11, 18, 22

*Jack Winter, Inc. v. Karatron Co.*,
    50 F.F.D. 225 (N.D. Cal. 1970) .............................................................................. 18

*Libbey Glass, Inc. v. Oneida, Ltd.*,
    197 F.R.D. 342 (N.D. Ohio 1999).......................................................................... 19

*Monon Corp. v. Stoughton Trailers, Inc.*,
    239 F.3d 1253 (Fed. Cir. 2001) .............................................................................. 12

iii

*Mushroom Assoc. v. Monterey Mushrooms Inc.*,
    24 U.S.P.Q.2d 1767 (N.D. Cal. 1992) ............................................................... 23

*Spalding*, 203 F.3d at 807 .................................................................................. 14

*Starsight Telecast, Inc. v. Gemstar Development Corp.*,
    158 F.R.D. 650 (N.D. Cal. 1994) ....................................................... 11, 20, 21

*United States v. de la Jara*,
    973 F.2d 746 (9th Cir. 1992) .............................................................................. 11

**Rules**

Fed. R. Civ. P. 26(b)(3) ....................................................................................... 21

Fed. R. Civ. P. 30 ................................................................................................. 23

Fed. R. Civ. P. 30(d)(2) ....................................................................................... 25

Fed. R. Civ. P. 37(a)(2)(A) .................................................................................. 10

OVERTURE'S MEMO. IN OPPOSITION TO GOOGLE'S MOT. TO COMPEL
02-01991 JSW (EDL)

# I.    INTRODUCTION

Two years ago, Plaintiff Overture Services, Inc. ("Overture") filed suit against Defendant Google Inc. ("Google") for infringement of United States Patent No. 6,269,361 ("the '361 patent").  As is far too easily and often done in patent cases, Google has asserted in defense that the '361 patent is unenforceable due to inequitable conduct in its prosecution before the U.S. Patent and Trademark Office ("PTO")[1] and has now invoked the crime-fraud exception to the attorney-client privilege to reopen the depositions of multiple Overture witnesses and to force the production of hundreds of pages of documents that are either attorney-client privileged or protected as attorney work product, or both.

Google falls far short of meeting its burden to establish a *prima facie* case of fraud based on the entire record to date, including testimony of the Overture inventors and patent prosecutors.  On the contrary, Mr. Davis truthfully told the PTO that the early, experimental "beta system" did not practice the claims of the patent and therefore is not invalidating prior art.  Google conflates optimistic "business plans" with the actual capability of the beta system, in a tortured effort to equate the beta system to the viable commercial system set forth in the '361 patent.  The facts are to the contrary.

Aware that its "crime-fraud" evidence is feeble at best, Google also has scoured the deposition transcripts of Overture's patent attorneys for bits of testimony that might be construed, in isolation, to constitute a waiver of privilege.  None of the pertinent examples succeeds, however.  Rather, Overture has consistently and properly sought to protect its communication with, and the work product of, its patent attorneys from discovery.

Even in the event the Court agrees that, at some point during hours of testimony, an attorney deponent did make an unintended disclosure, any resulting waiver was inadvertent and *de minimis*, and therefore its scope should be construed narrowly.  Such a modest disclosure certainly cannot justify the expansive waiver of privilege that Google seeks.

---

[1] "[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague." *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988).

1

## II.    BACKGROUND

### A.    Depositions and Documents in the Case

Overture has responded to Google's discovery requests throughout this litigation with careful attention to producing documents and allowing testimony to which Google is entitled and withholding documents and testimony properly protected from disclosure.  For example, in response to Google's 107 requests for production of documents, Overture has logged over 6700 pages of materials protected from disclosure, including documents withheld based on the attorney-client privilege and/or the work product protection.[2]  *See* Declaration of Ravind S. Grewal in Support of Google's Motion to Compel ("Grewal Decl."), Ex. A.

Among those witnesses whom Google noticed for deposition in this case were the three patent attorneys who prosecuted the '361 patent, and Darren Davis, one of its inventors.  *See* Supplemental Declaration of Ravind S. Grewal in Support of Google's Motion to Compel ("Supp. Gr. Decl."), Exs. B-D; Grewal Decl., Ex. Q.  These patent prosecutors have been deposed for nearly 20 hours to date.  Wickey Decl., ¶ 2.  At deposition, these attorney witnesses were cautioned 70 times not to provide an answer that would reveal client confidences.[3]  *Id.*

Overture has never affirmatively or intentionally waived either the attorney-client privilege or the work product protection in order to press its infringement claims or to rebut Google's alleged defenses or counterclaims.

---

[2] Google expresses confusion about the difference between documents relating to patent prosecution and those related to the enforcement of intellectual property rights.  Google's Opening Memorandum ("OM") at 1 n. 3.  Overture has explained its belief that this distinction is clear and has expressed a willingness to address any <u>specific</u> questions that Google might have about individual entries on its privilege log.  *See* Declaration of Michael P. Wickey ISO Overture's Opposition to Google's Motion ("Wickey Decl."), Ex. T.

[3] Overture is also engaged in litigation involving the '361 patent with FindWhat.com.  Google and FindWhat have agreed to share information in both cases; Overture is compelled to provide all depositions of its former employees to Google.  Wickey Decl., Ex. A, ¶¶ 9,11-14.  Thus, Google has also had the benefit of 14 hours of additional testimony by the prosecutors.  *Id.* at ¶ 4.

**B.    Posture and Deficiencies of Google's Motion**

In the fall of 2003, Google and Overture's counsel exchanged correspondence concerning Google's assertion that the deposition testimony of Ms. Lee, Mr. Rauch, and Mr. Davis effected a sweeping waiver of attorney-client privilege and work product protection as to the entire prosecution of the '361 patent.  *See* Supplemental Declaration of Christine P. Sun ISO Google's Motion ("Supp. Sun Decl."), Exs. A-E.  Google, however, appeared to abandon the issue after that exchange.[4]

On May 28, 2004, Google provided Overture with a draft of the current motion as an attachment to a mediation brief.  A month later, while settlement talks were ongoing and without any warning, Google filed its motion.  Wickey Decl., ¶ 5.  Surprised by this abrupt action after eight months of silence and in the midst of settlement talks, counsel for Overture informed Google that it did not believe that Google had adequately met and conferred on the substantive issues.  Wickey Decl., Ex. B.  Counsel further explained that they had not reacted to the draft motion because Overture believed that no action would be taken on the motion unless the negotiations failed.  *Id.*

Overture also has expressed to Google that it was unreasonable to rely on Overture's silence in response to Google's draft motion.  Wickey Decl., Exs. B-C.  In fact, on July 7, Overture expressed a willingness to discuss additional discovery related to particular portions of the patent prosecution process, rather than sweeping discovery based on the expansive waiver argued by Google in its motion.  Wickey Decl., Ex. C.  Google rejected Overture's offer on July 9.  Wickey Decl., Ex. D.

In addition to being premature, the pending motion is facially improper.  The proposed order submitted with Google's motion, if signed, would require Overture to "permit any and all testimony" about: (1)  the communications between Brinks Hofer and Overture regarding the prosecution of the '361 patent; and (2) the work product of Brinks Hofer related to that same prosecution, without any regard to any chronological limitation.

