# EXHIBIT K

```
 1
                IN THE UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
                      SAN FRANCISCO DIVISION
 3
 4   OVERTURE SERVICES, INC., a       )
     Delaware Corporation,            )
 5                                    )
                   Plaintiff,         )
 6                                    ) Case No. C 02-01991
         -vs-                         )
 7                                    )      CERTIFIED COPY
     GOOGLE, INC., a California       )
 8   Corporation,                     )
                                      )
 9                 Defendant.         )
10
11           Videotaped deposition of JAMES P. NAUGHTON,
12   ESQ., taken before MARGARET A. BACHNER, CSR, RMR, CRR,
13   and Notary Public, pursuant to the Federal Rules of Civil
14   Procedure for the United States District Courts
15   pertaining to the taking of depositions, at Suite 3600B,
16   NBC Tower, 455 North Cityfront Plaza Drive, Chicago,
17   Illinois, on the 15th day of April, A.D. 2004, at 8:38
18   a.m.
19
20           There were present at the taking of this
21   deposition the following counsel:
22
23
24
```

1

LEGALINK® A WORDWAVE COMPANY   LegaLink San Francisco   601 Van Ness Ave, Suite 2052   San Francisco, CA 94102   tel (415) 359-2040   tel (800) 869-9132   fax (415) 359-2050   www.legalink.com

1   A.   Not that I'm aware of.

2   Q.   Can you describe for me, please, your
3   educational background?

4   A.   I received a Bachelor's degree in electrical
5   engineering from the University of Illinois in 1978. I
6   received a law degree from the University of Illinois in
7   1981. I guess that would be the conclusion of my formal
8   academic education.

9   Q.   Have you had other informal academic training
10  since then?

11  A.   I don't believe so.

12  Q.   What did you do workwise upon completing your
13  college degree?

14  A.   I was first employed at a law firm called
15  Newman, Williams, Anderson & Olson.

16  Q.   What was your position there?

17  A.   I was an associate attorney.

18  Q.   How long did you remain there?

19  A.   I'm sorry?

20  Q.   How long did you remain there?

21  A.   At the firm?

22  Q.   Yes.

23  A.   Until approximately 1989 or 1990.

24  Q.   Can you describe for me very generally the

12

JAMES P. NAUGHTON

```
 1   nature of the work that you did at that firm?
 2        A.   I did intellectual property work, a mix of
 3   patent, trademark, copyright and related matters.
 4        Q.   Did you handle both patent prosecution and
 5   patent litigation?
 6        A.   Yes.
 7        Q.   In the course of your responsibilities in
 8   patent litigation, would your duties involve such things
 9   as drafting declarations?
10        A.   I think on occasion I did.
11        Q.   Responding to discovery requests?
12        A.   Did I do that?
13        Q.   Yes.
14        A.   I believe I did.
15        Q.   Did you ever make court appearances?
16        A.   Yes, I did.
17        Q.   I take it that you are a member of the patent
18   bar?
19        A.   Yes, I am.
20        Q.   Did you take any kind of review or study
21   course in connection with becoming a member of the patent
22   bar?
23        A.   Yes.
24        Q.   How long did that class last?
```

13

1   A.   The formal class itself I believe lasted a
2   week or less.
3   Q.   By whom was it given?
4   A.   I don't recall.
5   Q.   Did you take it here in Chicago?
6   A.   I believe I did.
7   Q.   And was it given by some national organization
8   that gives review sessions for taking the patent bar?
9   A.   It would have been some sort of formal course.
10  Whether it was a national or some other level, I don't
11  recall.
12  Q.   What did you do after leaving your employment
13  as an associate at the first firm that you worked at?
14  A.   Well, the question lacks foundation. I did
15  not leave that firm as an associate.
16  Q.   Fair enough. So, at some point you became a
17  partner at that firm?
18  A.   Yes, I did.
19  Q.   When was that?
20  A.   In about 1986.
21  Q.   As a partner did your job responsibilities
22  also encompass both patent prosecution and patent
23  litigation?
24  A.   I believe so.

