# EXHIBIT K (CONT.)

Dockets.Justia.com

JAMES P. NAUGHTON

1      Q.    Yes.

2      A.    I don't know whether it was comprehensive or

3   not.

4      Q.    Okay.  What sorts of articles did you have?

5      A.    Lots of different articles.  I can't recall

6   specific ones.

7      Q.    Okay.  Were these articles about the GoTo.com

8   system, articles about other possible prior art systems

9   or both?

10      A.    My initial investigation even at that point

11   would have included -- I would have been interested in

12   any other prior art, potential prior art that they were

13   aware of.  So, it may have included articles or mentions

14   of other things.

15      Q.    Were you familiar at that time with Open Text?

16      A.    At some point I heard of something called Open

17   Text.

18      Q.    Did you hear about Open Text in connection

19   with your initial investigation?

20      A.    I don't recall if it was in connection with

21   that initial investigation or not.

22      Q.    Can you sort of bookmark for me the time frame

23   in which you heard about Open Text?

24      A.    Likely 1999.  And if it was referred to in the

109

JAMES P. NAUGHTON

1      information disclosure statements filed in the Patent

2      Office in connection with this application, then that was

3      an outside -- or latest time by which I became aware of

4      it.

5          Q.    Okay.  Is there anything else you can tell me

6      more specifically about the documentation that you

7      received as part of your initial investigation?

8          A.    It was faxed to me initially.

9          Q.    Okay.

10         A.    'Cuz I wanted to start getting into it

11     quickly.  I can't presently recall further details.

12         Q.    Okay.  You said that there was also prior art

13     we gathered to submit to the PTO?

14         A.    Yes.

15         Q.    Who participated in the process of gathering

16     prior art to submit to the PTO?

17         A.    By that point I had asked Elaine Lee to

18     participate in the preparation of this patent

19     application.  And it would have been during that time

20     period that we would have made this more specific request

21     to the client to gather all prior art you're aware of,

22     such-and-such, for us to submit to the Patent Office.

23         Q.    Who made that request to the client?

24         A.    I don't recall specifically.

110

JAMES P. NAUGHTON

1       Q.      To whom at the client was that request made?

2       A.      I don't recall specifically.

3       Q.      Okay.  Did someone at GoTo submit to you or

4    Ms. Lee a set of prior art in response to that request?

5       A.      I believe so.

6       Q.      Okay.  And was everything that was received

7    from your client then submitted to the PTO?

8       A.      I can't recall if we weeded out anything as,

9    for example, being just clearly irrelevant and not

10   constituting prior art.  I certainly do not recall

11   weeding out anything that arguably was prior art.

12      Q.      Did you weed out any press releases?

13      A.      Not, not to my recollection.

14      Q.      Did you ask for all press releases relating to

15   the precritical date system to be submitted to the PTO?

16      A.      I don't recall if there was a specific request

17   for each and every press release.  I just don't recall

18   that specifically.

19      Q.      Well, was it your intent that all press

20   released relating to the precritical date system should

21   be submitted to the PTO?

22      A.      I can't -- I don't recall that being a

23   specific intent that -- that -- we specifically were

24   interested in making sure that each and every single

111

JAMES P. NAUGHTON

1   press release was submitted to the Patent Office. We

2   certainly, I recall, wanted to be as comprehensive as

3   reasonably possible.

4        On the other hand, in patent matters if

5   something is purely cumulative, you don't need to submit

6   it to the Patent Office. So, for example, if there were

7   two press releases reported in two different places but

8   they said exactly the same thing, you might decide not to

9   submit both of them. I don't recall if that occurred

10  here, but that's an example of where you may not submit

11  every single item of an article or a press release in a

12  particular category.

13       But on the other hand, we certainly intended

14  to be as comprehensive as we possibly could.

15  Q.   In the situation of two press releases saying

16  the same thing where one's gonna get weeded out, would it

17  be your practice to have both of those press releases

18  sent to you or one of the attorneys that you were working

19  with to make that determination?

20  A.   If someone asked me should they send me both,

21  I would say yes, send me both.

22  Q.   And I take it you didn't instruct people to

23  weed out things that were duplicative before they were

24  sent to you?

112

JAMES P. NAUGHTON

1       A.    Not that I recall.

2       Q.    And press releases was certainly one of the

3    categories of information that you were seeking to obtain

4    in order to provide to the PTO, right?

5       A.    I don't recall specifically identifying press

6    releases, but as I recall there were press releases among

7    the information.  So, it was something we were aware of

8    and the client provided to us.  So, it was in the mix.

9       Q.    Okay.  Well, I take it you certainly -- you

10    certainly understood that press releases were a

11    potentially important source of public statements about

12    the features of Overture's precritical date system?

13       A.    I believe I understood that the press releases

14    could be one category of potential prior art.

15       Q.    Did you or Overture retain an outside searcher

16    to conduct a prior art search?