---

[4] In December, 2003, Heller Ehrman, took over as lead counsel for Overture and, months later, defended the depositions of Messrs. Rauch and Naughton.  *See, e.g.*, Grewal Decl., Ex. Q.

*See* [Proposed] Order Granting Google's Motion, filed with Google's Motion.  The order does not specify questions that Google asked during an attorney deposition for which an answer must be provided, nor does it set limits as to time, number of individuals, number of depositions, or topics within the universe of the '361 patent's prosecution  *Id.*  Also, it is entirely unclear as to which documents should be produced. *Id.*

### C.    The Invention and Prosecution of the '361 Patent

Google's summary of the subject matter and prosecution of the '361 patent is both incomplete and heavily slanted.  This Section corrects and expands the factual record to afford a more fair perspective on Google's allegations of fraud.

### 1.    Overture's Development Work in 1998[5]

In the first half of 1998, Overture began development of the extensive hardware and software systems needed to launch one of the pioneering innovations in Internet search. The objective was to enable advertisers to participate in an auction for search terms by placing bids on-line, in essentially real time, representing the price they were willing to pay if a searcher (consumer) clicked on their ads.  *See* Amended Declaration of Christine P. Sun ISO Google's Motion to Compel, Ex. C at 3.  The amount of a bid would influence the position of the search listing on a search result page; thus, an advertiser seeking more prominent placement of its ad on a search page could increase its bid.  *Id.*  If the placement and content of the ad attracted a searcher to click on it, the advertiser would pay to Overture the bid amount.  Wickey Decl., Ex. V at 31-32.

While the concept was fairly easy to articulate in early 1998, it was utterly novel (and, indeed, derided by some) and required more than a year and many millions of dollars before the supporting technology could be created.  Wickey Decl., Exs. F at 21; E at 26, 32-33, 209-10; V  at 41-42, 59-63.  In order to raise the required capital from investors and attract potential advertisers to the new service, Overture created a crude prototype ("beta system") that could be used as a testing ground for the myriad different software systems

---

[5] Overture was previously known as GoTo.com.  As used in this brief, "Overture" refers to GoTo.com as well as Overture.

needed to effectuate the concept. *Id*., Exs. U at 98-99, 108; G at 77; H at 57-58; V at 55-56.
Also, company executives made concerted efforts to generate interest in the press and at
trade conferences during the first half of 1998. *Id*., Ex. E at 20-21.

The prototype was never intended to be used, and never was used, in commercial
operations. *Id*., Exs. I at 194; E at 50-51, 79-80; G at 116-17. The programmers who
created the various components of the prototype from February-May 1998 knew that it
could not handle the volume or speed of traffic (from searchers and advertisers) that was a
central feature of the proposed business model. *Id*., Exs. U at 98-99; H at 57-58; I at 194-
95; V at 84-86, 108-11, 127-28. Furthermore, the prototype did not possess systems
necessary to enable advertisers to establish and manage accounts pertaining to their search
listings. *Id*., Exs. F at 26-27, 62-64; E at 24-25, 30-31. The entire advertiser account
database was missing from the prototype. *Id.*, Exs. F at 35, 202; H at 100-102. In fact,
Overture was unable to keep accurate track of advertiser activity prior to June 1998. *Id*.,
Exs. E at 33, 81; F at 66-67; V  at 92-102. The prototype also had no program for
generating bills or account records for advertisers. *Id.*, Exs. G at 77, 119; J at 31, 110.[6] All
of the systems relating to advertiser accounts were developed well after the critical date.
*Id*., Exs. F at 63-64; J at 58-60; H at 101-102; G at 71-73; O at 61-64.

Development of the permanent, commercial system at Overture began in March 1998
and continued long after the official launch date in June 1998. Wickey Decl., Exs. V at
127-28; I at 32-33, 101-103; J at 54-55. The commercial site employed entirely new
hardware and software from that used in the prototype. *Id*., U at 81-83; H at 177-79. In
addition, a billing system and customer service software were created during the summer of
1998. *Id*., Exs. J at 29-31, 35-36; U at 57.

Most importantly, in November of 1998, a team of programmers supervised by Mr.

---

[6] Google asserts that Overture was maintaining "account records" prior to the critical date
(May 28, 1998). OM at 22. However, multiple witnesses have confirmed that there were no
account records at Overture before the critical date. Wickey Decl., Ex. F at 202-205. Rather,
Overture had internal web logs that maintained a chronological list of all activity on the early site
and also created crude reports based on those logs. *Id*., Exs. G at 74-77, 89-91; F at 40-42, 49-50.

OVERTURE'S MEMO. IN OPPOSITION TO GOOGLE'S MOT. TO COMPEL
02-01991 JSW (EDL)

Darren Davis began work on the DirecTraffic Center ("DTC"), a term coined to described the suite of programs that enabled advertisers to use the system as it was intended, *i.e*., as a nearly real-time auction for search terms. *Id*., Exs. E at 196-97; O at 30-31, 348-55; H at 211-12, 231; I at 102-103; J at 58-60, 74-75. The innovations from that group of programmers were implemented by March 1999 and ultimately became the subject of the '361 patent. *Id*., Exs. E at 187; O at 35-36, 39-40; U at 138-39.[7]

### 2. Overture's Alleged Revenues from its Bidded Search Engine

According to Google, "Overture immediately began making money" after announcing the proposed new search engine in early 1998. OM at 3. The only evidence Google cites, however, is a business <u>plan</u>. As Google well knows, the statement in its brief is not true.[8]

All witnesses (as well as the historical archive of software development) have confirmed that Overture did not receive any income on its paid search service prior to June 1, 1998. At least four inventors and executives have testified that no revenues were received or could have been received until well after that date. Wickey Decl., Exs. O at 86-87, 190; J at 130; G at 77-79; E at 36-37, 56-57, 65; see also Supp. Gr. Decl. Ex. B at 86-87. In fact, Overture did not send billing statements to advertisers before July 1998 because it had no ability to do so. *Id*., Exs. F at 71-73; J at 29-30; E at 73-74. Likewise, Overture had no ability to conduct credit transactions and no account for depositing the checks of advertisers prior to June 1, 1998. *Id*., Exs. F at 39, 80-81; J at 32-33; E at 56-58. For that reason, in mid-May, 1998, Overture specifically informed advertisers that they would not be billed for any search activities using their listings prior to June 1, 1998. *Id*., Exs. J at 33; F at 73.

While the founders of Overture believed that advertisers would use the paid search

---

[7] For this reason, programmers referred to the '361 patent as "the DTC patent." Wickey Decl., Exs. H at 214; U at 138.

[8] According to its author, the business plan projected revenue that the company believed it would be able to make – once the necessary technology was in place – and not actual revenues received by Overture. Wickey Decl., Ex. E at 111-12, 126-29.