14

JAMES P. NAUGHTON

1  Q. What did you do after leaving that firm?
2  A. I began at another law firm.
3  Q. What was the name of that other law firm?
4  A. Roper & Quigg.
5  Q. Where is that firm located?
6  A. It has an office in Chicago.
7  Q. Were you based out of the Chicago office?
8  A. Yes, I was.
9  Q. Generally speaking, what were the nature of
10 your responsibilities at Roper & Quigg?
11 A. Again intellectual property law practice.
12 Q. Did that again encompass both patent
13 prosecution and patent litigation?
14 A. Yes.
15 Q. And did you again have occasion to submit
16 declarations?
17 A. I can't recall specifically if I personally
18 submitted a drafted declaration in that time frame.
19 Q. Did you have the opportunity to make court
20 appearances?
21 A. Yes.
22 Q. And I take it you certainly had the
23 opportunity to review declarations in the course of your
24 work as a patent litigator at a patent firm?

15

JAMES P. NAUGHTON

```
 1      A.   I believe I did.
 2      Q.   What did you do next?
 3      A.   Then I became employed at another law firm.
 4      Q.   What was the name of the third law firm?
 5      A.   Brinks, Hofer, Gilson & Lione, although it had
 6   a different name at the time.
 7      Q.   What was the name of the firm at the time?
 8      A.   I believe, if my recollection is correct, it
 9   was Willen, Brinks, Hofer, Gilson & Lione.
10      Q.   If we simply refer to it as Brinks, Hofer, you
11   will understand that I'm referring to the firm,
12   regardless of its name at the time?
13      A.   Yes.
14      Q.   What was your position when you first joined
15   Brinks?
16      A.   I believe it was counsel or of counsel.  I
17   forget which one.
18      Q.   Did there come a time when you became a
19   partner of the firm?
20      A.   I became a shareholder of the firm.
21      Q.   When did that take place?
22      A.   I believe it was January of 1996.
23      Q.   Can you describe for me generally your duties
24   and responsibilities during the period of time that
```

16

JAMES P. NAUGHTON

1   you've been employed at Brinks?
2      A.   Intellectual property law practice.
3      Q.   Again encompassing both patent prosecution and
4   patent litigation?
5      A.   Yes.
6      Q.   Can you give to me the names of some of the
7   clients that you have had while at Brinks?
8      A.   Some of the clients --
9   MS. THAYER: Before you go on, if you're going to be
10  naming clients where it's not publicly known that they
11  are a client of the firm or that would involve
12  confidential information, you need to designate that so
13  that we can have the record so -- so indicate.
14     If you simply name the clients, then it's a
15  matter of public record that they are clients of the
16  firm, then that's fine.
17     Is the distinction clear?
18  THE WITNESS: Yes.
19  BY THE WITNESS:
20     A.   I certainly don't recall in each instance for
21  every client whether or not it was publicly known that
22  our firm represented them in a matter.  So, let me think
23  about clients for which I do know that there's some
24  public knowledge of our firm having represented the

17

1    client.

2           Amp, Incorporated, now part of Tyco, Inc.

3           Herman Miller, Inc.

4           GoTo.com, Inc., now Overture.

5           Alpine Electronics, Inc.

6           Those are some of the major ones. I've worked

7    on matters for a great number of clients over the years.

8           Q.   Have you ever been involved in the prosecution

9    of any patents as to which claims of inequitable conduct

10   were subsequently made?

11          A.   Not to my knowledge.

12          Q.   And something you said raised a good point.

13   GoTo became Overture Services. If I refer to GoTo or

14   Overture, will you understand that I am referring to the

15   two entities interchangeably?

16          A.   In general, yes, unless the name somehow

17   becomes a distinction.

18          Q.   Okay. Similarly, I may be referring to the

19   GoTo or Overture system as it existed on May 27th, 1998

20   or earlier. If I refer to such a system as the

21   precritical date system, will you understand what I'm

22   referring to?

23          MS. THAYER:   I actually don't understand what you're

24   referring to when you say, "the system." Can you be more

18

JAMES P. NAUGHTON

1   A.   No, I don't.

2   Q.   Do you know the nature of the work that Mr.
3   Fleming had been doing for Overture Services prior to
4   your introduction to the company?

5   MS. THAYER:  You can answer that yes or no.
6   BY THE WITNESS:

7   A.   Yes.
8   BY MS. DURIE:

9   Q.   Can you describe for me at a broad level of
10  generality the nature of that work?

11  A.   The thing I'm aware of -- there may be other
12  activities -- he was involved, I believe, in a litigation
13  at that time on behalf of GoTo.com.