17       A.    Yes.

18       Q.    What was the name of that entity?

19       A.    I'm not sure what the entity may have been

20    called, if even there was an entity associated --

21       Q.    What was the name of the person?

22       A.    Richard Turer, T-u-r-e-r.

23       Q.    When was Mr. Turer retained?

24       A.    I believe that I requested that he perform a

113

JAMES P. NAUGHTON

```
1      patentability search in 1999.

2           Q.    Do you recall when in 1999?

3           A.    Not specifically.

4           Q.    Was it prior to the filing of the application?

5           A.    I can't be sure, but I think it may have been

6      afterwards.

7           Q.    Okay.  Do you recall whether Mr. Turer located

8      any items of potential prior art?

9           A.    I believe he identified some search results.

10          Q.    Can you tell me what any of those search

11     results were?

12          A.    Not by name or patent number.

13          Q.    Okay.  Was everything that Mr. Turer

14     identified disclosed to the PTO?

15          A.    That's my recollection.

16          Q.    Is there someplace a list of those things that

17     Mr. Turer identified?

18          A.    I can't recall if there is such a specific

19     list or not.

20          Q.    Okay.  Did Mr. Turer typically give reports in

21     writing?

22          A.    I believe he did.

23          Q.    Do you have any reason to think that his

24     report in this case would have been discarded?
```

114

JAMES P. NAUGHTON

```
1              "It is therefore an object of the

2       present invention to provide a system and

3       method for enabling promoters to influence a

4       position on a search result list generated by

5       an Internet search engine for a specified set

6       of search terms."

7          MS. THAYER:  It actually says, "search result

8       listing."  I don't know if it --

9          MS. DURIE:  You're right.

10         MS. THAYER:  -- makes a difference or not, but --

11      BY MS. DURIE:

12         Q.    Taking just that paragraph in isolation, did

13      what we have been referring to as the beta system, which

14      was in public use prior to May 28th, 1998, satisfy just

15      the one paragraph that I have read?

16         MS. THAYER:  Objection.  Vague and ambiguous.

17      BY THE WITNESS:

18         A.    I don't think so, to the extent I understand

19      your question.

20      BY MS. DURIE:

21         Q.    Okay.  Did the beta system that was in public

22      use prior to May 28th, 1998 provide a system and method

23      for enabling promoters to influence a position on a

24      search result listing generated by an Internet search
```

125

JAMES P. NAUGHTON

```
1      engine for a specified set of search terms?

2           A.    I don't believe so.

3           Q.    Why not?

4           A.    I don't believe the beta system had this

5      capability.

6           Q.    And which capability specifically are you

7      referring to?

8           A.    I don't believe the beta system provided a

9      system and method for enabling promoters to influence a

10     position on a search result list generated by the beta

11     system, which we can call an Internet search engine, for

12     a specified set of search terms.

13          Q.    Okay.  Did the beta system involve the use of

14     an Internet search engine?

15          A.    I think that's a fair characterization to the

16     extent I understand both the phrase "Internet search

17     engine" and the functionality of the beta system as that

18     phrase is used often colloquially.

19          Q.    Okay.  Did the beta system allow website

20     promoters to bid on the placement of search result

21     listings?

22          A.    Did the beta system allow that?

23          Q.    Yes.

24          A.    No, to my understanding.
```

126

JAMES P. NAUGHTON

1    STATE OF ILLINOIS  )
                        )
2    COUNTY OF DU PAGE  )

3

4         The within and foregoing deposition of the

5    aforementioned witness was taken before MARGARET A.

6    BACHNER, CSR and Notary Public, at the place, date and

7    time aforementioned.

8              There were present during the taking of the

9    deposition the previously named counsel.

10             The said witness was first duly sworn and

11   was then examined upon oral interrogatories; the

12   questions and answers were taken down in shorthand by

13   the undersigned, acting as stenographer and Notary

14   Public; and the within and foregoing is a true, accurate

15   and complete record of all of the questions asked of and

16   answers made by the aforementioned witness, at the time

17   and place hereinabove referred to.

18             The signature of the witness was not waived,

19   and the deposition was submitted, pursuant to Rules 30(e)

20   and 32(d) of the Rules of Civil Procedure for the United

21   States District Court, to the deponent per copy of the

22   attached letter.

23

24

276

1    The undersigned is not interested in the

2    within case, nor of kin or counsel to any of the parties.

3    Witness my official signature and seal as

4    Notary Public in and for DuPage County, Illinois, on this

5    _19th_ day of _April_____, A.D. 2004.

6

7

8

Margaret A. Bachner, CSR, RMR, CRR
9    Illinois CSR No. 84-1481
     230 West Monroe Street
10   Suite 1500
     Chicago, Illinois  60606
11   Phone:  (312) 263-3524

12

13   "OFFICIAL SEAL"
     MARGARET A. BACHNER
14   COMMISSION EXPIRES 07/27/06

15

16

17

18

19

20

21

22

23

24

JAMES P. NAUGHTON

```
 1              IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2                  SAN FRANCISCO DIVISION
 3   OVERTURE SERVICES, INC., a      )
     Delaware Corporation,           )
 4                                   )
                 Plaintiff,          )
 5                                   ) Case No. C 02-01991
       -vs-                          )
 6                                   )
     GOOGLE, INC., a California      )
 7   Corporation,                    )
                                     )
 8                 Defendant.        )
 9
10            I, JAMES P. NAUGHTON, ESQ. Hereby certify that
11   I have read the foregoing transcript of my deposition
12   given at the time and place aforesaid, consisting of
13   Pages 1 to 277, inclusive, and I do again subscribe and
14   make oath that the same is a true, correct, and complete
15   transcript of my deposition so given as aforesaid, and
16   includes changes, if any, made by me.
17
18              _____
                JAMES P. NAUGHTON, ESQ.
19
20   SUBSCRIBED AND SWORN TO before me this
21    17  day of  May            2004.
22
23   _____
          Notary Public
```

> "OFFICIAL SEAL"
> KAREN S. IMUNDO
> Notary Public, State of Illinois
> My Commission Expires 03/03/07

```
24
```

278