OVERTURE'S MEMO. IN OPPOSITION TO GOOGLE'S MOT. TO COMPEL
02-01991 JSW (EDL)

1  service if it could be implemented and they wanted to be able to charge advertisers on a per-

2  click basis eventually, the company was not receiving revenue, even as of June 1, 1998, on

3  its new search services. *Id*., Ex. U at 108. Instead, it was investing millions of dollars to

4  develop the software solutions needed to operate the business, some of which were later

5  described and claimed in the '361 patent. *See, e.g., id.*, Ex. K at 125-6, 148:13-17.[9]

6      The truth about revenues is critical to the issue of whether Mr. Davis misrepresented

7  the capability of the beta system to the PTO while the '361 patent was undergoing

8  prosecution. Google contends that Overture perpetrated a fraud by telling the PTO that the

9  beta system did not meet all of the limitations of claim 1 of the '361 patent, which claim is

10  directed to a method of accurately billing advertisers each time a searcher clicks on their

11  listings. By contending (erroneously) that Overture was receiving revenues from the paid

12  search listings in early 1998, Google concocts a theory that the beta system must have

13  embodied the claimed invention and that Mr. Davis lied to the PTO. OM at 7, 22.

14  However, as every inventor has testified, the software solution to accurate billing, which is

15  embodied in claim 1, was not discovered or implemented until the fall of 1998. Wickey

16  Decl., Exs. F at 70-71, 80, 202; H at 228-29; G at 86-89; I at 59, 148-49. Thus, the alleged

17  fraud is just a theory without any foundation.

18      **3.    Preparation and Prosecution of the '361 Patent**

19      The application for the '361 patent was filed on May 28, 1999. All attorneys

20  involved in preparing and prosecuting the '361 patent have been deposed, at least once,

21  about their work and communications with the PTO. Wickey Decl. at ¶¶ 2, 4. All testified

22  extensively about their credentials and experience in prosecution, as well as their specific

23  procedure for determining what was patentable and who contributed to the inventions

24  claimed in the '361 patent. *See, e.g., id.*, Exs. K at 12-18, 23-34, 39-43, 43-67; L at 7-8, 11-

25      _____

26      [9] Google also notes that the May 19, 1998 press release touted "the financial success of
    Overture's search engine." OM at 3. That is as misleading as the reference to the business plan.
    The May 19 press release announced that Overture had raised the necessary capital to pursue the

27  business. Furthermore, the press release referenced a "beta system" then in use, confirming that
    there was no commercially operational system at the time. Grewal Decl., Ex. C. The "beta system"

28  mentioned in the press release was the prototype.

OVERTURE'S MEMO. IN OPPOSITION TO GOOGLE'S MOT. TO COMPEL
02-01991 JSW (EDL)

1   12, 16-17; M at 6-10; 143-147, ; *see also* Supp. Gr. Decl., Exs. C at 42-43; D at 65-66.

2        Google's motion attacks the '361 patent based on general and prophetic statements in

3   various press releases issued by Overture before the "critical date" of the '361 patent (*i.e.*,

4   May 28, 1998) and implies that the existence of the press releases vitiates any patent

5   protection.  OM at 3-4 (quoting two sentences from the '361 patent and stating that they

6   "echoed" the press releases and business plan).  However, as the lead patent prosecutor (Mr.

7   Naughton) and inventors testified during deposition, the patent application filed in May

8   1999 was directed to methods and software solutions that did not exist in early 1998.  *See,*

9   *e.g.*, Wickey Decl., Ex. K at 96-102.[10]  All of the patent claims were specifically drafted to

10  cover inventions that were conceived and reduced to practice in the second half of 1998, or

11  even later.  *Id*., Ex. K at 100-102.

12       The patent prosecutors also attested to their understanding of the duty to provide

13  relevant documents to the PTO and described the steps they took to gather documents and

14  provide them to the PTO.  *See, e.g.*, *id*., Exs. K at 106-114; L at 65; M at 27-29; *see also*

15  Supp. Gr. Decl., Exs. C at 61-62, 64; D at 30.  Likewise, the inventors testified that they

16  knew of and abided by the duty of candor regarding the production of prior art.  *See, e.g.*,

17  *id*., Exs. O at 96-100, 170-71; H at 239-41; I at 118-120; see also Supp. Gr. Decl. Ex. B at

18  101-102.  Mr. Naughton took the additional precaution of engaging an outside consultant to

19  search for prior art.  *Id*., Ex. K at 113:15-114:1.  Thereafter, Overture filed an Information

20  Disclosure Statement ("IDS") within months after filing the patent application, which

21  recited dozens of Overture publications and press releases along with third party

22  descriptions of the new search engine that was under development starting in early 1998.

23  *Id*., Ex. P.

24       As a result of these efforts, all relevant press releases were presented to the PTO

25  while the '361 patent was undergoing prosecution, a fact that Google does not contest.

26  
27      [10] Similar testimony was given to the PTO in 2000, in the form of a declaration from Mr. Davis.  After fully considering that testimony, along with other public disclosures about Overture's proposed business model, the Examiner found the <u>claimed</u> inventions novel and not obvious.

28  Wickey Decl. Ex. N.  Even a quick perusal of the patent claims substantiates this testimony.

1  Overture itself disclosed most press releases in its IDS.  *Id.*  The '361 patent contains three
2  pages of references, including multiple press releases from Overture that contain the very
3  same information  that Google now contends are relevant to the validity of the patent.  *Id.*,
4  Ex. Q.  Thus, when Mr. Davis told the PTO, in 1999, that Overture had made a "careful and
5  thorough search of the prior art", the results of which were "cited to the Examiner" in an
6  IDS, he was telling the truth.

7      As in all patent prosecution, the claims of the '361 patent evolved during the two
8  years that the application was pending.  Particularly important to this motion are the
9  changes made to claim 1 to distinguish the prior art and clarify the claimed method.  Those
10  changes are depicted chronologically in Exhibit R to the Wickey Declaration.

11      Most important was the addition of a limitation to claim 1, in September 2000, that
12  required recording a retrieval request event (*i.e.*, a click-through) in an account database.
13  *Id.*  This limitation reflected the disclosure in column 9 of the patent that "accurate account
14  debit records" can be maintained if "account identification information is recorded in the
15  advertiser's account along with information from the retrieval request as a retrieval request
16  event."  *Id.*, Ex. Q.  As numerous inventors have testified, the Overture programmers did
17  not discover a way of billing advertisers accurately until the Fall of 1998.  *Id.*, Exs. O at 85;
18  G at 70-71, 80, 202; I at 148-49; see also Supp. Gr. Decl. Ex. B at 86-87.

19  **III.    ARGUMENT**

20      **A.    At the Time of Its Filing, Google's Motion Failed to Comply with Fed. R.
21      Civ. P. 37, Local Rule 37-1(a), and This Court's Standing Orders.**

22      Google rushed to file its motion without attaching any certification that the parties
23  met and conferred to completion and in good faith.  Nor was the motion supported by a
24  declaration setting forth either these meet and confer efforts or the final positions of each
25  party, contrary to Federal Rule 37, Local Rule 37-1(a), and this Court's May 2, 2003
26  Standing Order on Discovery Disputes.[11]  These defects were not merely technical, for the

27  ─────────────
28      [11] After prodding from counsel, Wickey Decl., Ex. C, Google belatedly filed a supplemental
declaration regarding the meet and confer efforts of last fall.  *See* Supp. Sun Decl.  That declaration

9

parties had not had an opportunity to resolve their substantive disagreements when the motion was filed.  From the mid-November telephone conference until it actually filed the motion, Google neither indicated an intention to file a motion to compel on this subject nor approached Heller Ehrman with a request to renew efforts to resolve this dispute without court action.  Wickey Decl., Ex. B.