14  Q.   Who was the adverse party in that litigation?

15  A.   I believe it was Disney.

16  Q.   Do you know whether -- well, first of all,
17  does Dave Fleming handle patent prosecution work?

18  A.   Not to my knowledge.

19  Q.   To your knowledge, did anyone from Brinks,
20  Hofer have any involvement in patent prosecution work for
21  Overture prior to your first introduction to Overture?

22  A.   Not to my knowledge.

23  Q.   Approximately when were you first introduced
24  to someone from Overture?

23

```
 1      A.    I think it would have been the first half of
 2   1999.
 3      Q.    '99?
 4      A.    Yes.
 5      Q.    If you can turn in the binder in front of you
 6   to what's been marked -- previously marked as Exhibit 2,
 7   do you recognize Exhibit 2 as a copy of the '361 patent?
 8      A.    I recognize the first page.  I'll take your
 9   word for it that it's a complete copy.
10      Q.    You see on the first page that it says that
11   there's a filing date of May 28th, 1999?
12      A.    Yes.
13      Q.    Does that assist your recollection in trying
14   to recall when it was that you first had any
15   communications with anyone from Overture?
16      A.    It -- it corroborates that it was in the first
17   half of 1999.
18      Q.    Can you be any more specific?
19      A.    I believe it would have been sometime between
20   February and April 1999, with the bell curve being
21   centered somewhere over March.
22      Q.    Right.  Understood.  I want to start by
23   focusing on your first meeting with anyone at Overture.
24   Who was present at that meeting?
```

24

```
 1        A.    The first in-person meeting?
 2        Q.    Yes.
 3        A.    I can't recall specifically who the very first
 4   person was that I met.
 5        Q.    Okay.  Can you isolate some group of initial
 6   meetings and tell me who was present at those?
 7        A.    There did occur an initial visit by me to GoTo
 8   in Pasadena.  I believe I met with at least Joshua
 9   Metzger in that first trip.  And I likely met with a
10   number of other people, but I can't specifically recall
11   who I met on which trip.
12        Q.    Let me try to focus your attention generally
13   speaking on the time frame before May of 1999.
14        A.    Mm-hmm.
15        Q.    During that time frame did you ever have any
16   face-to-face meetings with Tom Soulanille?
17        A.    Again, it's hard for me to specifically recall
18   when I first met Mr. Soulanille.
19        Q.    So, I take it that you did meet Mr. Soulanille
20   at some point?
21        A.    Yes.
22        Q.    And you're having a hard time placing it
23   before or after May of 1999?
24        A.    The first meeting?
```

25

JAMES P. NAUGHTON

```
 1      Q.    Yes.
 2      A.    Mm-hmm.
 3      Q.    Have you ever met Steve Skovran?
 4      A.    Can you tell me what he looks like?
 5      Q.    No.
 6      A.    I may have.
 7      Q.    Do you recall whether you met him before May
 8   1999?
 9      A.    No, I don't.
10      Q.    Have you ever met a gentleman named Matthew
11   Derer?  He goes by the nickname Xeno.
12      A.    Yes, I believe I did.
13      Q.    When did you first meet him?
14      A.    I don't recall when I first met him.
15      Q.    Do you recall whether it was before or after
16   May 1999?
17      A.    I don't recall if the first meeting was before
18   or after that date.
19      Q.    Did you meet these gentlemen all at the same
20   time or in meetings that took place over more than one
21   visit to Pasadena?
22      MS. THAYER:  Objection.  Compound.
23   BY THE WITNESS:
24      A.    It's a good objection.  Can you rephrase the
```

26

JAMES P. NAUGHTON

```
 1   question?
 2   BY MS. DURIE:
 3        Q.    You can answer.
 4        A.    Are we talking about the first time I met the
 5   various people?
 6        Q.    Sure.
 7        A.    I would not have met all of them for the first
 8   time at the same time.
 9        Q.    Okay.  So, I take it you took multiple trips
10   out to Pasadena?
11        A.    I have taken multiple trips to Pasadena over
12   time.
13        Q.    What is your best estimate of when it was that
14   you first met Tom Soulanille?
15        A.    I don't recall specifically, but I believe it
16   likely I would have first met him in 1999.
17        Q.    Is it possible for you to be more precise as
18   to when in 1999 you first met him?
19        A.    Not -- not at the moment.
20        Q.    Okay.  When did you first meet Steve Skovran?
21        A.    I'm not sure if I have met him.  I'm also not
22   sure when it would have been that I first met him, if I
23   did.
24        Q.    When did you first meet Matthew Derer, a/k/a
```

27