On June 29, 2004, notwithstanding the pendency of the settlement negotiations, Google reversed its position and filed this motion.  Overture then proposed to discuss whether the disagreement might be resolved by viewing the alleged waiver more discretely, rather than as the expansive waiver advocated by Google.  *Id*., Ex. C.[12]  Google rejected Overture's proposal, reasserting its assertion that the alleged waiver extends "to the entirety of the '361 prosecution".  Wickey Decl., Ex. D.

Rather than discuss a practical resolution, Google has determined to plunge ahead with this motion, even while the settlement discussions between the parties are still underway.  *Id.*  While Google may have tactical reasons for pressing ahead with its motion, the fact remains that the motion was premature under the Local Rules.

**B.    Google Cannot Establish a *Prima Facie* Case of Fraud Sufficient to Justify the Broad Exception to Privilege It Seeks.**

Google seeks to use the crime-fraud exception to vitiate the attorney-client privilege and the work product protection covering "communications between Mr. Davis and Mr. Rauch about the '361 prosecution".[13]  *See* [Proposed] Order Granting Google's Motion.  However, Google cannot simply rely on its allegations of inequitable conduct before the

---

did not attach more recent efforts to resolve the disputes raised by Google's Motion.  *Id.*; *see also* Wickey Decl., Exs. B-D, T.

[12] Counsel for Google complains that since last fall, "Overture had not indicated to Google that it had changed its position."  Supp. Sun Decl., ¶ 9.  However, Federal Rule 37 makes clear that it is the <u>movant's</u> obligation to engage the meet and confer process and certify as to its good faith efforts.  Fed. R. Civ. P. 37(a)(2)(A).  Google's eight-month silence and abrupt filing can hardly be considered a reasonable effort to comply with this obligation.

[13] Google's brief suggests that it also seeks *in camera* review of "Mr. Rauch's notes about the '361 prosecution".  OM at 25.  However, Google's proposed order omits mention of these notes.  *See* [Proposed] Order Granting Google's Motion, ¶ 6.

10

1   PTO to justify the relief it seeks.  *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 807

2   (Fed. Cir. 2000)("Inequitable conduct is not by itself common law fraud").  Unlike

3   inequitable conduct, "fraud may not be based upon an equitable balancing of lesser degrees

4   of materiality and intent.  Rather, it must be based on independent and clear evidence of

5   deceptive intent together with a clear showing of reliance, *i.e.*, that the patent would not

6   have issued but for the misrepresentation or omission."  *Spalding*, 203 F.3d at 807.[14]

7        Thus, to invoke the crime-fraud exception, the party challenging the privilege must

8   establish a *prima facie* case that the communication was made in furtherance of a fraud.

9   *Starsight Telecast, Inc. v. Gemstar Development Corp.*, 158 F.R.D. 650, 655 (N.D. Cal.

10  1994).  The challenging party must point to nonprivileged evidence sufficient to support a

11  reasonable belief that *in camera* review may yield evidence establishing the exception's

12  applicability.  *United States v. de la Jara*, 973 F.2d 746, 748 (9th Cir. 1992).

13       Google has identified three grounds for finding that Overture defrauded the PTO.

14  Each is addressed and rebutted below.

15              **1.      The Features Of The Beta System**

16       Google's primary contention is that Mr. Davis took inconsistent positions in the two

17  declarations he submitted to the PTO.  *See, e.g.*, OM at 5 n.6.  On the one hand, it cites

18  deposition testimony and a 1999 declaration disclosing Mr. Davis' belief that a competitor,

19  Hitsgalore, was practicing the invention of then-pending claim 1 by (*inter alia*) recording

20  retrieval request events.  On the other hand, it points to Mr. Davis' declaration in 2000,

21  which stated that Overture's press release explaining that its proposed system would

22  "charge web site promoters per click through" did not inherently disclose the invention of

23  claim 1 pending at that time.  Google argues that if the first declaration was accurate, Mr.

24  Davis should have told the Examiner that any system which charges advertisers on a click-

25  through basis necessarily would record retrieval request events, and thus the beta system

26  necessarily would practice the method of claim 1.  OM at 22.  The problem with Google's

27  _____

28       [14] It is quite notable that Google fails to cite, much less comply with, the standard
     enunciated in *Spalding*.

                                        11

1    argument is that it misquotes the pending claims and ignores the level of skill in the art.

2    Mr. Davis correctly informed the Examiner that the beta system did not record

3    retrieval request events in an account database. Google's brief repeatedly omits this key

4    phrase when advocating the alleged fraud. See, e.g., OM at 7, 22.[15]  In so doing, Google

5    seeks to gloss over the entire development effort that commenced in the fall of 1998 (well

6    after the critical date for the patent) during which time Overture developed a "back end"

7    system that permitted the integration of data in a way that was commercially scalable.

8    Wickey Decl., Ex. O at 35-40, 171; see also Supp. Gr. Decl. Ex. B at 172.

9    Despite years of taking discovery, Google has no evidence that the claimed method

10    was in use at Overture, much less that there was a public use of such a method by Overture

11    before the critical date. The software systems in development at Overture in early 1998

12    were confidential and accessible only by employee programmers. Wickey Decl., Ex. F  at

13    49-50, 60-61, 99-100, 103-104. Moreover, the systems used in connection with the

14    prototype were highly experimental. Id., Ex. F  at 66-70. Thus, the account reports to

15    which Google refers (OM at 22) do not constitute prior art. Monon Corp. v. Stoughton

16    Trailers, Inc., 239 F.3d 1253, 1258 (Fed. Cir. 2001) (evidence that an alleged public use or

17    sale was primarily experimental may negate an assertion of invalidity).[16]

18    Moreover, Google has utterly failed to undercut Mr. Davis' opinion that, in May

19    1998, someone skilled in the art would not find such a limitation inherent in the press

20    release's statement that the Overture system would charge advertisers on a click-through

21    basis. To the contrary, Ms. Lee – one of the prosecutors of the '361 patent – testified that

22    there are methods to charge advertisers per click, other than by recording retrieval request

23    

_____

24    [15] Mr. Davis never stated that the beta system did not record retrieval request events. The
issue that he addressed was whether the invention of claim 1 – which required that retrieval request

25    events be recorded in an account database – was present in the beta system or inherent in the press
release. Clearly it was not. Wickey Decl., Exs. O at 174-81; G at 250; U at 189-90; V at 199-200.

26    [16] Google's additional contention that Overture should have mentioned its internal use of
web logs to the Examiner overlooks the fact that the patent itself discloses that the use of web logs

27    to track website activity (as was done internally at Overture) was known in the prior art. Wickey
Decl. Ex. Q, col. 9, line 65. The Examiner, who was skilled in the art, also would have known

28    about web log reports even without such a disclosure. In short, nothing material was withheld.

OVERTURE'S MEMO. IN OPPOSITION TO GOOGLE'S MOT. TO COMPEL
02-01991 JSW (EDL)

1  events in an account database.  Wickey Decl., Ex. L at 156-25, 158-159; *see also* O at 193,

2  202-03, 206-07.  The Examiner was skilled in the art, and he specifically considered what

3  the press release did and did not disclose in relation to claim 1.  He, too, concluded that

4  claim 1, as it existed in September 2000, was patentable over the press release.  Wickey

5  Decl. Ex. S.

6        Mr. Davis also was forthright when he told the Examiner that he believed that

7  Hitsgalore must be recording retrieval request events.  He had visited the Hitsgalore website

8  and viewed how it operated.  Wickey Decl., Ex. O at 146, 356-58.  He could tell – because

9  he was someone very skilled in the pertinent art, with knowledge of methods that did and

10  did not work at Overture – that the competitor was likely recording click-throughs in its

11  commercial site.  Thus, he did not rely solely on the statements quoted in Google's motion

12  in concluding that the method of then-pending claim 1 was being infringed.[17]

13        Google has further failed to acknowledge the fact that the claims pending at the time

14  of the Davis declaration regarding Hitsgalore were not the same claims as those that were

15  pending a year later, when Davis filed his Section 132 declaration.  *See* Wickey Decl., Ex.

16  R.  At the time of the first Davis declaration, all that was required was that the retrieval

17  request be recorded in a database but not necessarily in an "account database".  Thus Mr.

18  Davis honestly concluded, based on his use of the commercial website and the statements

19  made at that site, that HitsGalore was recording retrieval request events (but not necessarily

20  in an "account database").  The early statement was therefore entirely consistent with Mr.

21  Davis' view that Overture's May 1998 press release did not inherently convey the invention

22  of later-amended claim 1 (requiring the recording of retrieval request events in an account

23  database) to someone of average skill in May 1998.[18]

24        [17] In September 1999, claim 1 did not require that retrieval request events be recorded in an
account database.  Wickey Decl., Ex. R.  This is a critical distinction that Google simply ignores
25  because it conclusively dispels the alleged fraud.  Nowhere did Davis ever testify that, whenever a
web site promoter is charged on a "cost per click" basis, the search engine operator must be
26  recording retrieval request events in an account database.
27        [18] It is worth noting that both of the Davis declarations were presented to the same
Examiner.  The Examiner had every opportunity to review the two declarations and ask questions
28  during interviews or otherwise, if he believed that there were any inconsistency.

In summary, no credible evidence supports Google's conclusion that Overture misrepresented the features of the prototype or the import of its press releases to the Examiner. Likewise, Google's motion contains a glaring void regarding the intent to deceive. Google essentially relies on alleged bad acts (which did not occur) to establish that Mr. Davis must have intended to mislead the Examiner about the beta system. That falls far short of the showing required by law. *Spalding*, 203 F.3d at 807; *see also For Your Ease Only, Inc. v. Calgon Carbon Corp.*, et al, 2003 U.S. Dist. LEXIS 7131, *31-*33 (N.D. Ill. April 24, 2003) (no *prima facie* case of fraud where more than one inference may be drawn from the record).

### 2. Rauch's Characterization of the Second Davis Declaration

Google next alleges that Mr. Rauch, one of the prosecutors for Overture, made a false statement to the Examiner when he submitted an amendment and response in October 2000 to overcome a rejection of the claims based on the May 19, 1998 press release. OM at 7. Google's argument is based on a single sentence concerning Mr. Davis' second declaration, which stated that Mr. Davis "specified limitations of each independent claim . . . that were not disclosed in the May 19, 1998 press release." *See* Grewal Decl. Ex. M at 5. Google contends that that statement was false because the Davis declaration did not clearly "specify" limitations of each independent claim. OM at 7.

Such an argument cannot satisfy the "materiality" requirement for any claim of fraud, when one considers that Mr. Rauch's response was submitted at the same time as, and was meant to be read in conjunction with, the Davis declaration to which it refers. The Examiner received <u>both</u> the response and the declaration at the same time. It is inconceivable that he could have been misled in the manner that Google suggests. If the Examiner believed that the declaration fell short of meeting his request for evidence, he could and would have said so. *See Spalding*, 203 F.3d at 807 (fraud requires clear showing that the patent would not have issued but for the alleged misrepresentation).

Moreover, Mr. Rauch's summary of the attached evidence was not even arguably false. The Davis Declaration expressly mentions each of the independent claims and points

14

1   out either one feature, or a composite of features, that did not exist in the beta system.

2   Grewal Decl. Ex. M.  In fact, all of the distinctions that Mr. Davis drew between the

3   claimed invention and the beta system were <u>true</u>.  Google does not even suggest otherwise

4   for claims 2-67.  Google's belief that Mr. Rauch should have drafted his response

5   differently does not establish a misstatement of fact.

6         Finally, Google offers no evidence whatsoever regarding Mr. Rauch's intent.

7   Indeed, the brief fails to mention Mr. Rauch's extensive testimony on this subject.  *See*

8   Wickey Decl., Ex. M at 165-188.

### 3.    Davis' Personal Knowledge of the Beta System

9

10        The third element of Google's alleged fraud is even weaker than the second.  Google

11  alleges that Mr. Davis did not adequately inform the Examiner which of the facts detailed in

12  his second declaration he knew directly, and which he learned from talking to other

13  inventors at Overture.  Specifically, Google charges that Mr. Davis deceptively failed to tell

14  the Examiner that testimony "about the features of the pre-critical date system" was made

15  on information and belief.  OM at 8, 23-25.  Even if true, this would be feeble evidence of

16  inequitable conduct, unlikely to survive a motion for summary judgment.  It is not true,

17  however, and certainly does not support an inference of fraud.[19]

18        Mr. Davis did not purport to give testimony to the PTO about the features of the pre-

19  critical date systems.  The Examiner never posed that question, nor did Mr. Davis answer it

20  in his 2000 declaration.  Rather, his declaration focused on which of the limitations of the

21  pending claims were not present in the beta system.  The distinction is critical.

22        Mr. Davis had direct knowledge that various software features were not in existence

23  as of June 1998 because he was hired to supervise the group of engineers who created those

24  DTC features.  Wickey Decl., Ex. O at 30-35, 244-47.  He knew that the software his group

25  created did not exist before he was hired; if it had existed, there would have been no reason

26  to task them to recreate it.  *Id.* at 90-92.  Even assuming Davis were an attorney (which he

27        _____

28        [19] Stated otherwise, if, as we have shown, Mr. Davis told the truth about the beta system's
      capabilities, it would be immaterial if he lacked personal knowledge of the true facts contained in
      his declaration.

OVERTURE'S MEMO. IN OPPOSITION TO GOOGLE'S MOT. TO COMPEL
02-01991 JSW (EDL)

was not), it would not have occurred to him to add the words "on information and belief" when identifying what was new in the patent, because he had personal knowledge that the central, claimed features were not yet in existence when he arrived at Overture in the fall of 1998. *Id.* at 248-59, 315-21.  Thus, his declaration focused on topics about which he had direct knowledge.[20]

Given his direct supervision of the programming work that led to the '361 patent, it is ludicrous to suggest that Mr. Davis had a specific intent to mislead the PTO into granting an invalid patent based on his declaration concerning the new subject matter in the claims.

### C.    Google's Alternative Ground For Compelling Discovery Fails Because The Waiver of Privilege, If Any, Was Modest, Unintended and Narrow

Google cites 25 excerpts from the depositions of Mr. Rauch and Ms. Lee to establish that Overture disclosed the substance of attorney-client communications, and therefore waived the attorney client privilege, regarding prosecution of the '361 patent.  OM at 9.  Twenty-one of those excerpts do not disclose the substance of <u>any</u> attorney-client communication; however, the other four disclose such communications only opaquely.  None of the cited testimony waived privilege.

#### 1.    The Vast Majority of The Testimony Google Cites Does Not Disclose Any Privileged Communications.

##### a.    Most of The Deposition Excerpts Disclose No Attorney-Client Communications.

Google cites fourteen deposition excerpts where Mr. Rauch and Ms. Lee do not testify regarding any attorney-client communication.  Because the attorney-client privilege may be waived only where the substance of an attorney-client communication is disclosed, these excerpts cannot give rise to waiver.  *See, e.g., In re Brand Name Prescription Drugs Antitrust Litigation*, 1995 WL 531805, *1-2 (N.D. Ill. Aug. 8, 1995)(citations omitted).

Four of the fourteen excerpts address communications only between Overture's

---

[20] *See* Wickey Decl. Ex. U  at 193-94.  Davis did not concede that all of his knowledge was based in information from others.  OM at 25; s*ee also id Wickey Decl.,* Ex. O at 178-186, 188-191, 213-14; Supp. Gr. Decl. Ex. B at 187.

OVERTURE'S MEMO. IN OPPOSITION TO GOOGLE'S MOT. TO COMPEL
02-01991 JSW (EDL)

outside counsel, Messrs. Rauch and Naughton, which did not communicate any legal advice sought or given. Supp. Gr. Decl., Ex. D at 46:13-47:14 (Rauch did not investigate beta system because Naughton told him about the system); 50:2-5 (Naughton told Rauch that Naughton and Lee had taken beta system into account when preparing the patent application); 57:21-58:2 (Naughton told Rauch about beta system); 100:9-101:5 (Rauch spoke to Naughton about article on beta system); *see also* OM at 10-11.

Another six excerpts disclose the testifying attorney's <u>understanding</u> of what he or she had learned or had been told, not the substance of any attorney-client communication. Supp. Gr. Decl., Ex. D at 50:6-17 (Rauch's understanding of beta system, as informed by Naughton); 175:11-24 (Rauch's understanding of Davis' position that the beta system does not cover claim 15 in its entirety); 184:21-185:2 (same); 196:17-197:6 (Rauch's understanding of Davis' competence to give declaration); *id*., Ex. C at 42:21-43:7 (Lee's understanding of beta system from her investigation); 50:11-16 (Lee's understanding of beta system's difference from claims); *see also* OM at 11-13.

Three excerpts discuss only hypothetical attorney-client communications. In two, Google posed hypothetical questions to Mr. Rauch and Ms. Lee regarding how they would have prepared the Rule 132 declaration in the event that Davis had told them that he knew about certain aspects of the beta system from speaking with other inventors. Supp. Gr. Decl., Exs. D at 203:2-11, C at 97:15-98:2; *see also* OM at 13. In another excerpt, Mr. Rauch testified that he did <u>not</u> communicate with an inventor about inventorship prior to filing the Rule 132 declaration. Supp. Gr. Decl., Ex. D at 65-66; *see also* OM at 9.

The fourteenth excerpt discusses Ms. Lee's general practice regarding preparing declarations, which did not disclose any attorney-client communication and was similarly not privileged. Supp. Gr. Decl., Ex. C at 94:3-11; *see also* OM at 13.

### b. Other Deposition Excerpts Reflect Overture Employees' Passing Information Through Their Attorney To The PTO, Not Obtaining Legal Advice.

In another seven of the 25 deposition excerpts, Mr. Rauch and Ms. Lee discussed

17

1  information given to or received from Overture employees that did not concern legal advice

2  but rather was intended to be passed from or to the PTO Examiner.  Supp. Gr. Decl., Ex. D

3  at 85:8-20 (Rauch relayed Examiner's request to Davis), 90:9-17 (Davis described beta

4  system for declaration preparation), 90:18-91:6 (Davis told Rauch which claims were not

5  covered by the beta system), 171:11-13 (Rauch repeated in Rule 132 declaration what Davis

6  told him), 173:16-174:18 (Davis told Rauch that claim 15 not covered by beta system); Ex.

7  E at 61-64 (IDS identified documents given to Lee by Overture employees), 92:24-93:4

8  (Davis told Lee that he could attest to the truthfulness of the Rule 132 declaration).  None of

9  this testimony supports Google's motion.

10  A patent attorney must provide testimony about client communications relating to

11  her role as conduit to the PTO (to avoid a motion to compel on the grounds that such

12  information is not privileged) [21], but must not divulge the substance of client

13  communications made for the purpose of obtaining legal advice (to avoid a waiver) [22].  The

14  distinction between these two guides is often hazy, however.  What Google contends is

15  Overture's selective use of privilege as both a "sword" and a "shield" is merely the result of

16  conscientious patent attorneys, having been noticed for deposition by Google, attempting to

17  navigate between these two poles.

18  **2.    Even The Few Excerpts Referring to Attorney-Client Communications Do Not Trigger a Waiver**

19  Only four of Google's cited excerpts arguably address information that Mr. Rauch

20  and Ms. Lee obtained from Overture that was not passed along directly to the PTO.  Within

21  the pages, however, Google fails to specify which testimony allegedly constitutes a waiver.

22  Supp. Gr. Decl., Ex. D at 30, 60, 68-72, C at 31-33.  In any event, none of the cited

23  testimony provides anything more than "opaque" references to attorney-client

24

25  [21] Historically, the attorney-client privilege has not extended to all information passed
26  between applicant and attorney relating to the prosecution of a patent before the PTO.  *See, e.g.,*
   *Jack Winter, Inc. v. Karatron Co.*, 50 F.F.D. 225, 228 (N.D. Cal. 1970) (attorney-client privilege
   does not apply where patent prosecutor acts as mere conduit between applicant and PTO).
27  [22] A communication between an inventor and a patent prosecutor is privileged where the
28  information is provided to the prosecutor "for the purpose of securing primarily legal opinion, or
   legal services, or assistance in a legal proceeding."  *Spalding*, 203 F.3d at 807 (citation omitted).

18

communications, and none "illuminate[s] the facts and analysis" sufficient for waiver.

*Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342, 346 (N.D. Ohio 1999).

      In three excerpts, John Rauch testified only that he:

- "reminded inventors and others involved in the prosecution of the obligation to come forward with and disclose to the PTO any information that we had documents and other information, but I did not direct anyone to go out and search for anything that I can recall," Supp. Gr. Decl., Ex. D at 30:16-21;
- spoke with Overture in-house counsel Joshua Metzger regarding "the status of the application, progress through the [U.S. PTO], the examining process, and other – other patent matters," including "foreign filing" and "the opportunity for filing applications overseas," *id*. at 60:7-18; and
- explained to Mr. Soulanille his "understanding of that determination [of inventorship]," to which Mr. Soulanille responded that he should "probably" be listed as an inventor, and had discussed Soulanille's title and "patent matters, patent application matters, and so forth," *id*. at 68:18-24, 71:24-72:18.

      In the fourth and final excerpt, Ms. Elaine Lee testified that she had a "very high-level technical discussion" regarding Overture's engineering efforts, and a discussion regarding inventorship with Soulanille.  Supp. Gr. Decl., Ex. C at 31-33.

      Even where, as is the case here, a patent attorney makes passing reference to client communications made for the purpose of obtaining legal advice, such testimony does not constitute a waiver.  *Libbey Glass*, 197 F.R.D. at 346.  In addition, no waiver occurs where statements revealed "counsel's direction to comply with the law generally."  *In re Brand Name*, 1995 WL 531805 at *1-*2.  Rather, to waive privilege an attorney must disclose privileged information that "illuminates the facts and analysis underlying" the advice sought or given.  *Libbey Glass*, 197 F.R.D. at 346.  Mr. Rauch and Ms. Lee made no such disclosures in their deposition.

### 3.  Even Assuming Arguendo That A Waiver Occurred, Its Scope Is Extremely Limited

Even assuming that the four excerpts discussed above "illuminate" facts and analysis underlying Mr. Rauch's and Ms. Lee's advice, the Court should construe the scope of the resulting waiver narrowly. *ACLARA Biosciences, Inc. v. Caliper Tech. Corp.*, 2001 WL 777083, *5 (N.D. Cal. June 16, 2000).  Voluntary disclosure of the substance of a privileged attorney-client communication waives attorney-client privilege as to other communications on the same subject matter, but overly broad definitions of the subject matter of such a waiver should be rejected. *See Starsight*, 158 F.R.D. at 655; *ACLARA* at *5.

For example, in *Starsight*, the accused infringer, having pled inequitable conduct and alleging a waiver, sought discovery of <u>all documents</u> relating to the prosecution of the patent-at-issue. *Starsight*, 158 F.R.D. at 655.  The patentholder's declaration stating that all material prior art concerning the patented subject matter had been disclosed to his patent attorneys, along with testimony from those attorneys that the patent's claims differed from the prior art that had been cited as a basis for the inequitable conduct charge, was held to waive privilege. *Id.*  However, the Court rejected the alleged infringer's demand for an "expansive waiver," properly choosing instead to limit its scope to communications concerning "how the alleged prior art references identified in Starsight's charges of inequitable conduct relate to the [application of the patent-at-issue] before the PTO." *Id.*

In the excerpts discussed above, the attorneys testified only about attorney-client communications regarding Mr. Soulanille's inventorship and the search for prior art.  The other basis for Google's claim of waiver, Davis' declaration that all known prior art was cited to the Examiner, similarly focuses on the prior art search. *See* Grewal Decl., Ex. G, ¶ G.  These statements hardly implicate the broad subject matter of "the prosecution of the '361 patent," as Google suggests.  Thus, any further discovery should be limited to that needed to prevent unfairness to Google, *i.e.*, discovery regarding Mr. Soulanille's

inventorship and the search for prior art. [23]  *See ACLARA* at \*5.

Furthermore, Overture did not intentionally abandon the privilege in an effort to defend itself against Google's inequitable conduct charge.  The *ACLARA* decision, on which Google relies, repeatedly considered statements made by the <u>patentholder itself</u> that it had voluntarily waived privilege in order to rebut charges of inequitable conduct.  To justify expanding that waiver's scope, the court cited extensively from testimony by the patentholder's president and executive vice president that it believed waived privilege.  *ACLARA at* \*7.  By contrast, no example of an affirmative Overture waiver exists.  Instead, Google cites Mr. Davis' single, stock statement in his 102 declaration regarding submission of prior art to the PTO and a host of quotes cherry-picked from the depositions of Overture's patent attorneys, almost none of which suggests, much less volunteers, a waiver.

A testifying patent attorney must segregate her roles as counsel to her client and as conduit for her client to the PTO.  So, too, a court – in assessing the scope of any resulting waiver of privilege – should endeavor to discern and preserve the line that exists between information disclosed and advice withheld.  *Starsight*, 158 F.R.D. at 655 (citation omitted).  Counsel for Overture have endeavored to provide answers to Google's questions, where appropriate, without resulting in a waiver of attorney-client privilege.  Any miscalculations have been modest and inadvertent at worst. As such, they hardly justify the loss of privilege regarding the entire '361 patent prosecution process, as advocated by Google.

**D.**    **Google Is Not Entitled to the Work Product of Overture's Patent Attorneys**

Federal Rule 26(b) protects attorney work product from discovery by an adversary.  Fed. R. Civ. P. 26(b)(3).  Even where substantial need of the materials and undue hardship in obtaining their substantial equivalent by other means combine to permit the discovery of some work product, "opinion work product" (materials revealing counsel's mental impressions) must be further protected.  *Id.*; *see also Bio-Rad Labs., Inc. v. Pharmacia, Inc.*,

---

[23] Overture's recent offer to resolve this issue without court action focused on additional discovery in these two areas of the '361 prosecution.  Wickey Decl., Ex. C.

21

130 F.R.D. 116, 122 (N.D. Cal. 1990). This opinion work product is not discoverable "unless the information is directly at issue and the need for production is compelling." *Bio-Rad Labs.*, 130 F.R.D. at 122.

The work product doctrine applies to '361 patent prosecution materials,[24] and Google has not overcome the heightened protection afforded such opinion work product.

**1.   Overture Has Not Voluntarily Placed Mr. Rauch's State of Mind At Issue**

Google's Motion apparently seeks the entire body of opinion work product from Brinks Hofer arising during prosecution of the '361 patent. To obtain this discovery, Google relies on the standard enunciated in two cases from this district: an attorney's opinion work product is discoverable "where such information is directly at issue and the need for production is compelling." *See ACLARA* at *8 (citations omitted); *Bio-Rad Labs.*, 130 F.R.D. at 122. However, it is also clear that Overture should not be required to turn over its attorneys' opinion work product simply because Google has simply <u>alleged</u> a defense that requires Google to demonstrate an intent to deceive. *Allergan Inc. v. Pharmacia Corp.*, 2002 WL 1268047, *1 (D. Del. May 17, 2002) ("[A]bsent a *prima facie* showing of fraud, an allegation of inequitable conduct, in and of itself, does not vitiate the attorney-client privilege or the protections of the work product doctrine."), *citing Spalding*, 203 F.3d at 806-7. Rather, Google must demonstrate that <u>Overture</u> placed in issue the information that Google seeks – the opinion work product of Overture's patent prosecutors.

---

[24] "Litigation need not have already commenced in order for the work product doctrine to be operative; however, there must be more than a remote possibility of litigation." *Fox v. California Sierra Financial Services*, 120 F.R.D. 520 (N.D. Cal. 1988). On October 25, 1999, Overture filed a Petition to Make Special with the PTO in order to expedite prosecution of its application for the '361 patent. Grewal Decl., Ex. F. Overture sought such special treatment because it believed that several other companies were in the process of infringing the patent claims set to issue. *Id.* In his Declaration in support of this Petition, Mr. Davis outlined likely future litigation claims against several infringers, including FindWhat.com. *See, e.g., id.*, Ex. G at ¶¶ 6-8 (detailing Overture's contentions re FindWhat.com's pre-issuance infringing activities). Thus, the '361 prosecution after October 25, 1999 was informed by Overture's anticipation that, upon issuance, it would quickly seek to protect its intellectual property rights, making the possibility of litigation arising from the '361 patent far more than remote. Any work product of Overture's patent attorneys after the Petition's filing should therefore be protected under Federal Rule 26(b)(3).

OVERTURE'S MEMO. IN OPPOSITION TO GOOGLE'S MOT. TO COMPEL
02-01991 JSW (EDL)

1   In both cases on which Google relies, before ordering discovery of some work

2   product, the court emphasized that the party claiming protection had <u>voluntarily</u> put at issue

3   the information sought.  The *ACLARA* court noted, for instance, that the patentholder had

4   sought to defend itself against charges of inequitable conduct and misappropriation by

5   intentionally producing opinion work product with an accompanying letter that expressly

6   waived any protection over the disclosed communications.  *ACLARA* at *2.[25]

7   Similarly, in allowing testimony over a work product objection, the *Bio-Rad* court

8   noted that "[i]t is important to this court's analysis that Bio-Rad voluntarily engaged…the

9   prosecuting patent attorney, as expert consultant to trial counsel in the pretrial preparation."

10  *Bio-Rad*, 130 F.R.D. at 122-3.  Since Bio-Rad affirmatively adopted this strategy, it could

11  not later protect the patent prosecutor from testifying by arguing that doing so might expose

12  work product of its trial counsel.  *Id.*  The court noted that "the situation has the same

13  element of voluntariness" that existed in *Handgards*, a prior case in which a party had

14  "voluntarily waived by deciding to call its own patent attorneys as witnesses to testify..."

15  *Id.*, citing *Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. 926, 933 (N.D. Cal. 1976).

16  Here, Overture has <u>not</u> affirmatively injected the advice or mental state of Mr. Rauch

17  – or that of any of its other attorneys – into the issues to be decided in this case.  Rather, it is

18  Google that has alleged unenforceability of the '361 patent and challenged Mr. Rauch's

19  state of mind.  Nor can Google argue that making Mr. Rauch available – after Google had

20  noticed his deposition – was a voluntary act sufficient to justify broad waiver of the work

21  product protection.  As a patent prosecutor, Mr. Rauch often acted as a mere conduit

22  between Overture and the PTO, in likely possession of unprivileged and unprotected facts.

23  *See, e.g., Jack Winter,* 50 F.F.D. at 228.  By making him available, Overture merely

24  complied with its Rule 30 obligations.[26]  Fed. R. Civ. P. 30.

25  _____

26  [25] The court likened the facts before it to the situation where an alleged infringer invokes the
    advice of counsel defense to a charge of willful infringement, a legal position that, without

27  question, waives any protection over attorney opinion work product.  *Id.* at *8, *citing Mushroom
    Assoc. v. Monterey Mushrooms Inc.*, 24 U.S.P.Q.2d 1767,1771 (N.D. Cal. 1992).

28  [26] In fact, to defend against Google's claims of inequitable conduct, Overture will not rely
    on any testimony from Mr. Rauch regarding the beta system or the search for prior art.

23

1   Much of the particular testimony cited by Google to support its waiver of work

2   product protection is not even arguably work product.  Mr. Rauch testified about the status

3   of the '361 patent application at the point when he took over its responsibility from Mr.

4   Naughton, revealing what he was told that he did <u>not</u> have to do (*i.e.*, conduct another

5   investigation) on this new project.  *See* Supp. Gr. Decl., Ex. D at 46:13-47:14; 50:2-5.  Also,

6   Mr. Rauch discussed information received from Mr. Davis (*id.* at 90:9-17) and Mr.

7   Naughton (*id.* at 57:21-58:2) that was simply passed along to the patent examiner.

8   Google also cites testimony from Ms. Lee confirming that she conducted an

9   investigation of the pre-critical date system and relaying the facts uncovered (*i.e.*, that the

10  newer version of Overture's system incorporated features not present in the prior version).

11  OM at 18.  Whether such testimony reveals Ms. Lee's opinion work product (it does not[27]),

12  Google has not explained how such testimony could possibly relate to Mr. Rauch's state of

13  mind when he submitted the October 2000 amendment and response.

14  Finally, Google cites to Mr. Rauch's disclosure that Mr. Naughton's use of the

15  phrase "beta system" was significant (and what that phrase generally meant to him), and

16  Mr. Rauch's belief that Mr. Davis had personal knowledge of Overture's pre-critical date

17  system.  Grewal Decl., Ex. D at 50:6-17, 196:23-197:6.  Even if the Court could properly

18  decide that these excerpts reveal opinion work product, such discrete instances of

19  inadvertent testimony fall far short of the "voluntariness" present in the cases upon which

20  Google relies.  Thus, such limited testimony cannot justify an expansive waiver as ordered

21  in the cases cited by Google or as sought by Google here.

22  Should this Court decide that Overture has voluntarily put at issue Mr. Rauch's

23  intent, it should nevertheless limit disclosure to the opinion work product for which the

24  Court finds that Google has a compelling need.  *Bio-Rad Labs.*, 130 F.R.D. at 122.

25  Google's specific allegations of inequitable conduct center around the intent of only one

26  attorney, Mr. Rauch, and focus on only two statements:  Mr. Rauch's characterizations of

27

28  [27] *See, e.g., In re Savitt/Adler Litig.*, 176 F.R.D. 44, 48 (N.D.N.Y. 1997)(work product protection does not extend to facts).

24

Overture's pre-critical date system and of Mr. Davis' 132 declaration in support of the October 2000 amendments.  OM at 20.  To the extent that Google, by its Motion, seeks any and all work product of Overture attorneys, that motion should be denied.  *See, e.g., Canel v. Lincoln Nat'l Bank*, 179 F.R.D. 224, 226 (N.D. Ill. 1998)("subject matter" waiver does not apply to opinion work product).

### E.    The Remedy Sought by Google Is Impermissibly Broad

The Federal Rules provide that "[u]nless otherwise authorized by the court or stipulated by the parties, a deposition is limited to one day of seven hours."  Fed. R. Civ. P. 30(d)(2).  Yet Google's motion seeks an order requiring "any and all testimony about the communications between and among Brinks Hofer and Overture (including Overture.com) related to the prosecution of the '361 patent."  *See* [Proposed] Order Granting Google's Motion.  If granted, such an order would permit Google to notice anyone at Overture or Brinks Hofer for any length time to answer any question (whether previously asked and answered or not) regarding the '361 prosecution.

To the extent that Google's motion seeks to reopen any deposition, this Court should limit its order to permit Google to pose only those questions previously asked but for which the witness refused to answer based on a privilege instruction by the defending attorney. Google should not be rewarded with either the opportunity to raise questions that it simply neglected to ask the first time around nor the opportunity to ask questions already answered, in hopes of a more favorable response the second (or third) time around.

## IV.    CONCLUSION

For the foregoing reasons, Google's motion should be denied.

DATED:  July 15, 2004                    HELLER EHRMAN WHITE & McAULIFFE LLP

By /s/ M. Patricia Thayer

Attorneys for Plaintiff
OVERTURE SERVICES, INC.

OVERTURE'S MEMO. IN OPPOSITION TO GOOGLE'S MOT. TO COMPEL
02-01991 JSW (EDL)